UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

TAJE MONBO and DEAFUEH MONBO,

Plaintiffs,

v.

LOTFY NATHAN, RED GAP FILM GROUP,
LLC, VERTICAL ENTERTAINMENT, LLC,
OSCILLOSCOPE PICTURES, INC.,
OSCILLOSCOPE, INC., DANIEL BERGER,
THOMAS SLADEK, OVERBROOK
ENTERTAINMENT, INC., OVERBROOK
ENTERTAINMENT, LLC, SONY PICTURES
ENTERTAINMENT, INC., ERIC BLAIR,
WILLARD CARROLL SMITH, JR., MISSION
FILM, INC., and MARIA MOCHIN *individually
and doing business as* MISSION FILM
PRODUCTIONS,

Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
18-CV-5930 (MKB)

MARGO K. BRODIE, United States District Judge:

I.   Background ................................................................................................ 6
  a.  2001 and 2003 Documentaries ............................................................... 6
  b.  The 2013 Documentary ........................................................................... 7
  c.  The Feature Film ..................................................................................... 10
  d.  Plaintiffs' claims .................................................................................... 11
  e.  The Court's review of the 2001 and 2003 Documentaries ...................... 12
      i.   The 2001 Documentary ..................................................................... 13
      ii.  The 2003 Documentary ..................................................................... 14
  f.  The 2013 Documentary ........................................................................... 15
II.  Discussion ................................................................................................. 17
  a.  Standards of review ................................................................................. 17

i.    Rule 12(b)(6) ........................................................................................ 17

ii.    Rule 56 .................................................................................................. 18

b.    The Joint Moving Defendants' summary judgment motion ............................. 19

i.    The Court dismisses Plaintiff's copyright claims ...................................... 20

1.    Plaintiff's copyright claims against the Joint Moving Defendants are time-barred . 21

2.    Plaintiffs' direct infringement claims fail .................................................. 22

A.    The 2001 Documentary ....................................................................... 26

(1)    Standard test ............................................................................... 26

1.    Setting in Baltimore .............................................................. 27

2.    Characters ............................................................................ 29

3.    Mood and theme ................................................................... 32

4.    Plot similarities .................................................................... 38

5.    Total concept and feel ........................................................... 39

(2)    Fragmented literal similarity test and fair use ................................. 40

1.    Fragmented literal similarity test ............................................. 40

2.    Fair use ............................................................................... 41

a.    Purpose and character of the use ...................................... 43

i.    The use is transformative ........................................ 43

ii.    The use is commercial ............................................ 46

b.    Nature of the copyrighted work ........................................ 48

c.    Amount and substantiality of use ...................................... 50

d.    Effect of use on potential market for copyrighted work ........ 52

B.    The 2003 Documentary ....................................................................... 56

3.    Plaintiffs' contributory and vicarious copyright infringement claims fail .............. 56

ii.    Plaintiffs' right of publicity and unjust enrichment claims are preempted .................. 57

1.    Taje Monbo's right of publicity claim ...................................................... 57

2.    Plaintiffs' unjust enrichment claim .......................................................... 62

A.    Choice of law analysis ........................................................................ 62

B.    Analysis of Plaintiffs' unjust enrichment claim ...................................... 66

iii.    Plaintiffs' Lanham Act claims of trademark infringement, false designation of origin, unfair competition, trademark dilution, and cybersquatting, state law claims of trademark infringement, false advertising, and unfair competition, and claims of contributory and vicarious infringement fail ............................................... 69

1.    Plaintiffs' claims are untimely ................................................................ 71

A.    Plaintiffs' Lanham Act claims based on their registered marks are time-barred 72

B.   Plaintiffs' Lanham Act claims based on common law rights in their marks
are barred by laches ................................................................ 74

C.   Plaintiffs' state law trademark claims are time-barred................... 77

2.   Plaintiffs' Lanham Act claims under 15 U.S.C. § 1125 also fail on the merits........ 78

A.   Trademark infringement, false designation of origin, and unfair competition
claims under the Lanham Act ......................................... 78

(1)   Plaintiffs' claims based on the Joint Moving Defendants' use of the
phrase "12 O'Clock Boys" as a title fail........................ 78

(2)   The Joint Moving Defendants' use of the title card is nominative fair use..... 84

B.   Trademark dilution claim ................................................ 86

C.   Cybersquatting claim ..................................................... 88

3.   Contributory and vicarious trademark infringement under the Lanham Act........... 91

iv.   The Court denies Plaintiffs' application for declaratory judgments ........................... 93

v.   Dismissal under Rule 19 is inappropriate ...................................................... 95

c.   The SPE Defendants' motion to dismiss ......................................................... 101

i.   The court lacks personal jurisdiction over Overbrook Entertainment, Inc.,
Overbrook Entertainment, LLC, and Smith................................................. 102

1.   Specific jurisdiction ...................................................................... 103

2.   General jurisdiction....................................................................... 107

ii.   The Feature Film does not infringe Plaintiffs' copyrights........................................ 110

iii.   Plaintiffs' trademark infringement claims fail ............................................. 112

iv.   Plaintiffs' fail to state an unjust enrichment claim ...................................... 116

d.   Default judgment motions............................................................................ 118

e.   Leave to amend ..................................................................................... 120

III.   Conclusion ................................................................................................ 122

Plaintiffs Taje Monbo and Deafueh Monbo, proceeding pro se,[1] commenced the above-captioned action on October 23, 2018, and filed an Amended Complaint on August 29, 2019, against Defendants Lotfy Nathan, Red Gap Film Group, LLC ("Red Gap"), and Vertical Entertainment, LLC ("Vertical Entertainment") (collectively, the "Nathan Defendants");

[1]  Plaintiffs' counsel withdrew prior to the filing of the Amended Complaint.  (Min. Order dated Apr. 18, 2019, Docket Entry No. 64.)

3

Oscilloscope Pictures, Inc., Oscilloscope Inc. ("Oscilloscope"), Daniel Berger, and Thomas

Sladek (together, the "Oscilloscope Defendants"); Overbrook Entertainment, Inc., Overbrook

Entertainment, LLC, Willard Carroll Smith, Jr., and Sony Pictures Entertainment, Inc.

(collectively, the "SPE Defendants"); and Maria Mochin (both individually and doing business

as Mission Film Productions), Mission Film, Inc., and Eric Blair.  (Compl., Docket Entry No. 1;

Am. Compl., Docket Entry No. 98.)  Plaintiffs allege that the Nathan Defendants' 2013

documentary about an aspiring dirt-bike rider in Baltimore, titled "12 O'Clock Boys" (the "2013

Documentary"), and the SPE Defendants' upcoming feature film based on it (the "Feature Film")

infringe their copyrights on their 2001 film "12 O'Clock Boyz" (the "2001 Documentary") and

2003 sequel "12 O'Clock Boyz: The Paparazzi Edition" (the "2003 Documentary"), featuring the

12 O'Clock Boyz dirt-bike stunt group.  Plaintiffs also claim infringement of Taje Monbo's right

of publicity, unjust enrichment, and violations of the Lanham Act and related Maryland

trademark law and seek declaratory judgments invalidating the Nathan Defendants' copyrights

and declaring that the SPE Defendants' Feature Film infringes their copyrights.  (Am. Compl.)

Currently before the Court are the Nathan and Oscilloscope Defendants' (collectively, the

"Joint Moving Defendants") motion to dismiss the Amended Complaint, which the Court has

converted into a summary judgment motion;[2] Plaintiffs' motion to strike the Oscilloscope

---

[2] (Defs.' Joint Mot. to Dismiss ("Defs.' Joint Mot."), Docket Entry No. 114; Defs.'
Mem. in Supp. of Defs.' Joint Mot. ("Defs.' Joint Mem."), Docket Entry No. 117; Pls.' Opp'n to
Defs.' Joint Mot., Docket Entry No. 139; Pls.' Suppl. Resp. to Defs.' Joint Mot., Docket Entry
No. 141; Defs.' Joint Reply to Pls.' Opp'n and Suppl. Resp. ("Defs.' Joint Reply"), Docket Entry
No. 146.)  Copies of the Joint Moving Defendants' Memorandum of Law are also docketed as a
motion to dismiss, (Docket Entry No. 115), and as a memorandum in support, (Docket Entry No.
120).

Defendants from the joint motion and to strike their counterclaims;[3] the SPE Defendants' motion

to dismiss the Amended Complaint;[4] and Plaintiffs' motions for default judgment against

Mission Film Productions and Mission Film, Inc.[5]  For the reasons set forth below, the Court

denies Plaintiffs' motion to strike, grants the Joint Moving Defendants' summary judgment

motion and the SPE Defendants' motion to dismiss, and denies Plaintiffs' default judgment

motions.[6]

---

[3]  (Pls.' Mot. for Pre-Mot. Conf. to Strike ("Pls.' Mot. to Strike"), Docket Entry No. 205; Oscilloscope Defs.' Resp. to Pls.' Mot. ("Oscilloscope Defs.' Strike Opp'n"), Docket Entry No. 206; Pls.' Rule 42(a) Notice, Docket Entry No. 207; Oscilloscope Defs.' Rule 42(a) Opp'n, Docket Entry No. 208.)

[4]  (SPE Defs.' Mot. to Dismiss ("SPE Defs.' Mot."), Docket Entry No. 147; SPE Defs.' Mem. in Supp. of SPE Defs.' Mot. ("SPE Defs.' Mem."), Docket Entry No. 148; Pls.' Opp'n to SPE Defs.' Mot., Docket Entry No. 142; SPE Defs.' Resp. to Pls.' Opp'n ("SPE Defs.' Reply"), Docket Entry No. 154.)  The SPE Defendants "join in the [Joint Moving Defendants'] motion . . . as applicable," arguing that "[i]f the Court dismisses claims that the 2013 Documentary infringe[s] Plaintiffs' rights, then the claims against the SPE Defendants necessarily fail as well." (SPE Defs.' Mem. 15.)  Because the allegations against the Joint Moving Defendants differ from those against the SPE Defendants, and because the joint motion has been converted into a summary judgment motion, the Court addresses the motions separately.

[5]  (Pls.' Mots. for Entry of Default J. ("Pls.' Default J. Mots."), Docket Entry Nos. 130, 136; Nathan and Oscilloscope Defs.' Mem. in Opp'n to Pls.' Default J. Mots., Docket Entry No. 133; Nathan and Oscilloscope Defs.' Second Mem. in Opp'n to Pls.' Default J. Mots., Docket Entry No. 137.)  Mochin, proceeding pro se, has filed an answer asserting that Mission Film Productions is her trade name, that she has never done business as Mission Film Productions, and that she did not receive proper notice of this lawsuit.  (Mochin Answer, Docket Entry No. 132.)

[6]  The Court does not address in this Memorandum and Order the Oscilloscope Defendants' counterclaims for (1) declaratory judgments of noninfringement, (2) cancellation of Plaintiffs' trademark registration, and (3) tortious interference with Oscilloscope's business relationships, raised in their Amended Answer.  (Am. Answer to Compl., Docket Entry No. 87.)  On March 4, 2019, Plaintiffs notified the Court that Blair had filed for Chapter 7 bankruptcy in the District of Maryland on January 28, 2019.  (Letter dated Mar. 4, 2019, Docket Entry No. 40); Bankr. D. Md., No. 19-11083.  Therefore, the action against him is automatically stayed pursuant to 11 U.S.C. § 362(a).  *See In re Belmonte*, 931 F.3d 147, 149 (2d Cir. 2019) ("By force of 11 U.S.C. § 362, an automatic stay was imposed . . . .").

## I.   Background

Plaintiffs are the owners and creators of the 2001 and 2003 Documentaries, which depict the 12 O'Clock Boyz, a group of urban dirt-bike riders in Baltimore, Maryland.[7]  (Am. Compl. ¶¶ 1, 18–19.)  In 2013, the Joint Moving Defendants, together with Blair, Mission Film, Inc., Mission Film Productions, and Mochin released the allegedly infringing 2013 Documentary, entitled "12 O'Clock Boys."  (*Id.* ¶ 2.)  The SPE Defendants adapted the 2013 Documentary into the Feature Film, which Plaintiffs allege also infringes upon their intellectual property by borrowing "the characters, concepts, feel, and mood" of Plaintiffs' works.[8]  (*Id.* ¶¶ 6, 9.)

### a.   2001 and 2003 Documentaries

For the 2001 Documentary, Taje Monbo "organize[d] a group of highly skilled dirt-bike riders" to participate in a scripted film "that would highlight the exploits of an ostentatious group of dirt-bike riders in Baltimore called 12 O'Clock Boyz."  (*Id.* ¶¶ 36–39.)  Taje Monbo coined the phrase 12 O'Clock Boyz "to describe the way in which riders would elevate the front of their bikes and ride only on the back wheels until their bikes would be perpendicular to the road or in the '12 O'Clock' position."  (*Id.* ¶ 40.)  The 2001 Documentary "sold 50,000 copies in two weeks and revolutionized the Baltimore dirt-bike culture."  (*Id.* ¶ 47.)  Plaintiffs also released the 2003 Documentary, created the 12 O'Clock Boyz logo and associated "visual artworks" in which

---

[7]   As discussed below, the Court relies on the evidence submitted by the parties in evaluating the Joint Moving Defendants' motion for summary judgment.  The Court assumes the truth of the factual allegations in the Amended Complaint for the purposes of the SPE Defendants' motion to dismiss.  In light of Plaintiffs' pro se status, the Court also considers and assumes the truth of the factual allegations in Plaintiffs' opposition to the SPE Defendants' motion.  *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) (finding that district courts may consider factual allegations made by a pro se party in his papers opposing a motion to dismiss).

[8]   The SPE Defendants' film premiered at a film festival in January of 2020, after their motion was filed but before briefing was complete.  (SPE Defs.' Reply 5–6.)

they hold copyrights, and plan to make a third film in the series.  (*Id.* ¶¶ 48, 51–53.)  Plaintiffs

have used the 12 O'Clock Boyz trademarks since 2001 and formally registered the marks in

2016.[9]  (*Id.* ¶¶ 56–60.)

### b.  The 2013 Documentary

Nathan directed the 2013 Documentary, which allegedly infringes on Plaintiffs' 2001 and

2003 Documentaries.  (*Id.* ¶ 69.)  Plaintiffs contend that Nathan's online fundraising campaign

page states that Nathan first conceived of this film in 2008 after meeting a member of the

Wildout Wheelie Boyz, another Baltimore dirt-bike group.[10]  (*Id.* ¶¶ 70–84.)  The 2013

Documentary "tells the story of Pug, a thirteen-year-old child who wants to be a '12 O'Clock

Boy,' just like [he] has repeatedly watched in [the 2001 and 2003 Documentaries]."  (*Id.* ¶ 85.)

Plaintiffs allege that the Joint Moving Defendants took aspects of Plaintiffs' work, including "the

character Pug, clips, the title card, concepts, feel, mood, theme, and approach."  (*Id.* ¶¶ 89, 112.)

Plaintiffs contend that seventeen minutes into the 2013 Documentary, the title card from

their 2001 film appears, followed by "upward of thirty" excerpts from Plaintiffs' films taken

without permission.  (*Id.* ¶¶ 3, 125.)  Taje Monbo appeared as an actor in the 2001 and 2003

Documentaries, was interviewed in "[a]t least two" of the segments that the Joint Moving

Defendants used, and was not compensated for the use of his likeness.  (*Id.* ¶ 5.)  Plaintiffs

contend that the clips and excerpts used were substantial and formed the "heart" of Plaintiffs'

---

[9]  The marks are 12 O'Clock Boyz, Inc.; 12 O'Clock Girlz, Inc.; 12 O'Clock Boyz
Records, LLC; 12 O'Clock Boyz, LLC; and 12 O'Clock Boyz Sports, Inc.  (Am. Compl. ¶ 56;
Trademark Electronic Search System Results ("Trademark Registration"), annexed to Am.
Compl. as Ex. 4, Docket Entry No. 98-3, at 40–43.)

[10]  Other dirt-bike riding groups in Baltimore, such as the Wildout Wheelie Boyz and
Raise It Up, are independent business entities with their own marks.  Like the 12 O'Clock Boyz,
they organize their own events, sell branded merchandise, and maintain social media accounts
for their brands.  (Am. Compl. ¶¶ 61–65.)

film.  (*Id.* ¶ 116.)  In addition, Plaintiffs allege that the Joint Moving Defendants took scenes from "all of the seven chapters found in Plaintiffs' film" and used editing tools to compress scenes that constituted "about 70% or more of" the 2001 Documentary into minutes of footage that then appeared in the 2013 Documentary.[11]  (*Id.* ¶¶ 117–118.)

Plaintiffs contend that there are several similarities between the 2001 and 2003 Documentaries and the 2013 Documentary.  Like the 2001 and 2003 Documentaries, the 2013 Documentary is "docu-fiction," or "documentary mixed with fictional elements," (*id.* at 29), and both are set in Baltimore, (*id.* at 27).  Both the 2001 Documentary and the 2013 Documentary begin with a news clip used "[t]o give [the] feel of a documentary": the 2001 Documentary begins with "actual news footage from a Baltimore TV News segment" about the riders and the 2013 Documentary starts with the voice of "a real radio host."  (*Id.* at 30.)  Both the 2001 Documentary and 2013 Documentary include interviews with people sitting on the front steps of a house, transitions from riding scenes to interview scenes, a clip of the 12 O'Clock Boyz riding down the street, slow-motion shots of the riders, film of the riders from a moving vehicle, and the 12 O'Clock Boyz themselves.  (*Id.* at 31–33.)  Both incorporate the theme of death: the 2001 Documentary pays respect to a rider, "Buck," who passed away during filming, and the 2013 Documentary discusses Pug's brother, Tibba, who passed away during filming of that work.  (*Id.* at 31.)  In addition, "Pug" appeared with his hat turned backwards in the 2001 Documentary and in the 2013 Documentary.  (*Id.* at 28.)  Taje Monbo choreographed scenes of the 12 O'Clock Boyz riding in formation that are similar to a scene used on the DVD cover of the 2013

---

[11]  Plaintiffs do not elaborate on what these "chapters" are, and it is not obvious from the film.

Documentary.  (*Id.* at 35.)  The 2013 Documentary has been shown at film festivals and on cable

networks and is available for streaming and purchase online.  (*Id.* at 46–48.)

     Plaintiffs also contend that more than 100 riders appear in the 2013 Documentary, but

none of them (besides those depicted in excerpts from the 2001 Documentary) are 12 O'Clock

Boyz members.  (*Id.* ¶¶ 66–68.)  In addition, the design of the title of the 2013 Documentary is

similar to Plaintiffs' trademarked 12 O'Clock Boyz logo.  (*Id.* at 35; *id.* ¶¶ 102–104.)  The Joint

Moving Defendants also registered a website under the domain name 12oclockboys.com, where

they promote and sell the 2013 Documentary.  (*Id.* ¶ 107.)  Plaintiffs contend that the Joint

Moving Defendants' actions constitute trademark infringement, unfair competition, and dilution

of the distinctiveness and value of Plaintiffs' mark.  (*Id.* ¶¶ 105–109.)

     On October 20, 2014, Plaintiffs, through counsel, directed Nathan, Oscilloscope, and Red

Gap to cease and desist distribution and public performance of the 2013 Documentary.  (*Id.*

¶ 92.)  Plaintiffs contend that despite this letter, the Joint Moving Defendants have knowingly

continued to violate Plaintiffs' rights.  (*Id.* ¶¶ 93, 110.)

     Plaintiffs contend that Red Gap's copyright registration for the 2013 Documentary is

invalid because it includes "omissions, inaccurate information, and materials misstatements that

if known, would have caused the Register of Copyrights to refuse Red Gap's copyright

application."  (*Id.* ¶ 190.)  Specifically, Plaintiffs allege that Nathan knowingly misrepresented

that the 2013 Documentary "did not include pre-existing materials" from Plaintiffs' 2001 and

2003 Documentaries, and that although the copyright registration "states that Red Gap is the

author" of the 2013 Documentary, Red Gap did not exist when the 2013 Documentary was being

produced and was therefore not entitled to claim authorship under the "work for hire" doctrine.

(*Id.* ¶¶ 177–191.)

In addition, Plaintiffs contend that Vertical Entertainment's copyright registration in six DVDs Nathan produced in 2008 entitled "The Twelve O'Clock Boyz" (the "2008 DVDs") is invalid because Nathan identified Vertical Entertainment as one of the authors of the 2008 DVDs, but Vertical Entertainment did not exist when the 2008 DVDs were produced and therefore is not entitled to claim authorship of them under the "work for hire" doctrine.[12]  (*Id.* ¶¶ 192–201.)

Plaintiffs seek disgorgement of profits attributable to infringement and an order directing the Joint Moving Defendants to cease and desist infringing activity.  (*Id.* ¶ 11.)

### c.   The Feature Film

Plaintiffs contend that the SPE Defendants adapted the Feature Film based on the 2013 Documentary and, as a result, Plaintiffs sent Overbrook Entertainment, LLC and Smith cease-and-desist letters concerning the Feature Film.  (*Id.* ¶¶ 129–131.)  Plaintiffs contend that while the SPE Defendants disclaimed any intent "to produce a motion picture with the title 12 O'Clock Boys," (*id.* ¶ 134), they nevertheless filmed a script in Baltimore with the following plot:

> Mouse wants nothing more than to be a part of the Midnight Clique, a tough group of Baltimore bike riders, who rule the summertime streets. As he navigates the challenges of coming of age in a complicated world, he learns the hard way that the choices you make early on can change your life forever.

(*Id.* ¶ 139.)  Plaintiffs allege that the 2013 Documentary and the Feature Film have several similarities: (1) Pug in the 2013 Documentary, like Mouse in the Feature Film, wants to be a

---

[12]   The 2008 DVDs, which contain footage of riders, are separate from the 2013 Documentary, (*id.* ¶¶ 73, 197), and Plaintiffs do not bring infringement allegations concerning the 2008 DVDs.  Based on the above allegations, the Court understands Plaintiffs to seek a declaratory judgment that the copyright registration for the 2008 DVDs is invalid.  (*Id.* ¶¶ 192–201.)

veterinarian but also wants to join a group of dirt-bike riders; (2) both feature skilled dirt-bike riders; and (3) both are set in Baltimore.  (*Id.* at 43.)

In addition, Plaintiffs contend that the SPE Defendants have used Plaintiffs' mark to promote their work, creating consumer confusion, by (1) creating or authorizing the creation of a Wikipedia page titled "12 O'Clock Boys (upcoming film)"; (2) creating or authorizing the creation of a page on the Internet Movie Database ("IMDB") listing Plaintiffs' mark as the working title for their adaptation; (3) authorizing the promotion of their film using Twitter and other social media platforms; and (4) using the mark "Twelve," a "colorable imitation of Plaintiffs' registered 12 O'Clock Boyz mark," to promote their film.  (*Id.* ¶¶ 148–159.)

### d.   Plaintiffs' claims

Plaintiffs allege that: (1) Defendants have infringed and continue to infringe Plaintiffs' copyrights in the 2001 and 2003 Documentaries; (2) Defendants committed contributory copyright infringement by contributing to the unauthorized preparation of the 2013 Documentary and the Feature Film; (3) Defendants committed vicarious copyright infringement because they had the right and ability to supervise each other in the preparation of the 2013 Documentary and the Feature Film; (4) the Joint Moving Defendants infringed on Taje Monbo's right of publicity by republishing segments that feature him being interviewed in the 2013 Documentary; (5) Defendants committed trademark infringement, false designation of origin, passing off, and unfair competition in violation of the Lanham Act by using Plaintiffs' 12 O'Clock Boyz mark in connection with the 2013 Documentary and the Feature Film; (6) Defendants committed trademark dilution in violation of the Lanham Act by misidentifying and casting riders as "12 O'Clock Boyz" in the 2013 Documentary and the Feature Film; (7) the Joint Moving Defendants committed cybersquatting in violation of the Lanham Act by using a domain name that is

11

confusingly similar to Plaintiffs' mark; and Defendants' actions also constitute (8) trademark infringement in violation of Maryland Code Business Regulation § 1-414 *et seq.*; (9) trademark infringement, false advertising, and unfair competition under the Maryland common law; (10) contributory and vicarious trademark infringement in violation of federal law and the Maryland common law; and (11) unjust enrichment.  (*Id.* ¶¶ 206–270.)

Plaintiffs seek declaratory judgments invalidating the Nathan Defendants' copyright registrations for the 2013 Documentary and for the related 2008 DVDs; a declaratory judgment that the SPE Defendants' Feature Film infringes on their copyright; declaratory and injunctive relief as to the use of the 12 O'Clock Boyz mark; disgorgement of profits; and damages, among other relief.  (*Id.* at 69–79.)

   e.   **The Court's review of the 2001 and 2003 Documentaries**

The Court has reviewed copies of the 2001 and 2003 Documentaries.  (2001 Documentary and 2003 Documentary, annexed to Decl. of Robert Meloni in Supp. of Defs.' Joint Mot. to Dismiss as Ex. A, Docket Entry No. 119.)[13]

---

[13]  Plaintiffs argued that the 2001 and 2003 Documentaries the Nathan Defendants submitted were tampered with because they were submitted on a flash drive but only exist in DVD and VHS form.  (*See, e.g.*, Pls.' Opp'n to Defs.' Joint Mot. 6–7.)  When the Court ordered the Nathan Defendants' to provide the works in DVD format for technical reasons, (Order dated Oct. 22, 2020), Plaintiffs objected to the DVDs the Nathan Defendants provided on the ground that they are "counterfeit."  (Decl. of Deafueh Monbo, Docket Entry No. 167.)  In view of Plaintiffs' objections, the Court ordered Plaintiffs to provide copies of both works in DVD format.  (Order dated Nov. 20, 2020.)  Instead of providing copies, Plaintiffs "again disput[ed] the accuracy of the copies [the Nathan] Defendants submitted" but did "not point to any substantive inaccuracy" in those copies and instead "emphasize[d] a difference in media format between the VHS tape that one [P]laintiff gave a [Nathan Defendant] and the DVDs that [the Nathan] Defendants submitted."  (Order dated Dec. 8, 2020.)  The Court therefore ordered Plaintiffs to provide "a written description of the differences (if any) between the substance of the 2001 and 2003 works and the copies provided by [the Nathan] Defendants."  (*Id.*)  Plaintiffs failed to do so, restating that the DVDs are not true copies due to their format.  Because the Court needed to view the works to decide the pending motions, but could not do so on a motion

### i.   The 2001 Documentary

The 2001 Documentary, which is thirty-four minutes and seven seconds long, begins with a title screen that reads "12 O'CLOCK BOYZ INC. presents THE OFFICIAL 12 O'CLOCK BOYZ," followed by a shot of a man riding a four-wheeler down a city street, front wheels in the air.  (2001 Documentary 00:01–00:40.)  A newscaster's voice plays over the scene, stating "it's the stunt every four-wheeler rider wants to master."  (*Id.* at 00:47–00:51.)  Another voice then states, "[t]hem boys all day, they ride twelve o'clock all day.  Twelve o'clock is when you got the bike straight up in the air," followed by clips of two- and four-wheel vehicles riding on the street with their front wheels up in the air at a steep angle.  (*Id.* at 00:51–00:56.)  A series of dirt-bike riders then appear in short interviews in which they speak about their riding prowess, (*id.* at 2:38, 3:50, 25:52–26:27), and perform stunts shot in grainy black-and-white or color film, (*id.* at 00:57–2:38).

Riders perform on-road stunts that receive extended camera time.  (*Id.* at 4:27–6:33, 7:30, 19:00–20:20, 26:28–31:05.)  One member boasts "we twelve anything," lists a series of vehicles by way of example, and then proceeds to ride around a street on a bicycle with the front wheel removed.  (*Id.* at 7:47–9:48.)  The film also shows a series of crashes.  (*Id.* at 16:40–17:34.)

---

to dismiss given that the DVDs are matters outside the pleadings, and, although integral to the Amended Complaint, Plaintiffs disputed their accuracy and authenticity, the Court provided notice to the parties of its intention to convert the Joint Moving Defendants' motion to dismiss into a motion for summary judgment and granted Plaintiffs sixty days to submit additional evidence in response to the facts asserted by the Joint Moving Defendants or in further support of their claims.  (*See generally* Order dated Apr. 22, 2021, Docket Entry No. 177 (collecting cases)); *Weisshaus v. Port Auth. of N.Y. & N.J.*, 814 F. App'x 643, 646 (2d Cir. 2020) ("[W]here matter[s] outside the pleadings [are] offered and not excluded by the trial court, the motion to dismiss should be converted to a motion for summary judgment." (alteration in original) (quoting *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013))), *cert. denied*, 141 S. Ct. 1061 (Jan. 11, 2021).  Plaintiffs did not submit additional evidence.

Later in the film, viewers learn that the 12 O'Clock Boyz are one of several dirt-bike groups in Baltimore.  One rival group is the Wildout Wheelie Boyz.  A narrator points out an isolated Wildout Wheelie Boyz member riding on a busy street and expresses doubt about his riding abilities, predicting that he will be unable to turn a corner with his bike in the twelve o'clock position.  Others criticize riders from what appears to be a different group, who are not attempting the twelve o'clock or "wheelie" position, by pointing out that they have helmets and leather suits, but "y'all won't wheelie a bike."  (*Id.* at 11:18–11:57, 12:19–12:32.)  As to another group — referred to as "Wing-Worm" — whose members are pictured riding off the road, an interviewee proclaims, "you can't be no twelve o'clock boy [if] you ridin' around in the mud."  (*Id.* at 15:34–15:38.)  Twelve O'Clock Boyz are specifically those who ride on the streets — "control and balance is what mak[es] a Twelve O'Clock Boy totally different."  (*Id.* at 22:50.)  Anyone who shows sufficient riding ability — even members of rival groups — can become a Twelve O'Clock Boy.  (*Id.* at 20:30.)  The 2001 Documentary closes with a tribute to Buck, a departed teammate.  (*Id.* at 31:45.)

The 2001 Documentary consists of a loosely connected series of stunts performed by the 12 O'Clock Boyz, interspersed with statements by members about their riding prowess.  (*Id.* at 17:26–17:40, 21:41:21–50, 22:47–23:35.)  A member of the group explains that people can join and that the lone white member, nicknamed "White Boy," was recruited.  (*Id.* at 21:05–21:16.)

### ii.    The 2003 Documentary

The 2003 Documentary is forty-two minutes and thirty-six seconds long.  (2003 Documentary.)  Like the 2001 Documentary, it begins with dirt-bike stunts, some of which are clips from the 2001 Documentary, (*id.* at 00:53–4:11), and features stunts heavily throughout the remainder of the documentary, (*see, e.g.*, *id.* at 6:12–9:06, 11:07–11:33, 14:11–15:38, 20:16–

14

20:27, 23:54–25:10, 30:42–34:37).  A group of young boys cheer on the 12 O'Clock Boyz, (*id.* at 6:12), and one rider is briefly shown with a child on his bike, (*id.* at 6:30).  Two 12 O'Clock Boyz members, Moe-Town and Pee-Wee, comment on the success of their 2001 Documentary, which they state sold 50,000 copies in two weeks, (*id.* at 4:20–5:23), on the stunts they perform, and on what makes a good rider, (*id.* at 9:07–11:06).  Like the 2001 Documentary, the 2003 Documentary is a collection of scenes, primarily including stunts by and interviews with 12 O'Clock Boyz members.  The 2003 Documentary features an individual named "Pug" in the group of riders and in the credits.  (*Id.* at 21:03.)

### f.   The 2013 Documentary

The Court has reviewed a copy of the 2013 Documentary.  (2013 Documentary, annexed to Decl. of Robert Meloni in Supp. of Defs.' Joint Mot. as Ex. B, Docket Entry No. 119.)  The 2013 Documentary is one hour, fifteen minutes, and twenty seconds long and follows a boy named "Pug" for three years, starting just before his thirteenth birthday, as he aspires to join a group of dirt-bike riders in Baltimore.  (2013 Documentary 4:27–4:32.)

Pug mourns his older brother Tibba, who died from an asthma attack after filming began.  (*Id.* at 22:52–23:08.)  He describes how Tibba often watched the 2001 and 2003 Documentaries with him and explains that those documentaries, which featured "the legends," fueled his aspiration to join the 12 O'Clock Boyz.  (*Id.* at 15:29–16:13.)  The 2013 Documentary then shows clips from the 2001 Documentary, including a scene of the title card from the 2001 Documentary, all together totaling seventy-seven seconds.  (*Id.* at 16:02–16:13, 16:53–16:55.)  A voiceover describes how "you had to have a copy" of the tape when it came out.  (*Id.* at 17:30–17:50.)  The same narrator states that approximately a dozen riders took part in the 2001 and 2003 Documentaries, (*id.* at 17:53–18:03), and today, perhaps a hundred riders are active.  The

narrator attributes the growth of dirt-bike riding to the popularity of the 2001 Documentary, riders' newfound ability to become popular on YouTube, and the work of first-generation dirt-bike riders in popularizing the sport.  (*Id.*)  In addition to those excerpts from the 2001 Documentary, the 2013 Documentary includes more than five minutes of newly filmed footage of dirt-bike riders performing stunts, including in slow motion, both with and without Pug watching.  (*See, e.g.*, *id.* at 2:40–3:24.)

The 2013 Documentary also chronicles Pug's life and aspirations outside dirt-bike riding. It discusses his aspiration to become a veterinarian and the challenges of his academic career, including his suspension from school for fighting and his chronic truancy, which his mother, Coco, is called to court to address at one point.  (*Id.* at 14:33–15:00, 27:14–27:44, 42:14–42:27, 58:28–59:00.)

The 2013 Documentary begins with footage of Pug in a van at night.  A male radio host narrates over the opening shot, harshly criticizing "these little scumbags on these dirt bikes in our downtown."  (*Id.* at 00:15–00:54.)  Pug is shown riding in a car while capturing footage of riders and is also shown watching older boys ride dirt bikes in the park with a look of awe on his face.[14] (*Id.* at 0:55–2:37.)

The 2013 Documentary features Pug's voice throughout in interviews and narration, but also features comments from a rider identified by the name "Superman," who remembers the loss of a promising young dirt-bike rider during a police chase, and a conversation with former Baltimore police officer Lemon, whose actions allegedly contributed to that rider's death.  (*Id.* at 48:38–51:00 (Superman says "Lemon bumped his back wheel, and he went into this black

---

[14]  Near the end of the 2013 Documentary, Pug's bike is stolen.  At the end of the documentary, he is shown stealing back his bike and leaving in the van featured in the opening scene.  (2013 Documentary 59:00–1:00:30, 1:09:15–1:12:01.)

16

sedan").)  At the time the documentary was filmed, police officers were discouraged from

chasing riders, (*id.* at 50:51–50:55), but pursuit and other conflicts with the police nevertheless

occurred, (*id.* at 33:00–33:20, 35:00–35:55).  Officer Lemon notes that riding can be dangerous,

(*id.* at 48:26–48:37 ("I believe that we lose at least ten, fifteen lives each summer, in reference to

dirt bikes."), 51:00–51:07 ("[T]he act of them riding around, doing wheelies at high speed, is a

violent act in itself.")), but Superman describes the dirt-bike groups as "one of the first [and

only] things you see that's positive" in his impoverished Baltimore neighborhood, (*id.* at 13:33–

13:58, 28:59–29:45).  A former rider who knows Pug agrees: "[e]very city has a Pug, every hood

has a Pug.  This is what the ghetto produces."  (*Id.* at 1:08:44–1:09:00.)

## II.  Discussion

### a.  Standards of review

#### i.  Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a court must construe the complaint liberally, "accepting all factual allegations

therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y.

Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145

(2d Cir. 2020).  A complaint must plead "enough facts to state a claim to relief that is plausible

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d

533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir.

2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v.

Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all

allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal

conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

In reviewing a *pro se* complaint, a court must be mindful that a plaintiff's pleadings must

be held "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v.

Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106

(1976)); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even after *Twombly*,

courts "remain obligated to construe a *pro se* complaint liberally").

> ii.   **Rule 56**

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Borley v.

United States*, 22 F.4th 75, 78 (2d Cir. 2021); *Windward Bora, LLC v. Wilmington Sav. Fund

Soc'y*, 982 F.3d 139, 142 (2d Cir. 2020). The court must "constru[e] the evidence in the light

most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible

factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v.

Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football

League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532,

534 (2d Cir. 2006)). The role of the court "is not to resolve disputed questions of fact but only to

determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of

Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d

537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50

(1986). A genuine issue of fact exists when there is sufficient "evidence on which the jury

could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. The "mere

existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The

court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

In reviewing a motion for summary judgment involving a pro se litigant, "special solicitude should be afforded."  *Gachette v. Metro N.-High Bridge*, 722 F. App'x 17, 19 (2d Cir. 2018) (alteration omitted) (quoting *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988)); *see also Essani v. Earley*, No. 13-CV-3424, 2021 WL 1579671, at *4 (E.D.N.Y. Apr. 22, 2021) (quoting *Graham*, 848 F.2d at 344).  The court must "read his pleadings 'liberally and interpret them to raise the strongest arguments that they suggest.'"  *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). However, this "does not relieve [the pro se] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment."  *Id.* (quoting *Jorgensen v. Epic/Sony Recs.*, No. 00-CV-9181, 2002 WL 31119377, at *1 (S.D.N.Y. Sept. 24, 2002)).

### b.   The Joint Moving Defendants' summary judgment motion

The Joint Moving Defendants argue that Plaintiffs' (1) copyright claims (a) fail as a matter of law because the works are not substantially similar, and (b) even if the 2013 and 2001 Documentaries are similar under the alternative "fragmented literal similarity" test, the Joint Moving Defendants' use of excerpts from the 2001 Documentary is fair use, (2) right of publicity and unjust enrichment claims are preempted under the Copyright Act, (3) Lanham Act and state trademark claims fail on the merits, (4) declaratory judgment claims fail as a matter of law,

(5) claims are time-barred "in whole or in significant part," and (6) failure to join necessary

parties requires dismissal pursuant to Rule 19.[15]  (Defs.' Joint Mem.)

### i.  The Court dismisses Plaintiff's copyright claims

Plaintiffs' claims of direct, contributory, and vicarious copyright infringement fail for

several reasons: (1) they are time-barred; (2) Plaintiff's direct copyright infringement claims fail

because the 2013 Documentary is not substantially similar to the 2001 and 2003 Documentaries

under the standard test and, even if the 2013 Documentary is substantially similar to the 2001

Documentary under the fragmented literal similarity test due its use of clips from the 2001

Documentary, Plaintiffs' claim with respect to this documentary is barred by the fair use

---

[15] As noted above, Plaintiffs belatedly moved after the Joint Moving Defendants' motion was fully briefed to strike the Oscilloscope Defendants from the joint motion to dismiss, arguing that the Oscilloscope Defendants previously filed an Answer to the Complaint and therefore waived the right to file a motion to dismiss the Amended Complaint.  (Pls.' Mot. to Strike.)  The Oscilloscope Defendants oppose Plaintiffs' motion on numerous grounds.  (Oscilloscope Defs.' Strike Opp'n.)  The Court denies Plaintiffs' motion in view of Magistrate Judge Steven Tiscione's prior orders in this case granting Plaintiffs leave to file the Amended Complaint, (Min. Entry dated June 4, 2019, Docket Entry No. 78), and directing that "[i]f [the Oscilloscope] Defendants intend to move to dismiss the amended complaint, the parties shall confer and propose a joint briefing schedule," (Min. Entry dated July 3, 2019, Docket Entry No. 92), and this Court's adoption of the parties' briefing schedule, (Order dated Sept. 20, 2019).  In moving to dismiss the Amended Complaint prior to filing an Answer to the Amended Complaint, the Oscilloscope Defendants acted in accordance with Rule 12(b) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.").  Plaintiffs also moved to strike the Oscilloscope Defendants' counterclaims in their Amended Answer, arguing that the Oscilloscope Defendants' Answer to the original Complaint did not contain the counterclaims.  (Pls.' Mot. to Strike 1–2.)  The Court denies this motion as moot.  As the Oscilloscope Defendants explain, they originally filed a suit against Plaintiffs raising the claims that they now raise as counterclaims.  (Oscilloscope Defs.' Strike Opp'n 1.)  Plaintiffs subsequently brought this suit.  Because of the inefficiency of proceeding with two actions involving the same issues, Judge Tiscione allowed the Oscilloscope Defendants to voluntarily dismiss their action and amend their Answer in this action to assert as counterclaims the claims they brought in the other action.  (Min. Entry dated June 4, 2019.)  Subsequently, Plaintiffs requested a pre-motion conference to strike the Oscilloscope Defendants' counterclaims on the same basis they now assert, (Pls.' Mot. for Pre-Mot. Conf., Docket Entry No. 95), and Judge Tiscione denied their request as moot in view of his prior order, (Order dated July 11, 2019, Docket Entry No. 97).

doctrine; and (3) because Plaintiffs' claims of direct infringement fail, their claims of contributory and vicarious infringement also fail.

> **1.   Plaintiff's copyright claims against the Joint Moving Defendants are time-barred**

The Joint Moving Defendants argue that Plaintiffs "cannot recover damages on their copyright infringement claims for any purported infringements occurring prior to October 23, 2015," and their claims are therefore time-barred because they accrued "no later than the October 20, 2014, date of their attorney's letter" to these Defendants.  (Defs.' Joint Mem. 49.)

Plaintiffs argue that "[a]t least some" of their claims are timely because they have alleged continuing infringement and provided "website links and supporting exhibits as proof that the infringement occurred as late as 2019."  (Pls.' Opp'n to Defs.' Joint Mot. 10.)

A copyright infringement claim must be brought "within three years after the claim accrued."  17 U.S.C. § 507(b).  "A copyright claim . . . arises or 'accrue[s]' when an infringing act occurs."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014).  Under the separate-accrual rule, "when a defendant commits successive violations, the statute of limitations runs separately from each violation."  *Id.* at 671.  Therefore, "[e]ach act of [copyright] infringement is a distinct harm giving rise to an independent claim for relief."  *Id.* (quoting *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992)).  However, "[t]his does not mean that when infringements occur during the limitations period recovery may be had for past infringements." *Stone*, 970 F.2d at 1049–50 ("Application of the continuous wrong doctrine generally has been rejected in the infringement context." (collecting cases)).  "[A]n infringement is actionable within three years, and only three years, of its occurrence," and "the infringer is insulated from liability for earlier infringements of the same work."  *Petrella*, 572 U.S. at 671.

Plaintiffs filed this action on October 23, 2018.  (Compl.)  Accordingly, Plaintiffs cannot bring claims for any purported infringement that occurred prior to October 23, 2015, which includes the creation of the 2013 Documentary and its display at film festivals in February of 2013.  (Am. Compl. ¶ 176.)  Although Plaintiffs allege that the Joint Moving Defendants' infringing activities are "continuing to this date," (*id.* ¶¶ 166–171), and argue that they have provided proof of infringing acts that occurred "as late as 2019," (Pls.' Opp'n to Defs.' Joint Mot. 10), and although they are correct that, under the separate-accrual rule, claims based on infringing acts that occurred within the statute of limitations are actionable, their claims against the Joint Moving Defendants are all based on infringing acts that occurred prior to October 23, 2015, and there is no evidence in the record to support their allegations of continuing infringement.  Therefore, Plaintiffs' copyright claims are time-barred.

Even assuming that Plaintiffs' copyright claims against the Joint Moving Defendants were not time barred, for the reasons explained below, the Court nevertheless grants summary judgment to the Joint Moving Defendants as to the copyright claims.

### 2.  Plaintiffs' direct infringement claims fail

The Joint Moving Defendants argue that the 2013 Documentary does not infringe Plaintiffs' copyrights because: (1) it is not substantially similar to Plaintiffs' 2001 and 2003 Documentaries because the works "have vastly different moods, themes, characters and plots"; (2) with respect to the 2001 Documentary, the 2013 Documentary does not include actionable amounts of actual copying under the alternative "fragmented literal similarity" test; and (3) even if the 2013 Documentary is similar to the 2001 Documentary under the alternative test, Plaintiffs' claim relating to the 2001 Documentary is barred by the fair use doctrine.  (Defs.' Joint Mem. 2 (footnote omitted).  *See generally id.* at 16–31.)

22

Plaintiffs dispute the accuracy of the copies of the 2001 and 2003 Documentaries the Nathan Defendants provided to the Court, arguing that the USB drive was "tampered [with] or altered" because those works had never been available in "digital format" and that the works should not have been provided to the Nathan Defendants by Plaintiffs' former counsel, who had an ethical obligation to return client files.  (Pls.' Opp'n to Defs.' Joint Mot. 6–7.)  Plaintiffs do not address the Joint Moving Defendants' arguments regarding the lack of similarities between the substance of the 2001 and 2003 Documentaries compared to the 2013 Documentary.  (*Id.* at 7.)

"To establish a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  "To satisfy the second element, [a claimant] 'must demonstrate that: (1) the [alleged infringer] has actually copied the [claimant's] work; and (2) the copying is illegal because a substantial similarity exists between the [alleged infringer's] work and the protectible elements of [the claimant's work].'"  *Id.* (quoting *Yurman Design, Inc. v. PAJ Inc.*, 262 F.3d 101, 110 (2d Cir. 2001)); *Montgomery v. NBC Television*, 833 F. App'x 361, 363 (2d Cir. 2020) (same), *cert. denied*, 142 S. Ct. 317 (Oct. 4, 2021); *Perry v. Mary Ann Liebert, Inc.*, 765 F. App'x 470, 471 (2d Cir. 2019) (same).[16]

---

[16]  The Joint Moving Defendants do not dispute the validity of Plaintiffs' copyrights or move for summary judgment on the actual-copying prong of the copyright test.  Therefore, for purposes of considering the pending motions, the Court assumes that Plaintiffs have valid copyrights in the 2001 and 2003 Documentaries and that actual copying occurred and focuses on whether they have shown a substantial similarity between their works and the 2013 Documentary.  *See, e.g.*, *de Becdelievre v. Anastasia Musical LLC*, No. 16-CV-9471, 2018 WL 1633769, at *6 (S.D.N.Y. Apr. 2, 2018) ("[The] [d]efendants have not moved for summary judgment on the first prong of the copyright test — actual copying.  As such, the [c]ourt assumes

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same." *Abdin*, 971 F.3d at 66 (alteration in original) (quoting *Yurman Design, Inc.*, 262 F.3d at 111).  In applying this test, courts consider whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Peter F. Gaito Architecture LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (quoting *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)).  "[W]hen faced with works that have both protectable and unprotectable elements, [this] analysis must be more discerning, and [the court] instead must attempt to extract the unprotectable elements from [its] consideration and ask whether the protectable elements, standing alone, are substantially similar." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 53 (2d Cir. 2021) (quoting *Peter F. Gaito Architecture LLC*, 602 F.3d at 66), *cert. granted*, 142 S. Ct. 1412 (Mar. 28, 2022); *Abdin*, 971 F.3d at 66 (same).  However, courts are not required "to dissect [the works] into their separate components[] and compare only those elements which are in themselves copyrightable," *Peter F. Gaito Architecture LLC*, 602 F.3d at 66 (first alteration in original) (quoting *Knitwaves, Inc.*, 71 F.3d at 1003), but instead "are principally guided by comparing the contested [work's] total concept and overall feel with that of the allegedly infringed work," *Montgomery*, 833 F. App'x at 363 (quoting *Peter F. Gaito Architecture LLC*, 602 F.3d at 66).  "In addition, [courts] consider commonalities in the works' 'theme, characters, plot, sequence, pace, and setting.'" *Id.* at 363–64 (quoting *Williams v. Crichton*, 84 F.3d 581,

---

for the purpose of this [summary judgment] motion that actual copying occurred."); *see also Peter F. Gaito Architecture LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) ("Here, for purposes of [the] defendants' motion to dismiss, the district court assumed (as do we) that actual copying by [the] defendants occurred.").

588 (2d Cir. 1996)).  "[T]he appropriate inquiry is whether the copying of protectable elements 'is quantitatively and qualitatively sufficient to support a finding of infringement.'"  *Alexander v. Murdoch*, 502 F. App'x 107, 109 (2d Cir. 2012) (quoting *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999)).  "The qualitative component concerns the copying of expression, rather than ideas," and "[t]he quantitative component generally concerns the amount of copyrighted work that is copied."  *Ringgold v. Black Ent. TV, Inc.*, 126 F.3d 70, 75 (1997).  "[A] court may determine non-infringement as a matter of law[,] . . . either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar."  *Zalewski v. Cicero Builder Dev. Inc.*, 754 F.3d 95, 102 n.12 (second alteration in original) (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983)).

While substantial similarity can exist between works as a whole, it can also take the form of "fragmented literal similarity."  *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 140 (2d Cir. 1998); *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (quoting 3 Nimmer on Copyright § 13.03 [A], at 13-28 to 13-29 (1992)).  Fragmented literal similarity "focuses upon copying of direct quotations or close paraphrasing."  *Rose v. Hewson*, No. 17-CV-1471, 2018 WL 626350, at *4 (S.D.N.Y. Jan. 30, 2018) (quoting *Castle Rock Ent., Inc.*, 150 F.3d at 140).  In evaluating whether a work infringes by reason of fragmented literal similarity, courts "consider[] the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole."  *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 598 (S.D.N.Y. 2013) (quoting *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004)); *see also Nihon Keizai Shimbun, Inc.*, 166 F.3d at 70 (holding that where the articles at issue consisted chiefly of unprotected facts, a "one-paragraph abstract of a six-

25

paragraph article is not substantially similar . . . in a quantitative sense"); *Rose*, 2018 WL 626350, at *4 ("In determining substantial similarity in the qualitative sense, a court considers the nature of the copying: did the defendant copy important features of the plaintiff's protected expression?").

## A.   The 2001 Documentary

Based on its review of the documentary evidence submitted, the Court finds that none of the points of substantial similarity that Plaintiffs assert have merit and that the works as a whole are not substantially similar under the standard test for substantial similarity.  In addition, although the works may be substantially similar under the fragmented literal similarity test, Defendants' use of excerpts from the 2001 Documentary is fair use.

## (1)   Standard test

Plaintiffs contend that the 2013 Documentary and the 2001 Documentary share a similar setting, characters, mood and theme, and plot.  (Am. Compl. 27–33.)

It is a "fundamental axiom of copyright law . . . that 'no author may copyright his ideas or the facts he narrates.'"  *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1074 (2d Cir. 1992) (quoting *Feist Publ'ns, Inc.*, 499 U.S. at 344–45).  "[A]lso unprotectible are scènes à faire," which are "sequences of events which necessarily follow from a common theme," *Abdin*, 971 F.3d at 67 (quoting *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976)), and "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *id.* (quoting *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980)); *Nobile v. Watts*, 747 F. App'x 879, 881 (2d Cir. 2018) (same); *see also Montgomery*, 833 F. App'x at 363 ("One cannot copyright ideas, *scenes a faire*, or stock characters and themes." (footnote omitted) (quoting *Williams*, 84 F.3d at 587–88)); *Montgomery v. Holland*, 408 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) ("Stock characters and basic

character types are not entitled to copyright [protection]." (citing *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999))), *aff'd*, 833 F. App'x 361 (2d Cir. 2020).  For example, "'drunks, prostitutes, vermin and derelict cars,' in a depiction of policemen in the South Bronx, and 'electrified fences, automated tours, dinosaur nurseries, and uniformed workers' in a story about a dinosaur zoo,'" are *scènes à faire* that "are not entitled to copyright protection."  *Hogan*, 48 F. Supp. 2d at 309 (citation omitted) (first citing *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986); and then citing *Williams*, 84 F.3d at 589).  "Only when the similarities are insubstantial or unprotectible will a claim fail."  *Williams*, 84 F.3d at 590; *Green v. Harbach*, No. 17-CV-6984, 2018 WL 3350329, at *5 (S.D.N.Y. July 9, 2018) (finding no substantial similarity where features alleged to be similar were "either abstract ideas, *scenes a faire*, or trivial details insignificant to . . . either of the two works"), *aff'd*, 750 F. App'x 57 (2d Cir. 2019).  However, unprotectible elements may be "selected, coordinated, or arranged" in a way that "render[s] the work as a whole original."  *Feist Publ'ns, Inc.*, 499 U.S. at 358 (holding that the raw data of names, towns, and telephone numbers are not copyrightable, though their arrangement, if sufficiently original, could be); *see also Knitwaves*, 71 F.3d at 1003–04; *Burns v. Imagine Films Ent., Inc.*, No. 92-CV-2438, 2001 WL 34059379, at *14 (W.D.N.Y. Aug. 23, 2001) ("[A]lthough historic events, news stories, and *scenes a faire* are not themselves subject to copyright protection, original use of those elements is protected.").

### 1.   Setting in Baltimore

The Joint Moving Defendants argue that the setting of the 2001 and 2003 Documentaries in Baltimore is not protectible, both because it is a "*scène à faire*" and because it is an "unprotected fact[] of Pug's life."  (Defs.' Joint Mem. 19–20.)

Plaintiffs allege that the 2001 and 2003 Documentaries were filmed at "Reisterstown Road, Druid Hill Park, and Interstate 83" in Baltimore, and that the 2013 Documentary was filmed at the same locations, copying the setting of their films.  (Am. Compl. 27.)

Although the 2013 Documentary was filmed in the same locations in Baltimore where the 2001 Documentary was filmed, this similarity flows from the similar themes of the works, which are both about the 12 O'Clock Boyz who are from Baltimore and ride in those locations, and from the premise of the 2013 Documentary's plot, which follows a local boy's dream to become part of this group.  *See Hoehling*, 618 F.2d at 979 (holding that "settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are non-copyrightable *scènes à faire* (quoting *Alexander v. Haley*, 460 F. Supp. 40, 45 (S.D.N.Y. 1978))); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002) (finding that although works shared setting in night sky, "this setting naturally and necessarily flows from the basic plot premise of a child's journey through the night sky; therefore, the night sky setting constitutes scenes-a-faire and cannot support a finding of substantial similarity"); *Lewinson v. Henry Holt & Co.*, 659 F. Supp. 2d 547, 574 (S.D.N.Y. 2009) ("While both works depict scenes in the United States, Australia, Mexico, Russia, Japan, and China, it is to be expected that two works about children from around the world will share some overlap in the countries they depict. . . . These similarities are therefore unprotectable scènes à faire that naturally flow from the similar themes of the works." (first citing *Cavalier*, 297 F.3d at 824; and then citing *Williams*, 84 F.3d at 589); *see also Montgomery*, 833 F. App'x at 364 ("[T]he settings of cafés, bridges crossing the Seine, apartments, and parties are all *scenes a faire* arising from the works' respective depictions of Americans living in Paris, and therefore are not protectable."); *Alexander v. Murdoch*, No. 10-CV-5613, 2011 WL 2802923, at *7 (S.D.N.Y. July 14, 2011)

("[T]he choice of [a particular city] as a setting is not in itself copyrightable . . . ."), *aff'd*, 502 F. App'x 107 (2d Cir. 2012).

The setting of the 2013 Documentary in these locations in Baltimore is also not protectable because it is a fact in the public domain that the 12 O'Clock Boyz are from Baltimore and ride in these specific locations.  (*See* Tim Hill, *High Noon: Taking It to the Streets with the 12 O'Clock Boyz*, Balt. City Paper, May 21, 2003, annexed to Am. Compl. as Ex. 14, Docket Entry No. 99, at 37–39 [hereinafter Hill] (reporting groups of 12 O'Clock Boyz riding on Reisterstown Road and at Druid Hill Park)); *Walker*, 784 F.2d at 50 (finding that "the notion of telling a police story" about a group of police from the 41st Precinct in the South Bronx "that takes place there cannot be copyrightable" because "the South Bronx and the 41st Precinct are real places known to the public through media reportage"); *see also Feist Pub'ns, Inc.*, 499 U.S. at 347 (explaining that no one may claim originality as to facts "because facts do not owe their origin to an act of authorship").  For the same reason, the presence of dirt-bike riders in the neighborhoods where they ride in real life is not copyrightable, nor is a scene of them riding in a group, as they do regularly, as depicted in Plaintiffs' films and reported in the Baltimore City Paper.  *See* Hill, *supra*, at 37–39; *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 549 (S.D.N.Y. 2013) ("The reporting of facts is not protectable under the Copyright Act since facts are 'never original to an author.'" (quoting *Nihon Keizai Shimbun, Inc.*, 166 F.3d at 70)).

## 2.   Characters

The Joint Moving Defendants argue that (1) Plaintiffs concede that the characters are different because Plaintiffs allege that the Joint Moving Defendants "cast[ed]" dirt-bike riders from different dirt-bike groups to play 12 O'Clock Boys; (2) dirt-bike stunt riders are stock

characters in works involving dirt-bike riding and the stunts they perform are unprotected *scènes à faire*; (3) the character named "Pug" who briefly appears in the 2001 Documentary is a completely different person from the Pug who is the protagonist of the 2013 Documentary, the "coincidence of their shared name does not establish substantial similarity," and Plaintiffs' Pug is "a stock character with totally fungible characteristics of a dirt bike rider"; and (4) the 2013 Documentary's focus on Pug, Coco, and Tibba, who do not appear in the 2001 and 2003 Documentaries, "highlights the character differences in the works and their dissimilar plots, themes and moods." (Defs.' Joint Mem. 20–21.)

Plaintiffs allege that they "casted a specific group of highly-skilled dirt-bike riders who Plaintiff Taje called the 12 O'Clock Boyz" and the 2013 Documentary "casted Wildout Wheelie Boyz, Raise It Up, and random dirt-bike riders" to play the 12 O'Clock Boys, copying Plaintiffs' characters. (Am. Compl. 27.) In addition, Plaintiffs allege that "Pug is the name of one of the riders who appears" in the 2001 Documentary "wearing his hat turned backwards," and the 2013 Documentary copied the character Pug, featuring him in a press note and on a DVD cover with his hat turned backwards. (*Id.* at 28.)

As the Joint Moving Defendants argue, the dirt-bike riders in the 2001 Documentary, including Pug, are "stock characters" and thus are not protectible elements of Plaintiffs' work. The concept of skilled riders who perform daring stunts is not novel, and this basic character type flows from the theme of a work about dirt-bike riding. In addition, the characters are not developed beyond these attributes. *See Williams*, 84 F.3d at 589 ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." (quoting *Nichols v. Universal Pictures Corp.*, 45 F.3d 119, 121 (2d Cir. 1930))). This is particularly significant with respect to Pug. The Pug of the 2013 Documentary

30

shares no similarities with the Pug who appears in the 2001 Documentary other than having the same name and wearing a backwards baseball cap. However, the fact that these characters share the same name does not by itself make them substantially similar. *See* 37 C.F.R. § 202.1(a) (stating that "[w]ords and short phrases such as names, titles, and slogans" are "not subject to copyright"); *Eng v. Captain Blue Hen Comics*, No. 14-CV-3631, 2014 WL 2941280, at *3 (E.D.N.Y. June 30, 2014) ("[The] plaintiff cannot claim ownership of statutory copyright for the name Terrordactyl." (citations omitted)); *Sinicola v. Warner Bros.*, 948 F. Supp. 1176, 1187 (E.D.N.Y. 1996) ("A review of the remaining characters in the two works reveals no significant similarity of protectible expression, notwithstanding a number of identical or similar character names."); *see also Hogan*, 48 F. Supp. 2d at 311 ("The most obvious similarity between the main characters in *Matchsticks* and *Dhampire* is that they share the same name: Nicholas Gaunt. This shared trait, by itself, is insufficient to establish substantial similarity between the characters."). In addition, the fact that the characters both at times appear wearing a backwards hat is a "generic and generalized character trait[]" that is not protectible. *Abdin*, 971 F.3d at 67 (noting that traits "such as race, gender, and hair color are not protectible"). More significantly, in the 2001 Documentary, "Pug" is shown as an adult member of the 12 O'Clock Boyz, but the audience does not hear about how he joined, and his character is not explored or developed. By contrast, Pug is the main character and protagonist of the 2013 Documentary, who faces conflict between the desire to join a group of dirt-bike riders and his aspiration to become a veterinarian, and the viewer sees Pug grow up over the course of several years, as his ambition remains constant and his riding skills develop. *See id.* at 70 ("Most significantly, while it is unclear what role the nameless tardigrade plays in the [v]ideogame, Ripper is very much at the center of a fully-developed story in . . . the first season of *Discovery*."); *see also Williams*, 84 F.3d at 589

31

("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." (quoting *Nichols*, 45 F.3d at 121)).  The Pug portrayed in the 2001 Documentary and the Pug portrayed in the 2013 Documentary are therefore characters with a different "total concept and feel."[17]  *See Walker*, 784 F.2d at 50 (noting that, to determine whether a film misappropriates characters, courts "must consider the 'totality of [their] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel of figures'" in the plaintiff's work (quoting *Warner Bros. Inc.*, 720 F.2d at 241)); *Silberstein v. John Does 1-10*, 242 F. App'x 720, 722 (2d Cir. 2007) (describing the different portrayals of two similarly named cartoon animals and finding no infringement because the "total concept and feel" of the characters differed (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001))).

### 3.   Mood and theme

The Joint Moving Defendants argue that (1) the 2013 Documentary is not "docu-fiction" as Plaintiffs define it because it does not include fictional elements, and even if it were, this film style is not protectible because Plaintiffs do not have an exclusive right to make a "docu-fiction" about dirt-bike riding; (2) although both works begin with news clips, Plaintiffs do not have the exclusive right to make a documentary about dirt biking in Baltimore that begins with a news clip, "[f]acts and events are not protected by copyright," and the clips are "very different in tone and purpose"; (3) Plaintiffs' use of techniques such as filming in slow-motion and from a

---

[17]   The Pug of the 2013 Documentary is not the same individual as the Pug in the 2001 and 2003 Documentaries, as the Pug in Plaintiffs' 2001 and 2003 works is an adult member of the 12 O'Clock Boyz and the Pug who appears in the 2013 Documentary is a young adolescent. However, it is unclear whether the Pug in the 2013 Documentary is meant to be the same person or based on the Pug in the Plaintiffs' works.  Because the Pug in Plaintiffs' works is not developed, these characters do not appear to share any similarities apart from their names, backwards hat, and an interest in the 12 O'Clock Boyz.

moving truck are not novel and "a film's technique is not a protectible element under copyright law"; (4) the fact that both works include interviews with people on the front steps of a house is "non-actionable" and Plaintiffs do not allege "that the interviewers, interviewees or interview subjects are the same"; (5) transitions between riding scenes and interviews on the street and at people's homes are *scènes à faire* and the interviews "are expressed differently, including their topics and their purpose"; (6) although both works pay respect to someone who passed away, "there is no literal or conceptual similarity" in how they do so and "countless . . . works pay respect to real and/or fictional characters that passed"; and (7) the use of a clip showing the 12 O'Clock Boyz riding down the street labeled "The 12 O'Clock Boys" is a "*de minimis*" use that does not constitute infringement.  (Defs.' Joint Mem. 21–24.)

Plaintiff alleges that the 2013 Documentary copies the mood and theme of the 2001 Documentary because (1) the 2013 Documentary "intentionally mimics" Plaintiffs' "artistic expression" by "mixing real events with fictional scenes to support [its] narrative," placing it in the "docu-fiction" genre, and filming in an "[a]mateur [d]ocu-fiction style"; (2) both works begin with a media clip used "[t]o give [the] feel of a documentary"; (3) the 2013 Documentary copies the 2001 Documentary's techniques of filming stunts in slow-motion and from a moving vehicle; (4) both works include interviews with people in front of their homes; (5) both works include transitions from riding scenes to interview scenes; (6) the 2001 Documentary pays respect to a rider named "Buck" who passed away during filming and the 2013 Documentary pays respect to Pug's brother Tibba who passed away during filming; and (7) the 2013 Documentary took a clip from the 2001 Documentary showing the 12 O'Clock Boyz riding down the street and labeled the riders "The 12 O'Clock Boys."  (Am. Compl. 29–33.)

The aspects of the 2013 and 2001 Documentaries' mood and theme that Plaintiffs highlight are not substantially similar.  Although Plaintiffs describe the "mood and theme" of their 2001 Documentary as "docu-fiction"[18] and allege that the 2013 Documentary "mimics [their] artistic expression" in that it is also docu-fiction, Plaintiffs do not have the exclusive right to make docu-fiction about dirt-bike riders, as methods of story-telling are not protectible.  *See* 17 U.S.C. § 102(b) (excluding from copyright protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work"); 37 C.F.R. § 202.1 (including as an example of works not subject to copyright "[i]deas, plans, methods, systems, or devices, as distinguished from the particular manner in which they are expressed or described"); *cf. Rose*, 2018 WL 626350, at *5 ("Neither a style of playing [the guitar] nor the skill with which a composition is played are protectable, only the composition itself may be protected if it is sufficiently original."); *Churchill Livingstone, Inc. v. Williams & Wilkins*, 949 F. Supp. 1045, 1051–52 (S.D.N.Y. 1996) ("[T]he choice of a type of illustration is not copyrightable.  Thus, the decision to illustrate heart formation with a 3-D drawing is not copyrightable.").

---

[18]  Plaintiffs define "docu-fiction" as "the cinematographic combination of documentary and fiction," or:

> a film genre which attempts to capture reality such as it is . . . and which simultaneously introduces unreal elements or fictional situations in narrative in order to strengthen the representation of reality.  More precisely, it is a documentary mixed with fictional elements, in real time, filmed when the events take place, and in which the main character or characters[] — often portrayed by non-professional or amateur actors — are essentially playing themselves, or slightly fictionalized versions of themselves, in a fictionalized scenario.

(Am. Compl. 29.)

In addition, the use of a news clip or voiceover at the beginning of a film to give it a "documentary feel" is not original to Plaintiffs' work but rather a common feature of documentaries.  Similarly, Plaintiffs' use of techniques such as filming stunts in slow-motion and from a moving vehicle is not original to Plaintiffs' work, as these are common procedures for filming action sequences.  *See Fulks v. Knowles-Carter*, 207 F. Supp. 3d 274, 284 (S.D.N.Y. 2016) ("To the extent that the shots are filmed in a 'fast sweeping motion,' this is a common feature among cinema not original to [the plaintiff's work].");  *see also Stouffer v. Nat'l Geographic Partners, LLC*, 400 F. Supp. 3d 1161, 1189 (D. Colo. 2019) (finding that voice-over narration, narration beginning immediately after introductory credits, and "slow-motion action shot[s]," among other things, are "so standard as to essentially define the nature documentary genre" and are "unprotectable 'ideas[s]' or 'procedure[s]'" (alterations in original) (quoting 17 U.S.C. § 102(b)));  *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546 (S.D.N.Y. 2007) ("[M]aterial or themes commonly repeated in a certain genre are not protectible by copyright . . . ." (quoting *Am. Direct Mktg. v. Azad Int'l, Inc.*, 783 F. Supp. 84, 95 (E.D.N.Y. 1992))).  In addition, although both works open with a media excerpt, this similarity is insubstantial, as the works use different types of clips and incorporate them in different ways, setting different tones for the films.  While the 2001 Documentary includes a short news segment in which a news anchor, using an approving tone of voice, states that the wheelie is "the stunt every four-wheeler rider wants to master," (2001 Documentary 00:47–00:51), the 2013 Documentary opens with a long audio clip in which a man — likely a radio host or caller — expresses his disapproval of "these little scumbags on these dirt bikes in our downtown," (2013 Documentary 00:15–00:54).  The media clip in the opening of the 2001 Documentary portrays the riders in a neutral to positive fashion, with a tone of appreciation for the challenging stunts

35

they perform, while the voiceover used in the 2013 Documentary takes a distinctly negative tone, unambiguously incorporating the speaker's personal views into the discussion.  *See Walker*, 784 F.2d at 50–51 (finding similarity "that in both works a person is thrown off a roof" to be "insubstantial" because "the differences between the two incidents are overwhelming"); *Warner Bros. Inc.*, 720 F.2d at 243 ("Superman performs his superhuman feats with skill, verve, and dash, clearly the master of his own destiny.  Hinkley is perplexed by the superhuman powers his costume confers and uses them in a bumbling, comical fashion.").

Further, the 2013 Documentary's interviews with Pug, Coco, and others in the neighborhood in which they live, as well as its transitions between dirt-bike riding and interviews in the neighborhood, are *scènes à faire* that follow naturally from the documentary format and theme of the work.  *See Walker*, 784 F.2d at 50 ("Foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction."); *Williams*, 84 F.3d at 589 ("While both the *Dinosaur World* books and the *Jurassic Park* works share a setting of a dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers, these settings are classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo.").  In addition, while both works incorporate interviews, they are conducted in different settings, and the 2013 Documentary covers a broader range of topics.  In the 2001 Documentary, most interviews are done in a bare, intimate setting on a brown couch and some interviews in both works are conducted near a group of riders.  In the 2013 Documentary, interviews occur throughout Pug's house or on the street outside and the interviewer asks about broader social questions in addition to asking about the mechanics of dirt-bike stunts.

36

In addition, although the 2013 Documentary uses a clip from the 2001 Documentary in which the 12 O'Clock Boyz are depicted riding down the street, this brief, single clip does not appear to be qualitatively or quantitatively significant to the 2001 Documentary, and is therefore a *de minimis* similarity that does not, on its own, give rise to a finding of substantial similarity between the works.  *See Warner Bros., Inc.*, 720 F.2d at 242 (explaining that, under the "*de minimis* rule," the "literal copying of a small and usually insignificant portion of the plaintiff's work" may be permissible); *Nobile v. Watts*, 747 F. App'x at 882 ("[T]he brief exchange in each work in which a stranger compares the baby's nose to one parent's nose . . . reflects a *de minimis* similarity that does not, on its own, give rise to a finding of substantial similarity between the works.").

In addition, although both works pay respect to someone who passed away during filming, this common theme is too general to be protectible, and, as the Joint Moving Defendants argue, there are no similarities in the works' treatment of this theme — the 2001 Documentary acknowledges Buck's passing in a simple overlay at the end of the film, while the 2013 Documentary incorporates Tibba's death as part of its plot and explores its impact on Pug.  *See, e.g.*, *Castro v. Cusack*, No. 15-CV-6714, 2019 WL 3385218, at *9 (E.D.N.Y. July 16, 2019) (finding that the fact that the "universal theme[]" of "loss" appeared in both works "speaks to their general nature and does not, without more, give rise to an inference of copyright infringement"); *see also Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1079 (9th Cir. 2006) ("Although both works explore themes of death, relationships, and sex, they do so in very different ways."), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020); *DuMond v. Reilly*, No. 19-CV-8922, 2021 WL 733311, at *15 (C.D. Cal. Jan.

14, 2021) (noting that books covered similar topics, including death, "in different ways," and "these general topics are clearly not protectable by copyright").

### 4.    Plot similarities

Defendants argue that "Plaintiffs' short plot summary is contradicted by the works themselves," and "the alleged similarity is, at most, of a general plot idea and, as such, is not protected under the Copyright Act."  (Defs.' Joint Mem. 24.)

Plaintiffs allege that the 2013 Documentary's plot, in which "Pug, a young boy, wants to join the 12 O'Clock Boys," is similar to the 2001 Documentary's plot, in which "elite young riders (including 'Pug') showcase their talents and discuss what it takes for other young men to join the 12 O'Clock Boyz."  (Am. Compl. 33.)

Although, at the most general level, the 2013 and 2001 Documentaries both tell a story about the 12 O'Clock Boyz, the "differences in plot . . . far outweigh this general likeness." *Walker*, 784 F.2d at 49.  The 2001 Documentary is a series of clips of 12 O'Clock Boyz riders displaying their riding prowess, while the 2013 Documentary is a narrative work with a more somber tone, developed characters, and a complex storyline, which focuses on the challenges faced by one young man who aspires to be a rider.  *Id.* (finding plot and dramatic structure of works dissimilar even though "[b]oth recount the experiences of policemen battling the hostile environment of the 41st Precinct" because the defendant's work is "intensely plotted" with "several vivid, interrelated story lines," while the plaintiff's work "is organized topically, moves anecdotally from one event to another, and has little plot or story line," and "achieves its effects by creating a depressing, somewhat impressionistic, cumulative portrait of life in a crime-ridden and poverty-stricken urban neighborhood").  In addition, to the extent the 2001 Documentary's plot can be understood as one of inspiring young riders to join the 12 O'Clock Boyz, this is a

general plot idea that is not protectible beyond the manner in which it is expressed in the film. *See Nichols*, 45 F.2d at 122 (stating that plaintiffs have no "monopoly" over a general plot idea).

### 5.   Total concept and feel

In addition to the fact that the elements of the documentaries singled out by Plaintiffs do not constitute substantial similarities, the total concept and feel of the 2013 Documentary is not substantially similar to the 2001 Documentary when the works are viewed as a whole.  As discussed above, Plaintiffs' work is an approximately half-hour-long series of loosely connected clips of 12 O'Clock Boyz riders displaying their riding prowess.  The 2013 Documentary, which is nearly twice as long, is a narrative work with a different tone, characters who are developed and whose relationships are explored, and a clearer and more complex plot that follows Pug across several years as he faces challenges and pursues his goal to become a rider.  Thus, the "total concept and feel" of the works are different, *Peter F. Gaito Architecture LLC*, 602 F.3d at 67 (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 102 (2d Cir. 1999)), and the "average lay observer" would not "recognize the alleged copy as having been appropriated from the copyrighted work," *id.* (citing *Knitwaves, Inc.*, 71 F.3d at 1001) (holding that the plaintiff's design for an architectural project was not infringed by another firm's re-design of the project, which contained some similar elements); *see also Webb v. Stallone*, 555 F. App'x 31, 33 (2d Cir. 2014) (holding that a movie was not substantially similar to a screenplay, although they shared some common elements, because one was a "gunfire-riddled 'pure action' flick," while the other was "a trickery-based true caper": "a tale of a cunning heist with sensitive and human characters," so their "total concept and feel" were "quite distinct").

Accordingly, the 2013 Documentary is not substantially similar to the 2001 Documentary under the standard test for substantial similarity.

**(2)     Fragmented literal similarity test and fair use**

The Joint Moving Defendants argue that the 2013 Documentary is not substantially similar to the 2001 Documentary under the alternative fragmented literal similarity test and that, even if it is, their use of clips from the 2001 Documentary is fair use.  (Defs.' Joint Mem. 25–31.)

Plaintiffs have not responded to the Joint Moving Defendants' arguments that the works are not substantially similar under the fragmented literal similarity test but argue that the Joint Moving Defendants' use of clips from the 2001 Documentary is not fair use.  (Pls.' Opp'n to Defs.' Joint Mot. 14–17.)

**1.     Fragmented literal similarity test**

The Joint Moving Defendants argue that the works are not substantially similar under the fragmented literal similarity test because (1) the use of eighty-seven seconds of Plaintiffs' 2001 Documentary, edited into seventy-five seconds that appear in the 2013 Documentary, amounts to 3.7% of the 2001 Documentary and is not quantitatively significant, and (2) the fragments of work used are not qualitatively significant when viewed in the context of the 2001 Documentary because none of them are "an inherently or especially important component" of the 2001 Documentary.  (Defs.' Joint Mem. 25–26.)

Based on the evidence, Plaintiffs may be able to demonstrate substantial similarity with respect to the 2001 Documentary under a fragmented literal similarity theory.  Plaintiffs argue that the clips taken from the 2001 Documentary are impermissible copying.  While the quantity of the borrowed material is small, its qualitative importance to Plaintiffs' work is a triable issue of fact.  Because the 2001 Documentary consists of a series of vignettes, with a focus on the skill shown by 12 O'Clock Boyz members, it is difficult to determine to what extent any particular exhibition of that skill is qualitatively important to the work as a whole.  The Joint Moving

Defendants used clips of several seconds that amount to under four percent of the 2001 Documentary, but the clips used constitute a selection of stunts and two short interview segments, and the 2001 Documentary is a series of stunts and interview segments.  In effect, the Joint Moving Defendants captured over a minute of highlights of the 2001 Documentary. However, as explained below, the Joint Moving Defendants' use of these clips is fair use.

## 2.   Fair use

The Joint Moving Defendants argue that the 2013 Documentary's use of short clips from the 2001 Documentary constitutes fair use because those clips "were included to enable viewers . . . to understand the impact of the legends appearing in the 2001 [Documentary] on Pug's desire to mimic their feats, join the 12 O'Clock Boyz and to recapture Pug's treasured memory of watching it with his brother, Tibba." (Defs.' Joint Mem. 26–28.)  The Joint Moving Defendants also argue that Plaintiffs' attempt to limit the fair use defense to authors is unsupported by the Copyright Act and by precedent. (Defs.' Joint Reply 5–6.)

Plaintiffs argue that Red Gap is not the true author of the 2013 Documentary, and until the author is determined, it cannot raise fair use as a defense. (Pls.' Opp'n to Defs.' Joint Mot. 14–15.)  As to the merits of the defense, Plaintiffs argue that fair use does not apply because the Joint Moving Defendants' use is not transformative, their use was commercial in nature and affected Plaintiffs' market for their works, the 2001 Documentary was creative in nature and therefore the doctrine should be read narrowly, and the portion used was substantial both in kind and in quality. (*Id.* at 16–17.)

"The law has long recognized that 'some opportunity for fair use of copyrighted materials' is necessary to promote progress in science and art." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). "The doctrine of fair use, derived from common

41

law, is now codified in the Copyright Act of 1976, Pub. L. No. 94–553, 90 Stat. 2541." *Id.*

(citing 17 U.S.C. § 107).  Section 107 of the Copyright Act provides:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include — (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit education purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *see Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 660 (2d Cir. 2018)

(quoting 17 U.S.C. § 107).

"The determination of fair use is a mixed question of fact and law," *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014), and an "open-ended and context-sensitive inquiry," *Marano v. Metro. Museum of Art*, 844 F. App'x 436, 439 (2d Cir. 2021) (quoting *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006)).  "[A]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the facts set forth in § 107 weighs in their favor."  *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 81 (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004)).  "Courts most frequently address a proffered fair use defense at summary judgment."  *TCA Television Corp.*, 839 F.3d at 178; *see also Blanch*, 467 F.3d at 250 (explaining that courts may resolve fair use questions at summary judgment if there are no genuine issues of fact).  In some cases, "the only two pieces of evidence needed to decide the question of fair use [are] the original version" and the allegedly infringing work.  *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013) (quoting *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012)); *see also Brownmark Films, LLC*, 682 F.3d

at 690 (affirming grant of motion to dismiss after considering whether an episode of an animated television show presented a parody of a viral internet video and viewing the two works side-by-side). Authorship is irrelevant to this test. *See* 17 U.S.C. § 107 (listing the factors relevant to a fair-use determination, authorship not among them, and singling out the making of "multiple copies for classroom use" as a potential fair use); *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 293 (S.D.N.Y. 2013) (holding that digital scanning of books, rendering them searchable and displaying "snippets" to the general searching public, was permissible fair use), *aff'd sub nom. Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015).

The Court evaluates below the statutory fair use factors to determine whether the Joint Moving Defendants' use of the 2001 Documentary was fair.

### a.   Purpose and character of the use

In examining the purpose and character of an alleged fair use, courts examine whether the use is transformative and whether it is commercial.

### i.  The use is transformative

The Joint Moving Defendants argue that their use of the work is transformative because excerpts of the 2001 Documentary are played "to understand the impact of the legends appearing in the 2001 [Documentary] on Pug's desire to mimic their feats, join the 12 O'Clock Boyz and to recapture Pug's treasured memory of watching it with his brother, Tibba." (Defs.' Joint Mem. 28.)

Plaintiffs argue that, in evaluating whether the Joint Moving Defendants' use is transformative, the Court must ask whether "the material taken from the original work [has] been transformed by adding new expression or meaning" and whether "value [was] added to the original by creating new information, new aesthetics, new insights, and [new] understandings." (Pls.' Opp'n to Defs.' Joint Mot. 16.) Plaintiffs argue that the first factor favors them because

43

the Joint Moving Defendants' film "did not add new information, new aesthetics, new insights, or understanding of the 12 O'Clock Boyz, nor did it add new expression or meaning." (*Id.* at 17.)

In examining the first factor, "the primary inquiry is whether the use 'communicates something new and different from the original or [otherwise] expands its utility,' that is, whether the use is 'transformative.'" *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) (quoting *Google, Inc.*, 804 F.3d at 214). "To be transformative, a use must 'do[] something more than repackage or republish the original copyrighted work'; it must 'add something new, with a further purpose or different character, altering the first with new expression, meaning or message.'" *Id.* (alteration in original) (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014)); *see also Goldsmith*, 11 F.4th at 37 (stating that transformative means that the use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message," rather than merely "supersed[ing] the objects of the original creation" (quoting *Campbell*, 510 U.S. at 579)); *Capitol Recs., LLC*, 910 F.3d at 660 (same). Although "[u]ses that criticize, comment on, provide information about, or provide new uses for the copyrighted work are those likely to be deemed transformative," *Capitol Recs., LLC*, 910 F.3d at 660–61, the Second Circuit has noted that an infringing work does not need to comment on the original work in order to satisfy this first factor, *see Yang v. Mic Network Inc.*, No. 20-4097, 2022 WL 906513, at *2 (2d Cir. Mar. 29, 2022) ("[T]he law imposes no requirement that a work comment on the original . . . in order to be considered transformative." (quoting *Cariou*, 714 F.3d at 706)); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006) (stating that a defendant is "not required to discuss the artistic merits" of the original image to satisfy the first factor); *see also*

*Cariou*, 714 F.3d at 706 ("The law imposes no requirement that a work comment on the original or its author in order to be considered transformative, and a secondary work may constitute a fair use even if it serves some purpose other than those . . . identified in the preamble to the statute."). Some courts within the Second Circuit have found that "[d]ocumentaries and biographies fall within the protected categories of § 107, and are entitled to the presumption [that] the use of the copyrighted material is fair." *Hofheinz v. Discovery Commc'ns, Inc.*, No. 00-CV-3802, 2001 WL 1111970, at *3 (S.D.N.Y. Sept. 20, 2001); *Monster Commc'ns, Inc. v. Turner Broad. Sys.*, 935 F. Supp. 490, 493–94 (S.D.N.Y. 1996) (finding that a documentary about Muhammad Ali was a biography and therefore "undeniably constitute[d] a combination of comment, criticism, scholarship and research, all of which enjoy favored status under § 107" (quoting *Arica Inst., Inc. v. Palmer*, 761 F. Supp. 1056, 1067 (S.D.N.Y. 1991), *aff'd*, 970 F.2d 1067 (2d Cir. 1992))).

The Joint Moving Defendants' use of Plaintiffs' work is transformative because the work plays a new role in the narrative of the 2013 Documentary. The 2013 Documentary includes clips from the 2001 Documentary placed in a new context as a locally popular tape that had inspired Pug to start dirt-bike riding and uses it to explain the personal significance to Pug because he had watched it, along with the 2003 Documentary, many times with Tibba. *See Hofheinz v. A & E Television Networks*, 146 F. Supp. 2d 442, 446 (S.D.N.Y. 2001) (holding that twenty seconds of footage from an actor's early film career in a biography was fair use because "the use made of this particular footage . . . to show the kind of motion picture roles [the actor] took when he first began his acting career and what his perception of them was, served to enrich the biography" and thus was transformative); *see also Bill Graham Archives*, 448 F.3d at 609 ("[C]ourts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment

45

that require incorporation of original source material for optimum treatment of their subjects.");
*Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 347 (S.D.N.Y. 2020) (holding
that reproduction of basketball players' tattoos in a video game featuring the players was a
transformative use, because, in part, "[t]he [t]attoos were originally created as a means for the
[p]layers to express themselves through body art" and were reproduced in the game so that the
characters depicted in the video game would be identifiable as specific real-life players).  The
transformative nature of the Joint Moving Defendants' use in the 2013 Documentary provides
significant support for a finding of fair use.

### ii. The use is commercial

The Joint Moving Defendants argue that "Plaintiffs' labeling the [2013] Documentary
'commercial in nature' ignore[s] the *insignificance* of this designation as a fair use factor," and
that courts in this Circuit have found that documentaries and biographies enjoy a "special fair use
status."  (Defs.' Joint Reply 6 n.5.)

Plaintiffs argue that the 2013 Documentary "is of a commercial nature," weighing against
a finding of fair use.  (Pls.' Opp'n to Defs.' Joint Mot. 16.)

The first statutory factor also requires courts to consider "whether copyrighted materials
are used for a commercial purpose or for a nonprofit educational purpose, the former tending 'to
weigh against a finding of fair use.'"  *TCA Television Corp.*, 839 F.3d at 183 (quoting *Campbell*,
510 U.S. at 585); *Brown v. Netflix, Inc.*, 462 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) (same), *aff'd*,
855 F. App'x 61 (2d Cir. 2021).  "[W]hile the mere fact of a commercial motivation rarely
pushes the first factor determination against fair use . . . in some circumstances a commercial
motive will weigh against a finding of fair use under Factor One."  *Capitol Recs., LLC*, 910 F.3d
at 661.  "The less a use provides transformative value, the more its commercialism will weigh
against a finding of fair use."  *Id.* (citing *Campbell*, 510 U.S. at 579); *see Fox News Network,*

*LLC*, 883 F.3d at 178 ("[T]he [less] transformative the new work, the [more] will be the significance of other factors . . . ." (second and third alterations in original) (quoting *Campbell*, 510 U.S. at 579)); *Cariou*, 714 F.3d at 708 (same).

The 2013 Documentary is offered for commercial sale, and therefore has a commercial purpose. *See Arrow Prods., LTD. v. Weinstein Co.*, 44 F. Supp. 3d 359, 370 (S.D.N.Y. 2014) (stating that the use of an allegedly infringing work has a commercial purpose "when a secondary user makes unauthorized use of copyrighted material to gain a profit through copying the original work"). However, as the Joint Moving Defendants argue, commercial uses are not presumptively unfair. *See Cariou*, 714 F.3d at 708 ("[A]s the Supreme Court has recognized, Congress 'could not have intended' a rule that commercial uses are presumptively unfair." (citing *Campbell*, 510 U.S. at 584)). In addition, Plaintiffs do not allege that the excerpts from the 2001 Documentary are used to advertise the 2013 Documentary, or that they are otherwise used to enhance the commercial value of the 2013 Documentary. *See Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 348 (noting in a fair use analysis that while the video game challenged by plaintiffs was commercial, the tattoos depicted in that game "are indistinguishable during gameplay and they do not feature in any of the game's marketing materials"). The commercial purpose of this use therefore weighs only slightly against a finding of fair use.

Considering the transformative nature of the use of Plaintiffs' work in the 2013 Documentary together with the commercial purpose of the 2013 Documentary, the first factor favors a finding of fair use. *See Cariou*, 714 F.3d at 708 ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." (quoting *Campbell*, 510 U.S. at 579)).

b.   **Nature of the copyrighted work**

The Joint Moving Defendants argue that this factor "is rarely found to be determinative." (Defs.' Joint Mem. 29 n.37 (quoting *Davis v. Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001)).) They also argue that Plaintiffs' work is "factual and informational," and therefore "greater leeway is allowed in favor of finding fair use." (*Id.*)

Plaintiffs argue that because their work is creative in nature, not informational, this factor weighs against fair use. (Pls.' Opp'n to Defs.' Joint Mot. 16.)

"The second factor directs courts to consider the nature of the copyrighted work . . . ." *Goldsmith*, 11 F.4th at 45; *Capitol Recs., LLC*, 910 F.3d at 661 (same) (quoting 17 U.S.C. § 107(2)). This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Lombardo v. Dr. Seuss Enters., L.P.*, 729 F. App'x 131, 132–33 (2d Cir. 2018) (quoting *Campbell*, 510 U.S. at 586); *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 87 (same). The Supreme Court has observed that "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Google, Inc.*, 804 F.3d at 220 (alteration in original) (quoting *Harper & Row Publishers, Inc.*, 471 U.S. at 563). "Courts have sometimes speculated that this might mean that a finding of fair use is more favored when the copying is of factual works than when copying is from works of fiction." *Id.*; *see Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 353 (S.D.N.Y. 2017) ("[C]opyrighted works that are creative or fictional are closer to the core of copyright, and therefore less likely to be fairly used, than works that are factual in nature." (citing *Campbell*, 510 U.S. at 586)). However, "[t]he mere fact that the original is a factual work . . . should not

48

imply that others may freely copy it," as "authors of factual works, like authors of fiction, should be entitled to copyright protection of their protected expression." *Google, Inc.*, 804 F.3d at 220.

At the second step of the fair use analysis, courts consider "(1) whether [the work] is 'expressive or creative . . . or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower.'" *Goldsmith*, 11 F.4th at 45 (quoting *Blanch*, 467 F.3d at 256). This second factor "has rarely played a significant role in the determination of a fair use dispute." *Estate of Smith v. Graham*, 799 F. App'x 36, 38 (2d Cir. 2020) (quoting *Google, Inc.*, 804 F.3d at 220). "[T]his factor 'may be of limited usefulness where the creative work is being used for a transformative purpose . . . .'" *Goldsmith*, 11 F.4th at 45 (quoting *Bill Graham Archives*, 448 F.3d at 612); *Capitol Recs., LLC*, 910 F.3d at 661–62 ("Except to the extent that the nature of the copyrighted work is necessarily considered alongside the character and purpose of the secondary use in deciding whether the secondary use has a transformative purpose, it rarely, by itself, furnishes any substantial reasoning for favoring or disfavoring fair use.").

This factor has little relative importance. *See Capitol Recs., LLC*, 910 F.3d at 661–62. The weight of this factor is even more limited in this case because the Joint Moving Defendants reproduced excerpts from the 2001 Documentary to illustrate their effect on Pug, rather than because the stunts captured in the 2001 Documentary add creative value to the 2013 Documentary. As the excerpts play, Pug recalls the effect that watching the tape of "the legends" had on him. The Joint Moving Defendants' original filmography captures many similar stunts, at greater length, in higher-definition film. *Bill Graham Archives*, 448 F.3d at 612–13 ("[E]ven though [the plaintiff's] images are creative works, which are a core concern of

49

copyright protection, the second factor has limited weight in our analysis because the purpose of [the defendant's] use was to emphasize the images' historical rather than creative value.").

Plaintiffs concede that the 2001 Documentary was previously published. *Cariou*, 714 F.3d at 709–10. Although the Joint Moving Defendants argue otherwise, the Court finds that the 2001 Documentary is expressive in nature, *see id.*, and therefore enjoys more protection than a strictly factual work. However, this factor has limited weight in light of the transformative nature of the Joint Moving Defendants' use. *See id.* at 710 (holding "this factor 'may be of limited usefulness where,' as here, 'the creative work of art is being used for a transformative purpose'" (quoting *Bill Graham Archives*, 448 F.3d at 612)).

### c.   Amount and substantiality of use

The Joint Moving Defendants argue that "the reconfigured aggregate of the fractional [e]xcerpts included in the [2013] Documentary are approximately [eighty-seven] seconds of the [thirty-four-minute-and-forty-seven-second-long] 2001 [Documentary]," which "constitutes only [four percent] of the 2001 [Documentary] — not '[seventy percent] or more,' as Plaintiffs allege." (Defs.' Joint Mem. 29.) In addition, the Joint Moving Defendants argue that "with the exception of the approximately [twelve] seconds in which the *12 O'Clock Boyz* title appears . . . , every other excerpt is limited to just [two to four] seconds of longer segments . . . of dirt bike stunts or interviews," which is "the amount required to establish a visual of the 'legends' from the tape and/or stunts they performed to provide context for why the 2001 [Documentary] had an impact upon Pug and contributed to his desire to follow in their footsteps." (*Id.* at 29–30.) The Joint Moving Defendants also argue that "[s]uch limited use, 'to conjure up at least enough of the original' to accomplish the transformative purpose in the [2013] Documentary, is a permissible fair use," (*id.* at 30 (quoting *Campbell*, 510 U.S. at 588)), and "once the

transformative purpose was achieved, no further use of any content from Plaintiffs' [works] occurred over the remaining [fifty-seven] minutes of the [2013] Documentary," (*id.* at 30 n.39).

Plaintiff argues that this factor "clearly cuts" in their favor because the Joint Moving Defendants "took upward of [thirty] clips and the movie title card from Plaintiffs' film[,] which is substantial," and the Joint Moving Defendants "took the heart of Plaintiffs['] film." (Pls.' Opp'n to Defs.' Joint Mot. 16.)

"The third factor considers 'the amount and substantiality of the portion [of the original] used in relation to the copyrighted work as a whole.'" *Goldsmith*, 11 F.4th at 45 (quoting 17 U.S.C. § 107(3)); *Capitol Recs., LLC*, 910 F.3d at 662 (same). In assessing this factor, a court must consider the "amount of copyrighted material *made available to the public* rather than the amount of material *used by the copier*." *Fox News Network, LLC*, 883 F.3d at 179; *see Bill Graham Archives*, 448 F.3d at 613 ("We review this factor with reference to the copyrighted work, not the infringing work."). In addition, a court must "consider not only 'the quantity of the [copyrighted] materials used' but also 'their quality and importance' in relation to the original work." *Goldsmith*, 11 F.4th at 45–46 (quoting *TCA Television Corp.*, 839 F.3d at 185). "[A] finding of fair use is more likely when small amounts, or less important passages, are copied than when the copying is extensive, or encompasses the most important parts of the original." *Google, Inc.*, 804 F.3d at 221. However, "[c]omplete unchanged copying has repeatedly been found justified as fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner that it did not offer a competing substitute for the original." *Id.* (collecting cases). The Second Circuit has held that copying an entire copyrighted work neither cuts in favor of fair use nor against fair use. *See Goldsmith*, 11 F.4th at 46 ("[W]e have rejected the proposition that this factor necessarily favors the copyright

holder even where the secondary user has copied the primary work *in toto* in service of a legitimate secondary purpose." (first citing *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 89–90; and then citing *Rogers v. Koons*, 960 F.2d 301, 310–11 (2d Cir. 1992))); *see also Bill Graham Archives*, 448 F.3d at 613.  Instead, courts should "take into account that the extent of permissible copying varies with the purpose and character of the use." *Cariou*, 714 F.3d at 710 (citing *Bill Graham Archives*, 448 F.3d at 613).  "The ultimate question under this factor is whether 'the quantity and value of the materials used are reasonable in relation to the purpose of the copying.'" *Goldsmith*, 11 F.4th at 46 (quoting *Campbell*, 510 U.S. at 586).

As the Joint Moving Defendants argue, the portion of the work taken is quantitatively small.  The excerpted portions are representative portions of the original but do not provide a substitute for the 2001 Documentary.  *See Google, Inc.*, 804 F.3d at 221–22.  The "purpose and character of the use" is to provide a sample of the tape that Pug describes and which motivated him to begin dirt-bike riding.  *Campbell*, 51 U.S. at 586–87.  Therefore, this factor favors the Joint Moving Defendants.

### d.   Effect of use on potential market for copyrighted work

The Joint Moving Defendants argue that the amount taken from the 2001 Documentary is not substantial because they used short excerpts adding up to four percent of the work and that this limited use is "to 'conjure up' at least enough of the original" to make their creative point. (Defs.' Joint Mem. 29–30 (citing *Campbell*, 510 U.S. at 588).)  The Joint Moving Defendants also argue that the 2013 Documentary will not affect the market for the 2001 Documentary because their use of excerpts from the 2001 Documentary is transformative, and the 2013 Documentary "is not a market substitute for . . . a mostly chock-filled, random mix of daredevil stunts and boisterous commentary."  (*Id.* at 30–31.)

52

Plaintiffs argue that the Joint Moving Defendants "took the heart of Plaintiffs['] film," including more than thirty clips and the title card, amounting to substantial use.  (Pls.' Opp'n to Defs.' Joint Mot. 16.)  In addition, Plaintiffs argue that the market for the 2001 and 2003 Documentaries has been reduced by the perception that Plaintiffs consented to use of the excerpts in the 2013 Documentary.  (*Id.*)

"The final statutory factor considers the effect of the use upon the potential market for or value of the copyrighted work . . . ."  *Estate of Smith*, 799 F. App'x at 39 (quoting *TCA Television Corp.*, 839 F.3d at 186 (quoting 17 U.S.C. § 107(4))).  This factor asks "whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work."  *Goldsmith*, 11 F.4th at 48 (quoting *Bill Graham Archives*, 448 F.3d at 613).  "Analysis of this factor requires [courts] to balance the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied."  *Id.* (quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991)).  "In assessing market harm, [courts] ask not whether the second work would *damage* the market for the first . . . but whether it *usurps* the market for the first by offering a competing substitute."  *Id.* (citing *Bill Graham Archives*, 448 F.3d at 614); *see also Campbell*, 510 U.S. at 592 (stating that the role of a court is to "distinguish between '[b]iting criticism [that merely] suppresses demand [and] copyright infringement[, which] usurps it'" (alterations in original) (quoting *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir. 1986))).

In weighing the fourth statutory fair use factor, a court must consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original."  *Campbell*, 510 U.S. at

590; *Fox News Network, LLC*, 883 F.3d at 179.  "This analysis embraces both the primary

market for the work and any derivative markets that exist or that its author might reasonably

license others to develop . . . ."  *Goldsmith*, 11 F.4th at 48; *TCA Television Corp.*, 839 F.3d at

186; *see Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 (2d Cir. 1994) ("[T]he impact

on potential licensing revenues is a proper subject for consideration in assessing the fourth

factor.").  In assessing harm posed to a licensing market, a court should focus on the "challenged

use's 'impact on potential licensing revenues for traditional, reasonable, or likely to be

developed markets'" and "not on possible lost licensing fees from [the] defendants' challenged

use."  *TCA Television Corp.*, 839 F.3d at 186 (quoting *Am. Geophysical Union*, 60 F.3d at 929

n.17).  In effect, the fourth factor "focuses on whether the copy brings to the marketplace a

competing substitute for the original . . . so as to deprive the rights holder of significant revenues

because of the likelihood that potential purchasers may opt to acquire the copy in preference to

the original."  *Fox News Network, LLC*, 883 F.3d at 179 (quoting *Google, Inc.*, 804 F.3d at 223).

"[T]he first and fourth factors are closely linked, as 'the more the copying is done to achieve a

purpose that differs from the purpose of the original, the less likely it is that the copy will serve

as a satisfactory substitute for the original.'"  *Goldsmith*, 11 F.4th at 48 (quoting *Google, Inc.*,

804 F.3d at 223).

      Plaintiffs do not argue that they would be recouping additional licensing fees if not for

the Joint Moving Defendants' use.  *Cf. Castle Rock Ent., Inc.*, 150 F.3d at 145 (holding that the

fourth factor favored the plaintiffs, who produced a television show, because the defendants, who

had produced a trivia book about that show, had entered a market that the plaintiffs might wish to

enter).  Instead, Plaintiffs appear to argue that individuals who might have purchased one of their

documentaries are less likely to do so because the 2013 Documentary implies that Plaintiffs are

associated with the Joint Moving Defendants.  However, the 2013 Documentary is not a market substitute for Plaintiffs' works because the Joint Moving Defendants have made a transformative use of a small portion of the 2001 Documentary.  *See Monster Commc'ns, Inc.*, 935 F. Supp. at 495 (finding that "the uses [of historical footage] in [one film] are too few, too short, and too small in relation to the whole" to undercut the market for the other).  Therefore, it is unlikely that potential purchasers of the 2001 Documentary would opt to acquire the 2013 Documentary in order to see the seventy-five seconds of clips from the 2001 Documentary in preference to the original.  *See Google, Inc.*, 804 F.3d at 223 (explaining that this fair use factor examines "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original"); *Brown*, 462 F. Supp. 3d at 464 ("As the [f]ilm's use [of a clip from a song] is transformative of the original, the potential market . . . would not 'opt to acquire the copy' of a limited eight seconds of the [s]ong 'in preference to the original.'  Put another way, it is unlikely that [potential purchasers] would purchase copies of the film . . . so that they could hear the excerpt of the [s]ong in the [f]ilm." (citation omitted) (quoting *Google, Inc.*, 804 F.3d at 223)).  Therefore, this factor favors the Joint Moving Defendants.  *Cf. Capitol Records, LLC*, 910 F.3d at 662 (holding that the fourth factor favored the plaintiffs because the defendant made digital reproductions of the plaintiffs' audio files and online books "for the purpose of resale in competition with the [p]laintiffs' market," and explaining that "the more the objective of the secondary use differs from that of the original, the less likely it will supplant the commercial market for the original").

In summary, the first factor strongly favors the Joint Moving Defendants because their use is transformative.  The second, which is of relatively little importance, favors Plaintiffs.  The

third and fourth factors favor the Joint Moving Defendants.  Accordingly, the Joint Moving Defendants' use of clips from the 2001 Documentary constitutes fair use, and the Court grants them summary judgment on Plaintiffs' copyright infringement claim with respect to this documentary.

## B.   The 2003 Documentary

Plaintiffs allege that the 2013 Documentary is substantially similar to the 2003 Documentary for many, but not all, of the same reasons they allege it is similar to the 2001 Documentary — namely, because they share the same setting, the Joint Moving Defendants casted other dirt-bike riders to play the 12 O'Clock Boys, both films are docu-fiction, and both films use slow-motion.  For the same reasons the 2013 Documentary is not substantially similar to the 2001 Documentary, it is also not substantially similar to the 2003 Documentary with respect to these elements or in its total concept and feel.  In addition, because Plaintiffs do not allege that the 2013 Documentary contains actual clips from the 2003 Documentary, the fragmented literal similarity test does not apply.  Accordingly, the Court grants the Joint Moving Defendants summary judgment on Plaintiffs' copyright infringement claim with respect to the 2003 documentary.

### 3.   Plaintiffs' contributory and vicarious copyright infringement claims fail

Because Plaintiffs' claims of direct copyright infringement fail as to both the 2001 and 2003 Documentaries, their claims of contributory and vicarious copyright infringement also fail. *See, e.g.*, *Cariou*, 714 F.3d at 712 (finding that because there was no direct infringement, the defendants could not be held liable "as a vicarious or contributory infringer"); *Brown*, 462 F. Supp. 3d at 464 (noting "there can be no contributory, vicarious, or inducement of infringement where no direct infringement exists" and finding that these claims failed where the defendants

56

Case 1:18-cv-05930-MKB-ST   Document 209   Filed 08/26/22   Page 57 of 123 PageID #: 2733

had "successfully invoked the doctrine of fair use" (first citing *Cariou*, 714 F.3d at 712; and then citing *Fox News Network, LLC*, 883 F.3d at 176)).

### ii. Plaintiffs' right of publicity and unjust enrichment claims are preempted

For the reasons explained below, the Court finds that Plaintiffs' right of publicity and unjust enrichment claims are preempted.

### 1. Taje Monbo's right of publicity claim

The Joint Moving Defendants argue that Taje Monbo, who is featured in an interview excerpted in the 2013 Documentary, cannot argue that his right of publicity was violated by their use of excerpts of his interview because (1) his claim is based on material that is subject to copyright, and therefore his claim is preempted under the Copyright Act, and (2) his claim is untimely. (Defs.' Joint Mem. 31–32, 50–51.)

Plaintiffs, who are domiciled in Maryland, (Am. Compl. ¶¶ 18–19), argue that their state law right of publicity claim for the use of Taje Monbo's image, voice, words, and dirt-bike performance is not preempted because it is "not equivalent" to a claim that could be brought under the Copyright Act. (Pls.' Opp'n to Defs.' Joint Mot. 17; Pls.' Suppl. Opp'n 5.)

Maryland courts recognize the tort of appropriation of another's name or likeness if (1) the appropriation is more than "incidental" and (2) the likeness is being appropriated for a commercial purpose.[19] *See Lawrence v. A.S. Abell Co.*, 229 Md. 697, 702–03 (1984); *see LTVN*

---

[19] Because Plaintiffs are domiciled in Maryland, Maryland law applies to Plaintiffs' right of publicity claims. Federal courts in New York apply New York choice-of-law rules in adjudicating state law claims. *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (per curiam) ("A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989))). New York courts apply the law of the plaintiff's domicile in evaluating right of publicity claims. *Rogers*, 875 F.2d at 1002 (citing *Se. Bank, N.A. v. Lawrence*, 66 N.Y.2d 910, 912 (1985)); *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 442–43 (S.D.N.Y. 2021).

*Holdings, LLC v. Odeh*, No. 09-CV-789, 2010 WL 2612690, at \*6 (D. Md. June 25, 2010) ("Under Maryland law, the right of privacy is invaded when an individual's name or likeness is appropriated for the use or benefit of another." (citing *Lawrence*, 229 Md. at 702)).

"The Copyright Act exclusively governs a claim when (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 48 (2d Cir. 2019) (citing *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004)). "The first prong of this test is called the 'subject matter requirement,' and the second prong is called the 'general scope requirement.'" *Briarpatch Ltd., L.P.*, 373 F.3d at 305 (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997)).

The subject matter requirement "looks at the work that would be affected by the plaintiff's exercise of a state-created right, and requires (as an essential element of preemption) that the work 'come within the subject matter of copyright as specified by sections 102 and 103.'" *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at \*2 (2d Cir. Mar. 10, 2022) (quoting *Jackson v. Roberts (In re Jackson)*, 972 F.3d 25, 42 (2d Cir. 2020)). This requirement "is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Briarpatch Ltd., L.P.*, 373 F.3d at 305 (citing *Nat'l Basketball Ass'n*, 105 F.3d at 848–49). "In analyzing this prong, [courts] focus on 'the gravamen of the claim and the allegations supporting it.'" *ML Genius Holdings LLC*, 2022 WL 710744, at \*2 (quoting *In re Jackson*, 972 F.3d at 47).

58

The general scope requirement "looks at the right being asserted (over a work that comes within the 'subject matter of copyright') and requires (for preemption to apply) that the right be 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.'" *Id.* at *3 (quoting *In re Jackson*, 972 F.3d at 43). "Section 106 of the Copyright Act 'defines the "exclusive rights" granted by the federal copyright law, which consist of the rights "to do and to authorize" the reproduction, distribution, performance, and display of a work, and the creation of derivative works based on a work.'" *Id.* (quoting *In re Jackson*, 972 F.3d at 43). "The general scope requirement is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Id.* (quoting *Briarpatch Ltd., L.P.*, 373 F.3d at 305); *Universal Instruments Corp.*, 924 F.3d at 48 ("A state law right is equivalent to one of the exclusive rights of copyright if it may be abridged by an act which, in and of itself, would infringe one of the exclusive rights." (quoting *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 430 (2d Cir. 2012))). "For preemption to apply, 'the state law claim must involve acts of reproduction, adaptation, performance, distribution or display.'" *ML Genius Holdings LLC*, 2022 WL 710744, at *3 (quoting *Briarpatch Ltd., L.P.*, 373 F.3d at 305). "Even if a claim otherwise satisfies the general scope requirement, a claim is not preempted if it 'include[s] any extra elements that make it qualitatively different from a copyright infringement claim.'" *Id.* (alteration in original) (quoting *Briarpatch Ltd., L.P.*, 373 F.3d at 305); *Universal Instruments Corp.*, 924 F.3d at 48 ("'But if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action,' there is no preemption." (quoting *Forest Park Pictures*, 683 F.3d at 430)). "To determine whether a claim is qualitatively different, [courts] look at what the plaintiff seeks to

protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *ML Genius Holdings LLC*, 2022 WL 710744, at *3 (quoting *Briarpatch Ltd., L.P.*, 373 F.3d at 306); *Universal Instruments Corp.*, 924 F.3d at 48 (same). "The 'extra element' inquiry is not 'mechanical'" and instead "requires a holistic evaluation of the nature of the rights sought to be enforced, and a determination whether the state law action is qualitatively different from a copyright infringement claim." *ML Genius Holdings LLC*, 2022 WL 710744, at *3 (quoting *In re Jackson*, 972 F.3d at 44 n.17). The Second Circuit has directed courts to "take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright claim." *Briarpatch Ltd., L.P.*, 373 F.3d at 306.

The Second Circuit recently analyzed when right of publicity claims are impliedly or expressly preempted under the Copyright Act. *See In re Jackson*, 972 F.3d at 25. Preemption is less favored for right of publicity claims that "vindicate substantial state law interests," such as those regulating false endorsements or otherwise protecting consumers. *Id.* at 37–38. Where there is no such interest, and where a right of publicity suit, "although ostensibly an invocation of [a plaintiff's] rights to control the use of his persona in publicity, is so devoid of the substantial interests protected by that right" that it is best described as a "thinly disguised" copyright claim, *id.* at 41, such a suit is impliedly preempted, *id.* at 42. A right of publicity claim is expressly preempted when the work at issue falls within the Copyright Act and the common-law right asserted is equivalent to a right asserted under the Copyright Act. *Id.* at 43 (citing 17 U.S.C § 301(a)). If a claim primarily concerns a person's likeness, that fact weighs against preemption, but if the claim instead arises from "the reproduction or dissemination of the work itself (as opposed to the persona of the plaintiff)," it is more likely to be preempted. *Id.* at 49–50 ("[T]he more the defendant has used a copyrighted work for its own value, as opposed to using it to

60

exploit the depicted plaintiff's identity, the more the right of publicity claim brought by someone depicted in the work can be considered a disguised effort to control the dissemination of the work.").

Taje Monbo's right of publicity claim is both expressly and impliedly preempted because it concerns the Joint Moving Defendants' use of his image.  The challenged excerpts, which feature portions of an interview with Taje Monbo, are also covered by Plaintiffs' copyright claim.  The Joint Moving Defendants' excerpt of the 2001 Documentary does not imply that Taje Monbo endorsed the 2013 Documentary.  In the context of the film, it is unambiguous that he is depicted in an excerpt from the 2001 Documentary.  *Id.* at 37 ("Some right of publicity claims, for example, target false endorsements, and as such vindicate a state's interest in 'prevent[ing] consumer confusion.'" (alteration in original) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 154 (1989))).  The excerpts are neither derogatory nor an invasion of Taje Monbo's privacy, and he does not allege that they are.  The use of his image at issue appears in the 2001 Documentary, which Taje Monbo himself chose to film and sell.  *See id.* at 39 (finding that "[the defendant's] reference to [a recording artist's musical] persona [is not] in any way derogatory, or an invasion of [the artist's] privacy" where [the defendant] released a mixtape that included a sample of [the artist's] work).  As the Second Circuit warned in *Jackson*, this use of a right of publicity suit "could substantially interfere with the utilization of a work in ways explicitly permitted by the Copyright Act, such as for uses that would qualify as fair use under 17 U.S.C. § 107."  *Id.* at 40.

Accordingly, this claim "does not seek to vindicate any substantial state interests distinct from those furthered by the copyright law" and is preempted by the Copyright Act.  *See id.* at 39.

### 2.   Plaintiffs' unjust enrichment claim

The Joint Moving Defendants argue that Plaintiffs' common law unjust enrichment claim is preempted by the Copyright Act because it is based on their use of his image without his knowledge or consent, which are the same facts underlying Plaintiffs' copyright claim.  (Defs.' Joint Mem. 32–33.)

Plaintiffs allege that the Joint Moving Defendants have been unjustly enriched by their "use of Plaintiffs' movie title card, clips and excerpts and the character named Pug," as well as by their use of Taje Monbo's "image, actual voice, words and performance" in the 2013 Documentary.  (Am. Compl. ¶ 261.)  In response to the Joint Moving Defendants' preemption arguments, Plaintiffs do not make any arguments regarding their allegations that the Joint Moving Defendants were unjustly enriched by their "use of Plaintiffs' movie title card, clips and excerpts and the character named Pug," (*id.*), but argue that their unjust enrichment claim is not preempted because the Joint Moving Defendants used and profited from using Taje Monbo's "image, actual voice, words, and performance" without requesting permission or compensating him.[20]  (Pls.' Opp'n to Defs.' Joint Mot. 17–18.)

### A.   Choice of law analysis

"Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures*, 683 F.3d at 433 (citing *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219,

---

[20]   Plaintiffs cite a Florida state court case for the elements of an unjust enrichment claim, (Pls.' Opp'n to Defs.' Joint Mot. 17–18), but do not state whether the law of Maryland, New York, or another state applies.  Nor do Plaintiffs explain why they cite to Florida law.  (*See id.*)  The Joint Moving Defendants cite cases decided by courts in this district on the basis of New York law but also do not explain why New York law applies.  (*See* Defs.' Joint Mot. 32–33.)

223 (1993)); *see also Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021). Where there is no conflict, "a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citations omitted).

In the context of unjust enrichment claims, courts applying New York choice of law rules must decide whether to apply the "center of gravity" choice of law test, which applies to contract disputes, or the "interest analysis" test, which applies to tort disputes. *Gerloff v. Hostetter Schneider Realty*, No. 12-CV-9404, 2014 WL 1099814, at *9 (S.D.N.Y. Mar. 20, 2014) ("Whether to apply to an unjust enrichment claim New York's 'center of gravity' choice of law test applicable to contract disputes, or New York's 'interest analysis' test applicable to tort claims, is a matter of debate among district courts in this Circuit."). In deciding which test to apply, courts look to whether a claim sounds in tort or in contract. *See id.* (holding that "a claim for unjust enrichment based on a fraudulent conveyance by a debtor . . . sound[ed] more in fraud than in contract," and therefore the interest analysis test was appropriate); *Grund v. Del. Charter Guar. & Tr. Co.*, 788 F. Supp. 2d 226, 251 n.9 (S.D.N.Y. 2011) ("Under New York choice of law rules, interest analysis is applied to claims arising in equity, such as claims for unjust enrichment.").[21]

---

[21] In New York, the center of gravity test looks to where a contract was made and intended to be performed. *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018). Because there is no contract at issue in this case, the center of gravity test does not apply. However, the center of gravity test weighs similar factors to the interest analysis test. *See Moses v. Apple Hosp. Reit Inc.*, No. 14-CV-3131, 2015 WL 1014327, at *4 (E.D.N.Y. Mar. 9, 2015) ("Both [the center of gravity and interest analysis] tests focus on the parties' domiciles and the locus of the tort or harm a plaintiff suffers."). Because Plaintiffs' claim resembles a tort claim more than a contract claim, the Court applies the "interest analysis" test.

"New York courts confronted with a choice of law issue in torts conduct an 'interest analysis,' assessing which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 50 (2d Cir. 2005) (quoting *Padula v. Lilarn Prop. Corp.*, 84 N.Y.2d 519, 521 (1994)); *see also Kinsey*, 991 F.3d at 176 ("In tort cases, New York 'applies the law of the state with the most significant interest in the litigation.'" (quoting *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999))). "[T]he interest analysis is applied differently depending on whether the rules in question are conduct-regulating rules that 'people use as a guide to governing their primary conduct,' or loss-allocating rules that 'prohibit, assign, or limit liability after the tort occurs.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 49 (2d Cir. 2013) (per curiam) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012)). New York choice of law rules consider publicity torts to be conduct-regulating. *Locke v. Aston*, 814 N.Y.S.2d 38, 42 (App. Div. 2006); *see also Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 423 (S.D.N.Y. 2013) ("Conduct-regulating rules are defined as those that 'have the prophylactic effect of governing conduct to prevent injuries from occurring.'" (quoting *Padula*, 84 N.Y.2d at 522)). When a conduct-regulating rule is at issue, "the law of the jurisdiction where the [allegedly tortious acts] occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Licci*, 739 F.3d at 49 & n.3 (alteration in original) (collecting cases); *see also Bullock v. Caesars Ent. Corp.*, 83 F. Supp. 3d 420, 423 (E.D.N.Y. 2015) (noting that when a conduct-regulating rule is at issue, "the law of the place of the tort 'will usually have a predominant, if not exclusive, concern'" (quoting *Padula*, 84 N.Y.2d at 522)).

A choice-of-law analysis is necessary for Plaintiff's unjust enrichment claim because an actual conflict exists between the relevant Maryland and New York unjust enrichment laws.  In Maryland, unjust enrichment requires (1) "[a] benefit conferred upon the defendant by the plaintiff," (2) "[a]n appreciation or knowledge by the defendant of the benefit," and (3) "[t]he acceptance or retention by the defendant of the benefit by the defendant under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *MAS Assocs., LLC v. Korotki*, 475 Md. 325, 380 n.18 (2021) (quoting *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007)).  However, "[t]o prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution." *Green Tree Servicing, LLC v. Christodoulakis*, 689 F. App'x 66, 70 (2d Cir. 2017) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)); *Fin. Assistance, Inc. v. Graham*, 143 N.Y.S.3d 380, 385 (App. Div. 2021) (same).  In addition, under New York law, "while 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'" *Ga. Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16 (2007)).  Unlike a claim for unjust enrichment under Maryland law, New York law does not require "an appreciation or knowledge by the defendant of the benefit," *MAS Assocs., LLC*, 475 Md. at 380 n.18, but does require "allegations . . . that would indicate a relationship between the parties," *Ga. Malone & Co.*, 19 N.Y.3d at 517 (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)).  Because these differences have "a significant possible effect on the outcome of the trial," a choice of law analysis is appropriate. *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 71 (E.D.N.Y. 2000).

As noted above, Plaintiffs' claim resembles a tort claim more than a contract claim. Therefore, the Court applies the "interest analysis" test. Because publicity torts are conduct-regulating rules and the 2013 Documentary was filmed in Maryland, the Court applies Maryland law to the unjust enrichment claim. *See Velon v. Di Modolo Int'l LLC*, No. 653485/2013, 2014 N.Y. Misc. LEXIS 2297, at *5–7 (Sup. Ct. May 16, 2014) (applying interest analysis test to unjust enrichment claim "related to unauthorized use of a person's image or likeness" and applying New York law where images were created in New York).

## B.   Analysis of Plaintiffs' unjust enrichment claim

The Copyright Act preempts Plaintiffs' unjust enrichment claim. Plaintiffs' claim is based on the Joint Moving Defendants' use in the 2013 Documentary of the title card and clips from the 2001 Documentary, which, as a motion picture or other audiovisual work, is within the scope of the Copyright Act, satisfying the subject matter requirement of the preemption test. *See* 17 U.S.C. § 102(6) (copyright protection extends to "motion pictures and other audiovisual works"); *see also, e.g.*, *Genius Media Grp. v. Google LLC*, No. 19-CV-7279, 2020 WL 5553639, at *11 (E.D.N.Y. Aug. 10, 2020) ("Because the 'gravamen' of [the] [p]laintiff's unjust enrichment claims is that [the] [d]efendants were unjustly enriched by their use of [the] [p]laintiff's lyric transcriptions — work that, as discussed above, is within the scope of the Copyright Act — these claims are preempted."), *aff'd sub nom. ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744 (2d Cir. Mar. 10, 2022).

As to the general scope requirement of the preemption test, based on Plaintiffs' theory of their claim — that the Joint Moving Defendants were unjustly enriched by using the title card and clips from the 2001 Documentary in the 2013 Documentary, including clips featuring Taje Monbo — the rights they seek to enforce are rights "equivalent to . . . exclusive rights within the

66

general scope of copyright as specified by section 106." *ML Genius Holdings LLC*, 2022 WL

710744, at *3 (quoting *In re Jackson*, 972 F.3d at 43); *see U.S. Tennis Ass'n, Inc. v. VSW Prods.*

*LLC*, No. 13-CV-4124, 2013 WL 12195853, at *4 (S.D.N.Y. Nov. 6, 2013) (noting that "unjust

enrichment claims generally involve no more than the 'act of reproduction, adaptation,

performance, distribution or display' that the Copyright Act already covers" (quoting *Briarpatch*

*Ltd., L.P.*, 373 F.3d at 305–06)).  Indeed, the Second Circuit has held that an unjust enrichment

claim premised on the defendant's adaptation of a movie from the plaintiff's novel and

screenplay was preempted by the Copyright Act because the state-law claim involved

copyrightable work and was not "qualitatively different" from a copyright claim.  *Briarpatch*

*Ltd., L.P.*, 373 F.3d at 306 (considering New York unjust enrichment law); *see also U.S. Tennis*

*Ass'n, Inc.*, 2013 WL 12195853, at *4 ("[T]he rights [the] [p]laintiff seems intent on protecting

in the unjust enrichment count involve the reproduction and adaptation of its copyrighted

broadcasts, rights protected by 17 U.S.C. § 106.").

Moreover, although Plaintiffs allege that the Joint Moving Defendants were unjustly

enriched, this does not make their unjust enrichment claim "qualitatively different" from a

copyright infringement claim.  The Second Circuit has held that "[w]hile enrichment is not

required for copyright infringement," it does "not . . . go[] far enough to make the unjust

enrichment claim qualitatively different from a copyright infringement claim."  *Briarpatch Ltd.,*

*L.P.*, 373 F.3d at 306; *see also Forest Park Pictures*, 683 F.3d at 432 ("Under these quasi-

contractual theories, [such as unjust enrichment,] the plaintiff need only prove that the defendant

was unjustly enriched through the use of her idea or work.  Such a claim is not materially

different from a claim for copyright infringement that requires a plaintiff to prove that the

defendant used, reproduced, copied, or displayed a copyrighted work."); *U.S. Tennis Ass'n, Inc.*,

2013 WL 12195853, at *4 (noting that "additional burden [of proving enrichment] does not render the state law claim 'qualitatively different'" and finding claim preempted where the plaintiff alleged "only that [the] [d]efendants were enriched from their unauthorized use of its broadcasts, a claim equivalent to the assertion of damages from the copying of materials protected by the Copyright Act"); *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 321–22 & 322 n.64 (S.D.N.Y. 2010) ("[T]he Second Circuit and courts in this district have consistently held that this enrichment element does not suffice to shield an unjust enrichment claim from preemption when the claim arises from unauthorized use of a copyrighted work." (collecting cases)).  This is because, "[l]ike the elements of awareness or intent," which are also elements of a Maryland unjust enrichment claim but which Plaintiffs do not plead, "the enrichment element . . . limits the scope of the claim but leaves its fundamental nature unaltered." *Briarpatch Ltd., L.P.*, 373 F.3d at 306.  Thus, "[w]here the gravamen of an unjust enrichment claim is that defendants 'unjustly benefitted from unauthorized use' of a work within the scope of the Copyright Act . . . the claim is preempted."  *Stanacard, LLC v. Rubard, LLC*, No. 12-CV-5176, 2016 WL 462508, at *22 (S.D.N.Y. Feb. 3, 2016) (quoting *Einiger v. Citigroup, Inc.*, No. 14-CV-4570, 2014 WL 4494139, at *6 (S.D.N.Y. Sept. 12, 2014)); *see also U.S. Tennis Ass'n, Inc.*, 2013 WL 12195853, at *4 ("The overwhelming majority of courts in this circuit have held that an unjust enrichment claim based upon the copying of subject matter within the scope of the Copyright Act is preempted." (quoting *Boyle v. Stephens Inc.*, No. 97-CV-1351, 1998 WL 690816, at *5–6 (S.D.N.Y. Sept. 29, 1998))); *Panizza v. Mattel, Inc.*, No. 02-CV-7722, 2003 WL 22251317, at *4 (S.D.N.Y. Sept. 30, 2003) (same).

Plaintiffs do not allege any extra element other than enrichment that differs from a copyright claim.  *Cf. Briarpatch Ltd., L.P.*, 373 F.3d at 306 (explaining "a state law claim is

qualitatively different" for Copyright Act preemption purposes "if it requires such elements as breach of fiduciary duty or possession and control of chattels" (citation omitted)).  Accordingly, Plaintiffs' unjust enrichment claim is preempted by the Copyright Act.[22]  *Schleifer v. Berns*, No. 17-CV-1649, 2017 WL 3084406, at *5 n.2 (E.D.N.Y. July 19, 2017) ("[I]t is well-settled that a claim for unjust enrichment is preempted by the Copyright Act.").

Accordingly, the Court grants the Joint Moving Defendants summary judgment on Plaintiffs' right of publicity and unjust enrichment claims.[23]

### iii. Plaintiffs' Lanham Act claims of trademark infringement, false designation of origin, unfair competition, trademark dilution, and cybersquatting, state law claims of trademark infringement, false advertising, and unfair competition, and claims of contributory and vicarious infringement fail

The Joint Moving Defendants argue that Plaintiffs' trademark claims fail: (1) because their Lanham Act claims, as well as their claims under Maryland law, are untimely; (2) as a matter of law under *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003); (3) under the doctrine of nominative fair use because the title card was used to describe the actual video that Pug was watching; (4) because the mark, which is based on the "12 O'Clock"

---

[22]  The Court notes that the result would be the same under New York law.  In addition, under New York law, Plaintiffs' unjust enrichment claim based on the unauthorized use of Taje Monbo's image or likeness would also be preempted by the New York Civil Rights Law.  *See, e.g.*, *Sondik v. Kimmel*, 16 N.Y.S.3d 296, 298 (App. Div. 2015) ("Common-law unjust enrichment claims for the unauthorized use of an image or likeness are preempted by Civil Rights Law §§ 50 and 51."); *Velon v. Di Modolo Int'l LLC*, No. 653485/2013, 2014 N.Y. Misc. LEXIS 2297, at *7 (Sup. Ct. May 16, 2014) (applying New York law after interest analysis test and dismissing unjust enrichment claim because "[u]nder [New York] law, common law claims for . . . unjust enrichment related to unauthorized use of a person's image or likeness are subsumed under Civil Rights Law §§ 50 and 51" and collecting cases); *Zoll v. Jordache Enters., Inc.*, No. 01-CV-1339, 2002 WL 31873461, at *16 (S.D.N.Y. Dec. 24, 2002) ("A number of cases have squarely held that common law unjust enrichment claims for unauthorized use of an image or likeness are subsumed by the Civil Rights Law." (collecting cases)).

[23]  The Court declines to address the Joint Moving Defendants' arguments, in the alternative, that Plaintiffs' right of publicity and unjust enrichment claims are time-barred.

term, is merely descriptive; and (5) under the First Amendment, because the title was used on

artistic grounds.  (Defs.' Joint Mem. 33–44, 52–53.)  The Joint Moving Defendants also argue

that Plaintiffs fail to state a dilution claim because they do not have a famous mark, (*id.* at 44–

45), and that their contributory and vicarious trademark infringement claims fail because their

direct infringement claims fail, (*id.* at 54).  Because Plaintiffs' opposition to the Joint Moving

Defendants' motion ignores these arguments, the Joint Moving Defendants argue that Plaintiffs

therefore abandon these claims.[24]  (*See* Defs.' Joint Reply 6–7.)

       Plaintiffs bring claims of (1) trademark infringement under section 32(1) of the Lanham

Act, 15 U.S.C. § 1114(1), (Am. Compl. ¶¶ 225–226), based on the Joint Moving Defendants' use

of their marks in connection with the 2013 Documentary and (2) trademark infringement, false

designation of origin, passing off, and unfair competition under section 43(a)(1)(A) of the

Lanham Act, 15 U.S.C. § 1125(a)(1)(A), based on the Joint Moving Defendants' use of the

phrase "12 O'Clock Boys" as the title for the 2013 Documentary and use of the title card stating

"12 O'Clock Boyz, Inc. presents The Official 12 O'Clock Boyz" in the 2013 documentary, (*id.*

¶¶ 103–106, 228–229).  In addition, Plaintiffs allege (1) trademark dilution under section 43(c)

of the Lanham Act, 15 U.S.C. § 1125(c), based on the Joint Moving Defendants' casting of other

dirt-bike riders as "12 O'Clock Boys," (*id.* ¶¶ 104, 231–235); (2) cybersquatting under section

43(d) of the Lanham Act, 15 U.S.C. § 1125(d), based on the Joint Moving Defendants' use of the

12oclockboys.com domain, registered on January 9, 2013, (*id.* ¶¶ 107, 236–241; Domain

---

[24]  Because Plaintiffs' trademark claims under 15 U.S.C. § 1125(a) fail for the reasons
discussed, the Court does not address the Joint Moving Defendants' other arguments in support
of their motion, including their arguments that Plaintiffs' trademark claims fail because the mark,
which is based on the "12 O'Clock" term, is merely descriptive and their argument that Plaintiffs
have abandoned their trademark claims by failing to respond in their opposition to the Joint
Moving Defendants' arguments.

Registration, annexed to Am. Compl. as Ex. 39, Docket Entry No. 99-1, at 98); and (3) state law claims of (a) trademark infringement under Maryland Code Business Regulation § 1-414 *et seq.*, (Am. Compl. ¶¶ 242–243), and (b) trademark infringement, false advertising, and unfair competition under the Maryland common law, (*id.* ¶¶ 246–248). Finally, Plaintiffs allege federal and Maryland common law claims of (1) contributory trademark infringement, (*id.* ¶¶ 249–253), and (2) vicarious trademark infringement, (*id.* ¶¶ 254–259). (*See also* Pls.' Opp'n to Defs.' Joint Mot. 3 (listing claims).) Plaintiffs do not respond to the Joint Moving Defendants' arguments on the merits of their claims.

### 1.   Plaintiffs' claims are untimely

The Joint Moving Defendants argue that Plaintiffs' (1) trademark infringement claims under section 1114(1) of the Lanham Act are untimely because they accrued before Plaintiffs registered their marks in July of 2016 and Plaintiffs cannot recover for retroactive registration of trademarks, (Defs.' Joint Mem. 33–34); (2) trademark infringement, false designation of origin, unfair competition, trademark dilution, and cybersquatting claims under section 1125 of the Lanham Act are untimely and barred by laches; and (3) state law trademark claims are untimely under Maryland's three-year statute of limitations because they accrued no later than when Plaintiffs sent them a cease-and-desist letter on October 20, 2014, more than three years before they brought suit, (*id.* at 52–54).

Plaintiffs argue that the Joint Moving Defendants' "infringement activity is ongoing," and therefore, "even assuming a statute of limitations defense may bar some portion of Plaintiffs' trademark infringement claim[s], Plaintiffs would still be entitled to pursue damages based on the infringement activity that occurred within the statute of limitations period." (Pls.' Opp'n to

Defs.' Joint Mot. 12 (quoting *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, No. 07-CV-554, 2008 WL 913279, at *2 (N.D. Cal. Apr. 3, 2008)).)

### A.   Plaintiffs' Lanham Act claims based on their registered marks are time-barred

"Section 32(1) of the [Lanham] Act, 15 U.S.C. § 1114(1) . . . protects only registered trademarks." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 726 F.3d 62, 72 (2d Cir. 2013).  This section "provides a cause of action against any person who 'use[s] in commerce any . . . imitation of a registered mark . . . likely to cause confusion, or to cause mistake, or to deceive.'"  *Id.* (alteration in original) (quoting 15 U.S.C. § 1114(1)).  Courts in this Circuit and others have held that a plaintiff cannot recover for infringement of a registered mark based on conduct that occurred prior to the plaintiff's registration of its mark.  *See, e.g.*, *Viacom Int'l, Inc. v. Armstrong Interactive, Inc.*, No. 18-CV-6117, 2019 WL 3890138, at *5 n.3 (S.D.N.Y. Aug. 19, 2019) ("[T]here is no potential for [the defendants] to recover . . . for conduct that occurred prior to the registration of the subject marks." (quoting *Synergy Tech & Design, Inc. v. Terry*, No. 06-CV-2073, 2007 WL 1288464, at *4–5 (N.D. Cal. May 2, 2007))); *Sly Mag., LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 431 n.1 (S.D.N.Y. 2007) (noting at summary judgment that the court previously denied the plaintiff's motion to amend to add a claim for infringement of its newly registered mark because "the law does not permit direct liability based upon retroactive registration"), *aff'd*, 346 F. App'x 721 (2d Cir. 2009); *Sly Mag., LLC v. Weider Publ'ns L.L.C.*, 241 F.R.D. 527, 530 (S.D.N.Y. 2007) ("[T]here can be no liability based on retroactive registration of a trademark."); *IMAF, S.p.A., v. J.C. Penney Co.*, No. 86-CV-9080, 1989 WL 54128, at *3 (S.D.N.Y. May 15, 1989) ("[T]he plaintiff has presented no cases and the [c]ourt has uncovered no authority that supports [a] theory of retroactive registration.").

72

Plaintiffs have been using their 12 O'Clock Boyz mark since 2001 but did not register the phrase or any marks until July of 2016.  (Trademark Registration; Am. Compl. ¶¶ 128–131.)  As the Joint Moving Defendants argue, Plaintiffs cannot retroactively recover for acts that occurred before they registered their mark.  *See, e.g.*, *Viacom Int'l, Inc.*, 2019 WL 3890138, at *5 n.3 (collecting cases).  Plaintiffs allege that the Joint Moving Defendants committed trademark infringement in violation of 15 U.S.C. § 1114(1) by using and continuing to use "reproductions, copies, and colorable imitations of Plaintiffs' registered 12 O'Clock Boyz [m]arks" in connection with the 2013 Documentary, (Am. Compl. ¶ 226), however all of the allegedly infringing acts on which Plaintiffs' base their federal claims — the Joint Moving Defendants' use of the 12 O'Clock Boyz mark as the title for the 2013 Documentary, use of the 2001 Documentary's title card, casting of other dirt-bike riders, and registration of the domain name 12oclockboys.com, (*id.* ¶¶ 103–107) — are acts that occurred prior to Plaintiffs' registrations, as evidenced both by Plaintiffs' allegations and the attachments to the Amended Complaint, (*see, e.g.*, Am. Compl. 80–84 (exhibit list describing exhibits and providing relevant dates)).  Plaintiffs' exhibits demonstrate that, after learning of the Joint Moving Defendants' alleged infringement in or around 2013, Plaintiffs sought to protect their marks by registering them before commencing this action.  (*See* Letter Dated Oct. 20, 2014 ("Oct. 20, 2014 Letter"), annexed to Am. Compl. as Ex. 35, Docket Entry No. 99-1, at 83 (cease-and-desist letter asserting common law rights in the marks prior to registration).)  Plaintiffs' trademark infringement claims under the Lanham Act based on their registered marks are therefore time-barred.[25]

---

[25]  Plaintiffs allege that the Joint Moving Defendants' infringement is continuing but offer no facts in support of their continuing infringement claim.  In general, plaintiffs may pursue claims based on infringing acts that occur after they register their marks.  *See CSL Silicones Inc. v. Midsun Grp. Inc.*, 170 F. Supp. 3d 304, 311 (D. Conn. 2016) (collecting cases holding "that

**B.  Plaintiffs' Lanham Act claims based on common law rights in their marks are barred by laches**

Even construing Plaintiffs' arguments and allegations as contending that they acquired common law rights in their marks based on their use of the marks since 2001, and that they may therefore pursue timely claims based on their common law rights under section 43 of the Lanham Act, 15 U.S.C. § 1125, including their claims for trademark infringement, false designation of origin, unfair competition, trademark dilution, and cybersquatting, such claims are barred by laches.

Unlike section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), which "protects only registered trademarks, . . . [s]ection 43 of the [Lanham] Act[, 15 U.S.C. § 1125] . . . allows suits 'by *any person* who believes that he or she is or is likely to be damaged' by the defendant's actions."  *Spirits Int'l B.V.*, 726 F.3d at 72 (quoting 15 U.S.C. § 1125(a)(1)).  The Lanham Act "contains no statute of limitations" but "expressly provides for defensive use of 'equitable principles, including laches.'"  *Petrella*, 572 U.S. at 678 n.15 (quoting 15 U.S.C. § 1115(b)(9)). A party asserting laches must establish: "[(1)] that [the] plaintiff had knowledge of [the] defendant's use of its marks, [(2)] that [the] plaintiff inexcusably delayed in taking action with respect thereto, and [(3)] that [the] defendant will be prejudiced by permitting [the] plaintiff inequitably to assert its rights at this time."  *Vaas L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc'y*, 697 F. App'x 63, 64 (2d Cir. 2017) (quoting *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d

---

claims sounding in trademark accrue for the purpose of a statute of limitations as to each infringing use of the mark"); *see also Rosenshine v. A. Meshi Cosmetics Indus.*, No. 18-CV-3572, 2020 WL 1914648, at *6 (E.D.N.Y. Mar. 30, 2020) (finding that the plaintiffs could pursue trademark claims "for any infringement that occurred on or after" date of registration). However, as explained above, Plaintiffs' claims with respect to the Joint Moving Defendants are all based on pre-registration acts, and there is no evidence in the record to support their allegations of continuing infringement.

1037, 1040 (2d Cir. 1980)); *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 410 F. App'x 362, 364 (2d Cir. 2010).

 "Although laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense." *Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, No. 06-3508, 2007 WL 2914452, at *1 (2d Cir. Oct. 5, 2007) (quoting *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996)). "Because the Lanham Act establishes no limitations period and because no corresponding federal statute of limitations exists, '[courts] look to the most appropriate or the most analogous state statute of limitations for laches purposes.'" *Id.* (quoting *Conopco, Inc.*, 95 F.3d at 191); *see also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 745–46 (2d Cir. 2016) ("Because the Lanham Act does not prescribe a statute of limitations, federal courts often 'look to the most appropriate or most analogous state statute of limitation' to determine when the presumption of laches applies to Lanham Act claims." (quoting *Conopco, Inc.*, 95 F.3d at 191)). "That statute, in turn, determines which party has the burden of proving or rebutting the laches defense." *Black Diamond Sportswear, Inc.*, 2007 WL 2914452, at *1; *see also RBC Nice Bearings, Inc.*, 410 F. App'x at 364 ("The 'burden of proving or rebutting the defense [of laches]' is determined by reference to 'analogous [state] statutes of limitation.'" (alterations in original) (quoting *Conopco, Inc.*, 95 F.3d at 191)). "If the most closely analogous state statute of limitations has not run, the presumption of laches does not attach and the defendant bears the burden of proving the defense. But once the analogous state statute of limitations has run, the burden shifts to the plaintiff to show why laches should not apply." *Spirits Int'l B.V.*, 809 F.3d at 746 (citing *Conopco, Inc.*, 95 F.3d at 191).

"New York's 'borrowing statute,' C.P.L.R. § 202, dictates that '[w]hen a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period . . . of either: (1) New York; or (2) the state where the cause of action accrued.'" *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 717 F. App'x 35, 37 n.1 (2d Cir. 2017) (alteration in original) (quoting *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998)).  "[I]n evaluating a laches defense to trademark infringement in a New York suit, [courts in this Circuit] analogize to New York's six-year statute of limitations for fraud claims." *Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018) (citing *Conopco, Inc.*, 95 F.3d at 192).  By contrast, "[t]he federal district court of Maryland has in the past borrowed that state's general three-year statute of limitations period for cases brought under the Lanham Act." *Holland v. Psych. Assessment Res.*, 482 F. Supp. 2d 667, 685 (D. Md. 2007) (using three-year statute) (first citing *Fischer v. Viacom Int'l, Inc.*, 115 F. Supp. 2d 535, 539 (D. Md. 2000); and then citing *Mylan Labs., Inc. v. Pharm. Basics, Inc.*, 808 F. Supp. 446, 454 (D. Md. 1992), *rev'd on other grounds*, 7 F.3d 1130 (4th Cir. 1993)).  Federal law determines when a Lanham Act claim accrues and provides that the "laches clock begins to run when the trademark owner 'knew or should have known, not simply that [the infringer] was using the potentially offending mark, but that [it] had a provable infringement claim against [the infringer].'" *Or. Brewing Co.*, 897 F.3d at 419 (alterations in original) (quoting *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002)).  "The ultimate determination of whether laches bars a plaintiff's claim is within the trial court's discretion." *Spirits Int'l B.V.*, 809 F.3d at 745 (citing *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994)).

The most analogous Maryland statute of limitations is shorter than the most analogous New York statute, and the Court therefore applies it to Plaintiffs' Lanham Act claims.  As noted above, based on the record before the Court, the latest date for accrual of these claims is October 20, 2014 — the date Plaintiffs sent a letter to the Joint Moving Defendants setting forth their purported common law claims based on the alleged infringing acts.  (Oct. 20, 2014 Letter.) Because Plaintiffs commenced this action on October 23, 2018, more than a year after Maryland's applicable three-year statute of limitations expired, a presumption of laches arises and "the burden shifts to [Plaintiff] to show why laches should not apply."  *Spirits Int'l B.V.*, 809 F.3d at 746.  Plaintiffs, however, did not respond to the Joint Moving Defendants' arguments or provide any evidence to carry this burden, despite notice of the Joint Moving Defendants' argument and of the Court's intention to convert their joint motion into a summary judgment motion.  As a result, it is not inequitable to apply the doctrine of laches to their case, and their federal claims based on any common law rights they may have acquired are barred.  *See RBC Nice Bearings, Inc.*, 410 F. App'x at 365–66 (affirming finding that laches barred trademark claims where presumption of laches applied and the plaintiff failed to offer evidence sufficient to rebut the presumption).

However, in light of Plaintiffs' pro se status, and because this bar is equitable rather than statutory, the Court considers the merits of their Lanham Act claims under 15 U.S.C. § 1125 below.

### C.   Plaintiffs' state law trademark claims are time-barred

Because Maryland's three-year statute of limitations applies to Plaintiffs' state law claims under both Maryland Code Business Regulation § 1-414 *et seq.* and the Maryland common law, Plaintiffs' state law claims are time-barred.  *See, e.g.*, *De Simone v. VSL Pharms., Inc.*, 352 F.

Supp. 3d 471, 487 (D. Md. 2018) ("[C]ivil suits must be filed within three years from the date the action accrues.")..

### 2. Plaintiffs' Lanham Act claims under 15 U.S.C. § 1125 also fail on the merits

Plaintiffs' Lanham Act claims under 15 U.S.C. § 1125 — including their claims of trademark infringement, false designation of origin, and unfair competition based on the Joint Moving Defendants' use of the phrase "12 O'Clock Boys" as the title for the 2013 Documentary and use of the 2001 Documentary's title card in the 2013 Documentary, their trade dilution claim, and their cybersquatting claim — in addition to being barred by laches, also fail on the merits.

### A. Trademark infringement, false designation of origin, and unfair competition claims under the Lanham Act

Plaintiffs allege that the Joint Moving Defendants committed trademark infringement, false designation of origin, and unfair competition in violation of section 43(a)(1)(A) of the Lanham Act, 15 U.S.C § 1125(a)(1)(A), by using the phrase "12 O'Clock Boys" as the title of the 2013 Documentary and by using the title card of the documentary.  (Am. Compl. ¶¶ 105–106, 229.)  The Court considers the claims separately.

### (1) Plaintiffs' claims based on the Joint Moving Defendants' use of the phrase "12 O'Clock Boys" as a title fail

The Joint Moving Defendants argue that Plaintiffs' claims are barred by the First Amendment under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), because the use of the phrase "12 O'Clock Boys" in the film's title "has artistic relevance to the underlying work, merely describes the subject of the Documentary, and does not explicitly mislead as to its source and/or content."  (Defs.' Joint Mem. 41–44.)

"Because of an author's significant First Amendment interest in choosing an appropriate title for his or her work, [the Second Circuit has] held that literary titles do not violate the Lanham Act 'unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.'" *Twin Peaks Prods.*, 996 F.2d at 1369 (quoting *Rogers*, 875 F.2d at 999); *Rogers*, 875 F.2d at 999 ("Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, [courts] must construe the Act narrowly to avoid such a conflict."); *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp.*, 886 F.2d 490, 495 (2d Cir. 1989) (noting that *Rogers* test is "generally applicable to Lanham Act claims against works of artistic expression"). "The threshold for 'artistic relevance' is purposely low and will be satisfied unless the use 'has *no* artistic relevance to the underlying work whatsoever.'" *Louis Vuitton Mallatier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (quoting *Rogers*, 875 F.2d at 999). Whether a title is explicitly misleading is determined "by application of the venerable *Polaroid* factors." *Twin Peaks Prods.*, 996 F.2d at 1379 (citing *Cliffs Notes, Inc.*, 886 F.2d at 495 n.3). The "*Polaroid* factors," articulated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), are a nonexclusive list of eight factors that courts balance to evaluate the likelihood of confusion. *See Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020). The factors include:

> (1) the strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will "bridge the gap" by developing a product for sale in the defendant's market; (5) evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers.

*Id.* at 84–85 (first citing *Polaroid*, 287 F.2d at 495; and then citing *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).  The "evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins.  Rather, a court should focus on the ultimate question of whether consumers are likely to be confused."  *Id.* at 85 (quoting *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)).)  "The pertinence of individual factors varies with the facts of the particular case."  *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (same).  Nevertheless, "it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why."  *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995) (citing *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 214 (2d Cir. 1985)).  "[T]he finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*."  *Twin Peaks Prods.*, 996 F.2d at 1379.  "The question then is whether the title is misleading in the sense that it induces members of the public to believe [the work] was prepared or otherwise authorized by [the plaintiff]."  *Id.*

The Joint Moving Defendants' use of the title "12 O'Clock Boys" for their documentary meets the low threshold for artistic relevance to the documentary's content, as it is relevant to the film's story of how Plaintiffs' works inspired Pug.  *See Rogers*, 875 F.2d at 1001 (finding that the defendant satisfied artistic relevance prong where its use of the trademark was "not arbitrarily chosen just to exploit the publicity value of [the plaintiffs' mark] but instead ha[d] genuine relevance to the film's story").

In addition, the title is not explicitly misleading as to the source or content of the documentary under the *Polaroid* factors.  Prior to its registration, Plaintiffs' "12 O'Clock Boyz"

mark appears to have been descriptive and thus not particularly strong.  (*See* Oct. 20, 2014 Letter; Am. Compl. ¶ 40 (stating that "12 O'Clock Boyz" is "a phrase coined by Taje to describe the way in which riders would elevate the front of their bikes and ride only on the back wheels until their bikes would be perpendicular to the road or in the '12 O'Clock' position").)  *Compare Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered trademarks are presumed to be distinctive . . . ."), *with Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) (explaining that descriptive marks are not inherently strong or "distinctive").  The marks are similar, and the parties are in proximate areas of commerce, as Plaintiffs sell accessories associated with their group, including their documentaries, and the Joint Moving Defendants sell the 2013 Documentary.  *See Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991) ("To the extent goods . . . serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.").  However, the gap between these areas of activity has already been bridged, making this factor irrelevant.  *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (holding that where "products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case").  In addition, Plaintiffs do not allege and have not provided any evidence of actual consumer confusion, which is relevant because both products have been in the marketplace since 2013.  *Cf. Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988) (finding that "[t]he magistrate [judge] properly declined to make any negative inference" from a lack of confusion because the defendant's product had been on the market a "short time").  In addition, although Plaintiffs allege bad faith, the evidence shows that after they contacted Oscilloscope to inform them of their alleged trademark infringement claims, Oscilloscope responded indicating that "[p]rior to

the release of the [2013 Documentary,] extensive copyright and trademark searches were

conducted and no references to your alleged trademark were uncovered," as the trademark "was

registered long after the production of the film."  (Oscilloscope Letter dated Nov. 21, 2017,

annexed to Am. Compl. as Ex. 36, Docket Entry No. 99-1, at 87.)  Further, the 2013

Documentary is a higher quality production, which weighs against a finding that confusion is

likely.  *See Arrow Fastener Co.*, 59 F.3d at 398 ("This factor is primarily concerned with

whether the [first] user's reputation could be jeopardized by virtue of the fact that the [second]

user's product is of inferior quality." (citing *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875).

Finally, the relevant consumer group is assumed to be relatively unsophisticated because the item

at issue, a film, is inexpensive and marketed to the general class of consumers rather than to

experts.  *See Lever Bros. Co. v. Am. Bakeries Co.*, 693 F.2d 251, 259 (2d Cir. 1982) ("The

ordinary purchaser of bread and margarine is a casual buyer, and the bustling, self-service

atmosphere of a typical supermarket makes careful examination of products unlikely . . . ."); *cf.*

*Arrow Fastener Co.*, 59 F.3d at 399 (finding that "[a] consumer [of pneumatic staplers]

who . . . possess[ed] [a] high level of knowledge, and who [was] also paying a substantial

amount of money for the product, [was] not likely to be confused by" a common term in the

model number).

    Based on the *Polaroid* factors, there is not a "particularly compelling" likelihood of

confusion, and, therefore, the title is not explicitly misleading as to the source or content of the

documentary.  In addition, even if a significant number of consumers would not pay attention to

the end credits of the 2013 Documentary, *see Brown v. Showtime Networks, Inc.*, 394 F. Supp.

3d 418, 443 (S.D.N.Y. 2019), the end credits, as well as the promotional materials for the 2013

Documentary attached to the Amended Complaint as exhibits, clearly indicate that the producers

of the 2013 Documentary are not the individuals who produced Plaintiffs' films,[26] *see, e.g.*,

*Medina v. Dash Films, Inc.*, No. 15-CV-2551, 2016 WL 3906714, at *5 (S.D.N.Y. July 14,

2016) (noting that "[c]onsumers expect a title to communicate a message about the . . . movie,

---

[26]   As the Joint Moving Defendants argue, to the extent Plaintiffs base their trademark infringement, false designation of origin, and unfair competition claims under 15 U.S.C. § 1125(a) on the Joint Moving Defendants' failure to credit them for use of clips, including their title card, creating confusion as to the source or origin of the 2013 Documentary, (*see, e.g.*, Am. Compl. ¶ 106), these claims are also barred because, as the producers of the 2013 Documentary, the Joint Moving Defendants are the source of the 2013 Documentary, consistent with *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003).  In *Dastar*, Twentieth Century Fox Film Corporation ("Fox") produced the 1948 television series "Crusade in Europe" based on a book written by General Dwight D. Eisenhower the same year.  *Id.* at 25–26.  Fox failed to renew its copyright in the show when it expired in 1977, and, in 1995, Dastar Corporation ("Dastar") purchased tapes of Fox's series, "copied them, and then edited the series," renaming it and selling the final product as its own, without reference to Fox's series.  *Id.* at 26–27.  Fox and others sued Dastar alleging that its sale of the videos "without proper credit" to Fox's series constituted reverse passing off — a type of false designation of origin claim — under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  *Id.* at 27.  The Supreme Court held that the phrase "origin of goods" in section 1125(a) "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods," *id.* at 37, finding that "[s]uch an extension would not only stretch the text, but it would be out of accord with the history and purpose of the Lanham Act and inconsistent with precedent," *id.* at 32.  In reaching this conclusion, the court "'caution[ed] against misuse or over-extension' of trademark . . . into areas traditionally occupied by . . . copyright," *id.* at 34 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001)), explaining that the Lanham Act was "not designed to protect originality or creativity," *id.* at 37.  Thus, "[s]ince *Dastar*, Lanham Act claims arising from the alleged copying of creative work have been 'clearly foreclosed.'"  *Hudson v. Universal Studios, Inc.*, No. 04-CV-6997, 2008 WL 4701488, at *8 (S.D.N.Y. Oct. 23, 2008) (quoting *Contractual Obligation Prods., LLC v. AMC Networks. Inc.*, 546 F. Supp. 2d 120, 129 (S.D.N.Y. 2008)), *aff'd*, 369 F. App'x 291 (2d Cir. 2010); *see, e.g.*, *Lieb v. Korangy Publ'g, Inc.*, No. 15-CV-40, 2016 WL 8711195, at *10 (E.D.N.Y. Sept. 30, 2016) (finding false designation of origin claim barred by *Dastar* and collecting cases); *see also Vaad L'Hafotzas Sichos, Inc. v. Krinsky*, 133 F. Supp. 3d 527, 538 (E.D.N.Y. 2015) ("Under *Dastar*, then, the law of unfair competition does not allow a claim for false or misleading representations as to the origin of the content of a 'communicative product.'"); *Contractual Obligation Prods., LLC*, 546 F. Supp. 2d at 124 ("[The] plaintiff's trademark infringement claim was foreclosed by the Supreme Court's ruling in *Dastar* that the Lanham Act does not apply to claims arising out of a failure to attribute or credit the origin of creative work."); *see also Narrative Ark Ent. LLC v. Archie Comic Publ'ns, Inc.*, No. 16-CV-6109, 2017 WL 3917040, at *4–5 (S.D.N.Y. Sept. 5, 2017) (finding unfair competition claim under New York law, which is evaluated under the same standard as 15 U.S.C. §1125(a), barred by *Dastar*).

but they do not expect it to identify the publisher or producer," and that "[t]his is particularly true where '[the] defendants employed their own source designations elsewhere on the product'" and "materials promoting the film prominently informed the reader" who the producers were (first quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002); and then quoting *Rin Tin Tin, Inc. v. First Look Studios*, *Inc.*, 671 F. Supp. 2d 893, 901 (S.D. Tex. 2009))).

Accordingly, the Court grants the Joint Moving Defendants summary judgment as to Plaintiffs' trademark infringement, false designation of origin, and unfair competition claims based on the use of Plaintiffs' mark in the title of the 2013 Documentary.  *See Medina*, 2016 WL 3906714, at *5–6 (dismissing federal and state law claims under 15 U.S.C. §§ 1114(1) and 1125(a) where the title "'Loisaidas' clearly ha[d] artistic relevance" to the work, which was "a series of short films about drug dealers . . . in Manhattan's Lower East Side," as "Loisaidas . . . is the Spanish slang term for 'lower east siders,'" "[t]he characters repeatedly refer to people and places 'downtown in Loisaidas,'" and "scenes are identifiably set in the Lower East Side," and finding no likelihood of confusion given explicit source designations).

### (2) The Joint Moving Defendants' use of the title card is nominative fair use

The Joint Moving Defendants argue that Plaintiffs' claims based on the Joint Moving Defendants' use of the title card in the 2013 Documentary are barred by the nominative fair use doctrine because the title card appeared for only several seconds and was "necessary to identify the video that Pug 'used to watch' that fueled his desire to be a member of the 12 O'Clock Boyz."  (Defs.' Joint Mem. 38.)

A trademark may be used by a non-owner to identify a product or service, so long as that use is not confusing.  *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102–03 (2d Cir. 2010) ("[A] defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe

the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant."). "When considering a likelihood of confusion in nominative fair use cases, *in addition to* discussing each of the *Polaroid* factors" discussed above, courts must consider:

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder.

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 168 (2d Cir. 2016). "When assessing the second nominative fair use factor, courts are to consider whether the alleged infringer 'step[ped]' over the line into a likelihood of confusion by using the senior user's mark too prominently or too often, in terms of size, emphasis, or repetition." *Id.* (alteration in original) (quoting 4 McCarthy on Trademarks and Unfair Competition § 23:11 (4th ed.)). "[W]hen considering the third nominative fair use factor, courts must not . . . consider only source confusion, but rather must consider confusion regarding affiliation, sponsorship, or endorsement by the mark holder." *Id.* at 169.

The Joint Moving Defendants display the title card of the 2001 Documentary, which contains Plaintiffs' "12 O'Clock Boyz" mark, at the beginning of the excerpts from the 2001 Documentary. They use the card to identify the film that Pug is watching, and they accompany that segment of the video with Pug's narration that he used to watch the film with Tibba. Nothing about the Joint Moving Defendants' use implies that Plaintiffs or other 12 O'Clock Boyz members endorse the 2013 Documentary, and, considered in the context of the 2013 Documentary having its own title and credits in a distinct font, the use does not confuse viewers as to the origin of the 2013 Documentary.

85

The three nominative fair use factors, taken together with the above analysis of the *Polaroid* factors, favor the Joint Moving Defendants. On balance, the Joint Moving Defendants' use of the 12 O'Clock Boyz mark in reproducing the title card in the 2001 Documentary is unlikely to cause confusion, and Plaintiffs' trademark infringement, false designation, and unfair competition claims concerning the title card fail under the nominative fair use doctrine.

### B.   Trademark dilution claim

The Joint Moving Defendants argue that "Plaintiffs have not alleged that [their] 12 O'Clock Boyz mark is 'famous,'" and any notoriety their mark may have "is limited to a niche market of the 'urban dirt-bike community', limited to the geographic region of the 'Northeast', in particular [the] 'Maryland, Washington DC, and Virginia metropolitan area.'"  (Defs.' Joint Mem. 45 (quoting Am. Compl. ¶¶ 1, 36, 45).)

"Under federal law, an owner of a famous, distinctive mark is entitled to an injunction against the user of a mark that is likely to cause dilution of the famous mark." *E.A. Sween Co. v. A & M Deli Express Inc.*, 787 F. App'x 780, 786 (2d Cir. 2019) (quoting *Starbucks Corp.*, 588 F.3d at 105); *see also* 15 U.S.C. § 1125(c). "[T]o state a [dilution] claim under [15 U.S.C. § 1125(c)], the plaintiff must plead that it owns the mark, that the mark is famous and distinctive, and that [the] defendant's actions dilute that mark." *Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 573 (S.D.N.Y. 2013) (citing *Starbucks Corp.*, 588 F.3d at 105). "A mark is famous 'if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.'" *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 215 (S.D.N.Y. 2015) (quoting 15 U.S.C. § 1125(c)(2)(A)). Courts have recognized that "the inclusion . . . of the phrase 'widely recognized by the general consuming public of the United States' 'was intended to reject dilution claims

86

based on niche fame, *i.e.* fame limited to a particular channel of trade, segment of industry or service, or geographic region.'" *Luv N' Care Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757–58 (S.D.N.Y. 2012) (quoting *Dan–Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 n.90 (S.D.N.Y. 2007)).  Indeed, "[c]ourts generally have limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public." *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12-CV-8205, 2013 WL 3943267, at *10 (S.D.N.Y. July 31, 2013) (alteration omitted) (quoting *Heller Inc. v. Design Within Reach*, No. 09-CV-1909, 2009 WL 2486054, at *3 (S.D.N.Y. Aug. 15, 2009)).  In assessing fame, courts may consider all relevant factors, including:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*A.V.E.L.A., Inc.*, 131 F. Supp. 3d at 216 (quoting 15 U.S.C. § 1125(c)(2)(A)(i)–(iv)).  A mark can be distinctive either "inherently or through acquired distinctiveness."  15 U.S.C. 1125(c)(1); *Dan–Foam A/S*, 500 F. Supp. 2d at 306 n.87 (noting that changes to federal dilution law under the Trademark Dilution Revision Act of 2006 include a provision that "non-inherently distinctive marks may qualify for protection").  As the Second Circuit has noted, "the requirement that the mark [at issue] be 'famous' and 'distinctive' significantly limits the pool of marks that may receive dilution protection."  *Starbucks Corp.*, 588 F.3d at 105 (citations omitted).

Plaintiffs' trademark dilution claim fails because Plaintiffs have not alleged or provided evidence that the 12 O'Clock Boyz mark is famous outside the niche community of dirt-bike riders or the limited geographic region of the city of Baltimore.  *See Helios Int'l S.A.R.L.*, 2013 WL 3943267, at *10 (holding claim "that the marks 'have an extremely high degree of recognition *among consumers of luxury jewelry*' . . . is the very definition of the type of 'niche' fame that is insufficient to support a finding of fame for [trademark dilution] purposes"); *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 380 (S.D.N.Y. 2008) (holding "fame limited to a particular channel of trade, segment of industry or service, or geographic region is not sufficient to meet" the standard of the Federal Trademark Dilution Act of 1996).  Although Plaintiffs allege that the 2001 Documentary sold fifty thousand copies, (Am. Compl. ¶ 47), those sales numbers fall well short of sales for marks that have been considered famous for trademark dilution purposes.  *See Heller Inc.*, 2009 WL 2486054, at *3 (collecting cases and explaining that trademark dilution law is intended to protect "almost universally recognized" marks such as Hot Wheels, Budweiser, and Kodak).  Accordingly, the Court grants the Joint Moving Defendants summary judgment on Plaintiffs' trademark dilution claim.

## C.   Cybersquatting claim

The Joint Moving Defendants do not address the merits of Plaintiff's claim.

Plaintiffs assert that the Joint Moving Defendants violated the Anticybersquatting Consumer Protection Act by registering the domain 12oclockboys.com.  (Pls.' Opp'n to Defs.' Joint Mot. 3.)

"To successfully assert a claim under [15 U.S.C. § 1125(d)], a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3)

the infringer has a bad faith intent to profit from that mark." *Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. 2011); *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 496–99 (2d Cir. 2000).

The Joint Moving Defendants registered their domain name on January 9, 2013, prior to Plaintiffs' registration of their mark. Therefore, Plaintiffs' mark is not presumed to be distinctive. *See Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 871 ("[R]egistered trademarks are presumed to be distinctive . . . ."). However, "the general principles qualifying a mark for registration . . . are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a) [of the Lanham Act]." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Lyons P'ship, L.P. v. D & L Amusement & Ent., Inc.*, 702 F. Supp. 2d 104, 113 (E.D.N.Y. 2010). "An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc.*, 505 U.S. at 769. "Inherent distinctiveness is assessed on a continuum from least to most distinctive, with the aid of categories usually called (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful, with marks in the last category considered the strongest." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329 (2d Cir. 2020); *see also Two Pesos, Inc.*, 505 U.S. at 768 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)) (same). The Second Circuit has explained that:

> A mark is generic if it is a common description of products and refers to the genus of which the particular product is a species. A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

*Lane Cap. Mgmt.*, 192 F.3d at 344.  "Generic marks are not protectible."  *Id.*  Descriptive marks "are not inherently distinctive" and thus are only protected upon a showing that the mark has acquired "secondary meaning," *id.*, which is "determined by analyzing six factors: advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use," *Car-Freshner Corp.*, 980 F.3d at 329 (citing *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)).  Suggestive, arbitrary, and fanciful marks are inherently distinctive and thus automatically protected because "[t]heir intrinsic nature serves to identify a particular source of a product."  *Lane Cap. Mgmt.*, 192 F.3d at 344.

As the Joint Moving Defendants argue and Plaintiffs' allegations and exhibits demonstrate, Plaintiffs' mark is descriptive of "the way in which riders would elevate the front of their bikes and ride only on the back wheels until their bikes would be perpendicular to the road or in the '12 O'Clock' position."  (Oct. 20, 2014 Letter; Trademark Registration; Am. Compl. ¶ 40 ("The title of the film is a phrase coined by Taje to describe the way in which riders would elevate the front of their bikes and ride only on the back wheels until their bikes would be perpendicular to the road or in the '12 O'Clock' position."); *see also* Defs.' Joint Mem. 39–40.)  Although the Amended Complaint contains several allegations that the phrase "12 O'Clock Boyz" has "acquired secondary meaning," (Am. Compl. ¶¶ 50, 229), these allegations are conclusory, and Plaintiffs have not shown evidence of acquired distinctiveness by January of 2013 beyond the fact of their use of the mark since 2001 and the existence of a 2003 article in a Baltimore newspaper describing the 12 O'Clock Boys and noting their documentaries.  (Hill, *supra*.)  Accordingly, the Court grants the Joint Moving Defendants summary judgment on Plaintiffs' cybersquatting claim.

90

### 3. Contributory and vicarious trademark infringement under the Lanham Act

The Joint Moving Defendants argue that because "Plaintiffs' direct federal trademark infringement claim is time-barred," and therefore no underlying claim of direct trademark infringement has been established, "Plaintiffs' related claims for contributory and vicarious trademark infringement are also barred."  (Defs.' Joint Mem. 54 (first citing *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 163 (4th Cir. 2012); and then citing *MDT Corp. v. N.Y. Stock Exch., Inc.*, 858 F. Supp. 1028, 1034 (C.D. Ca. 1994))); *see also Rosetta Stone Ltd.*, 676 F.3d at 163 ("[F]or there to be liability for contributory trademark infringement, the plaintiff must establish underlying direct infringement." (citing *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 451 (4th Cir. 2010))).

"To be liable for contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied."  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 314 (2d Cir. 2013) (quoting *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007)).  "Vicarious liability for trademark infringement requires a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product."  *Id.* (quoting *Perfect 10, Inc.*, 494 F.3d at 807).  "Vicarious and contributory liability [for trademark infringement] must be predicated on some *direct* infringement by the third party."  *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013) (citing 4 McCarthy on Trademarks and Unfair Competition § 25:17; *see also Inwood Laby's, Inc. v. Ives Laby's, Inc.*, 456 U.S 844, 854 (1982) ("[I]f a manufacturer or distributor intentionally induces another to infringe a trademark, or if it

continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit."); *Ga. Pac. Consumer Prods., LP*, 618 F.3d at 451 ("[A defendant] cannot be liable for contributory infringement without corresponding direct trademark infringement." (citing *Inwood Laby's, Inc.*, 456 U.S. at 853–54)); *Tiffany (NJ) Inc.*, 600 F.3d at 103 (describing "contributory trademark infringement" as "culpably facilitating the infringing conduct" of another).

Plaintiffs' claims of contributory and vicarious trademark infringement fail because Plaintiffs have not established direct trademark infringement. *See, e.g.*, *Dish Network L.L.C. v. Siddiqi*, No. 18-CV-4397, 2019 WL 5781945, at *3 (S.D.N.Y. Nov. 6, 2019) ("As a preliminary matter, . . . the [c]ourt first must find a direct infringing use of the . . . marks before it may consider whether [the] defendant is liable under either [a contributory or vicarious] theory of secondary liability."); *Carrell v. Origami Owl, LLC*, No. 18-CV-694, 2019 WL 1330941, at *6 (S.D.N.Y. Mar. 25, 2019) (denying leave to amend to add contributory infringement claim as futile where the plaintiff failed to state a claim of direct infringement because "contributory trademark infringement . . . definitionally requires that direct infringement occurred" (citing 4 McCarthy on Trademarks and Unfair Competition § 25:17)); *Kelly-Brown v. Winfrey*, No. 11-CV-7875, 2012 WL 701262, at *7 (S.D.N.Y. Mar. 6, 2012) (noting that "[b]oth contributory trademark infringement and vicarious trademark infringement are predicated upon the existence of a direct infringement" and dismissing these claims because the plaintiffs "have not adequately alleged that any [d]efendant committed direct trademark infringement"), *aff'd in part and vacated in part*, 717 F.3d 295 (2d Cir. 2013) (vacating finding of no direct infringement and affirming dismissal of contributory and vicarious infringement claims on other grounds).

Accordingly, the Court grants the Joint Moving Defendants summary judgment on Plaintiffs' contributory and vicarious trademark infringement claims under the Lanham Act.[27]

### iv.   The Court denies Plaintiffs' application for declaratory judgments

Plaintiffs seek declaratory judgments invalidating the Nathan Defendants' copyrights in the 2013 Documentary and 2008 DVDs.  (Am. Compl. ¶¶ 271–288.)

The Nathan Defendants argue that (1) Plaintiffs seek an improper advisory opinion in seeking to invalidate the Nathan Defendants' copyright registrations in the 2013 Documentary and the 2008 DVDs because the validity of these copyright registrations is not relevant to Plaintiffs' claims for relief on the merits, (Defs.' Joint Mem. 45–48); (2) even if the declaratory relief sought was relevant to Plaintiffs' affirmative claims, the Court should dismiss these causes of action "because they would be redundant of Plaintiffs' affirmative claims," (*id.* at 48 n.58); and (3) these claims are time-barred, (*id.* at 56–58).

---

[27]   Plaintiffs bring their contributory and vicarious trademark infringement claims pursuant to "federal law and the Maryland common law" and "federal law and common law." (Am. Compl. ¶¶ 249–259.)  The Court is not aware of causes of action for contributory and vicarious trademark infringement under the Maryland common law and understands Plaintiffs to be asserting these claims under the Lanham Act.  The Court also understands Plaintiffs' references to the common law as acknowledging the fact that the doctrines of contributory and vicarious liability were imported into trademark law from the common law of torts.  *See, e.g.*, *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 104 (2d Cir. 2010) ("Contributory trademark infringement is a judicially created doctrine that derives from the common law of torts."); Deborah F. Buckman, Annotation, *Liability as Vicarious or Contributory Infringer Under Lanham Act — Modern Cases*, 152 A.L.R. Fed. 573 (2022) ("Although the [Supreme Court in *Inwood Laboratories Inc. v. Ives Laboratories, Inc.*, 456 U.S 844, 854 (1982)] established the standard for contributory trademark infringement, many courts have also recognized vicarious trademark liability, basically applying the legal standards and rules established by the common law." (footnote omitted)); Andrew Ligon Fant, Note, *Reconsidering the Willful Blindness Doctrine in Contributory Trademark Infringement*, 29 J. Intell. Prop. L. 318, 324 (Spring 2022) ("No provision of the Lanham Act created a cause of action of secondary infringement.  . . . [C]ourts imported both vicarious and contributory liability doctrines into trademark law from the common law of torts.").

The Declaratory Judgment Act provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007). For the purposes of the Declaratory Judgment Act, "actual controversy" means "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *see also Nike, Inc. v. Already, LLC*, 663 F.3d 89, 95 (2d Cir. 2011), *aff'd*, 568 U.S. 85 (2013). "[A] mere demand for declaratory relief does not by itself establish a case or controversy necessary to confer subject matter jurisdiction." *Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Council*, 729 F. App'x 33, 41 (2d Cir. 2018) (quoting *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch.*, 24 F.3d 427, 431 (2d Cir. 1994)). Rather, where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed." *Id.* at 40 (quoting *Browning Debenture Holders' Comm. v. Dasa Corp.*, 524 F.2d 811, 817 (2d Cir. 1975)).

Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants" under the Declaratory Judgment Act. *MedImmune, Inc.*, 549 U.S. at 136 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)); *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180, 187 (2d Cir. 2010); *see also Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (per curiam) ("Courts have consistently interpreted [the Declaratory Judgment Act's] permissive language as a broad grant of discretion to district courts

94

to refuse to exercise jurisdiction over a declaratory action that they would otherwise be

empowered to hear."). The Second Circuit instructs district courts to consider certain prudential

factors in determining whether to exercise their discretion to consider a declaratory judgment

action, including:

> [1] whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; . . . [2] whether a judgment would finalize the controversy and offer relief from uncertainty[;] . . . [3] whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; [4] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [5] whether there is a better or more effective remedy.

*New York v. Solvent Chem. Co.*, 664 F.3d 22, 26 (2d Cir. 2011) (alterations in original)

(quoting *Dow Jones & Co., Inc.*, 346 F.3d at 359–60).

A declaratory judgment would not settle the legal issues disputed in this case because the

validity of the Nathan Defendants' copyrights has no bearing on whether Plaintiffs' copyrights

(or their other rights) were violated. Therefore, it would not have practical implications for the

dispute between the parties. *See Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 415 F.

App'x 264, 267 (2d Cir. 2011).

Accordingly, the Court declines to issue declaratory judgments as to the validity of the

Nathan Defendants' copyrights.[28]

### v. Dismissal under Rule 19 is inappropriate

The Joint Moving Defendants argue that the Court must dismiss Plaintiffs' claims

pursuant to Rule 19 of the Federal Rules of Civil Procedure because Plaintiffs have failed to join

---

[28] Because these claims are not relevant to the issues being decided, the Court declines to address the Joint Moving Defendants' alternative arguments that the Court should dismiss these causes of action because they would be redundant of Plaintiffs' affirmative claims and because they are time-barred.

indispensable parties — namely, Danielle Avent, who co-owns the copyright in the 2001

Documentary, and the 12 O'Clock Boyz, Inc., which is the copyright proprietor of the film —

and "[i]f they are not joined," Defendants "face the possibility of duplicative litigations and

inconsistent judgments." (Defs.' Joint Mem. 59–60.)  The Joint Moving Defendants further

argue that by failing to respond to this argument, Plaintiffs "have abandoned the right to contest

it." (Defs.' Joint Reply 11.)  In addition, the Joint Moving Defendants argue that Deafueh

Monbo, who, contrary to Plaintiffs' allegations, is not listed on the copyright registrations for the

2001 and 2003 Documentaries, "does not have standing to assert copyright claims in this

lawsuit." (Defs.' Joint Mem. 59, 60 n.70; Defs.' Joint Reply 10.)

Plaintiffs argue that, as a co-owner of the copyrights in the 2001 and 2003

Documentaries, Taje Monbo has "independent standing to sue and need [not] join . . . Danielle

Avent." (Pls.' Opp'n to Defs.' Joint Mot. 7.)  Plaintiffs do not respond to the Joint Moving

Defendants' other arguments.

Rule 19 of the Federal Rules of Civil Procedure "recognizes exceptional circumstances in

which the plaintiff's choice of parties or forum must give way because of an absent party's

interest in the outcome of the action or involvement in the underlying dispute." *Marvel*

*Characters, Inc. v. Kirby*, 726 F.3d 119, 131 (2d Cir. 2013).  Rule 19(a)(1) specifies the

circumstances under which a party is necessary to an action:

> A person who is subject to service of process and whose joinder will not
> deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> > (A) in that person's absence, the court cannot accord complete relief
> > among existing parties; or
> >
> > (B) that person claims an interest relating to the subject of the action and
> > is so situated that disposing of the action in the person's absence
> > may

(i)        as a practical matter impair or impede the person's ability to protect the interest; or

(ii)       leave an existing party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1); *Washington Nat'l Ins. Co. v. OBEX Grp. LLC*, 958 F.3d 126, 134 (2d Cir. 2020) (stating Rule 19(a)(1)'s requirements to show that a party is necessary to an action (quoting Fed. R. Civ. P. 19(a)(1))).

If a party is necessary but unable to be joined, a court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed," Fed. R. Civ. P. 19(b), i.e., whether a party is "indispensable," *see Marvel Characters*, 726 F.3d at 132–33; *Viacom Int'l, Inc.*, 212 F.3d at 724–25 (noting that an action must be dismissed for nonjoinder if the absent party is necessary and "indispensable" to the action, but joinder is "not feasible" (citing Fed. R. Civ. P. 19(b))).  In making this decision, a court should consider: "(1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have adequate remedy if the court dismissed the suit."  *Marvel Characters*, 726 F.3d at 133 (citing *CP Sols. PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 (2d Cir. 2009) (per curiam)).  Courts must apply these four factors in a flexible manner.  *CP Sols.*, 553 F.3d at 159 ("[A] court should take a flexible approach when deciding what parties need to be present for a just resolution of the suit." (citation omitted)).  None of these factors is dispositive or necessary.  *Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co*., 312 F.3d 82, 88–89 (2d Cir. 2002) ("Rule 19(b), however, does not require that every factor support the district court's determination.").

Under Rule 19(b), the movant has the "burden" of proving that joinder "is not feasible" and that "considerations of 'equity and good conscience' weigh in favor of dismissal rather than proceeding in the absence of the necessary parties." *Tae H. Kim v. Ji Sung Yoo*, 776 F. App'x 16, 20 (2d Cir. 2019) (first citing Fed. R. Civ. P. 19(b); and then citing 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1609, at 129–30 (3d ed. 2019)); *see also Lipman v. Rodenbach*, No. 19-CV-1073, 2020 WL 2307980, at *6 (E.D.N.Y. May 8, 2020) (noting that "the movants[] bear the burden of showing that joinder is appropriate" and that dismissal is warranted (citing *Greenwich Life Settlements, Inc. v. ViaSource Funding Grp.*, 742 F. Supp. 2d 446, 455 (S.D.N.Y. 2010))), *aff'd*, 852 F. App'x 578 (2d Cir. 2021). In addition, Rule 19(c) requires the movant "to explain why [it] did not itself bring the indispensable party into the litigation." *See Kim*, 776 F. App'x at 20 ("Federal Rule of Civil Procedure 19(c) requires that a party requesting relief must 'plead . . . the reasons for nonjoinder' by stating '(1) the name, if known, of any person who is required to be joined if feasible but is not joined; and (2) the reasons for not joining that person.'"). "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)." *Viacom Int'l, Inc.*, 212 F.3d at 724 (citing *Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1123 (2d Cir. 1990)); *see also Am. Trucking Ass'n, Inc. v. N.Y.S. Thruway Auth.*, 795 F.3d 351, 361 (2d Cir. 2015) ("Having concluded that the State of New York is not a necessary party under Rule 19(a), we need not consider whether the State was also an indispensable party under Rule 19(b) . . . .").

As the Joint Moving Defendants argue, Deafueh Monbo lacks standing to sue on Plaintiffs' copyright infringement claims because she is not an owner of the copyrights in the 2001 and 2003 Documentaries, as Plaintiffs allege. (*Compare* Am. Compl. ¶¶ 1, 19 (alleging

that Plaintiffs own the copyrights); *with* Copyright Registrations, annexed to Am. Compl. as Ex. 1, Docket Entry No. 98-3, at 2–3 (listing Taje Monbo and Avent as claimants of copyright in 2001 Documentary and Taje Monbo as claimant of copyright in 2003 Documentary)); *see also Urbont v. Sony Music Ent.*, 831 F.3d 80, 87 n.6 (2d Cir. 2016) (collecting cases and noting that the "plaintiffs must prove ownership not only as an element of a copyright infringement claim, but also to assert their standing to bring suit").

Plaintiffs concede that Danielle Avent is a co-owner of the copyright in the 2001 Documentary.[29]  As Plaintiffs argue, however, Taje Monbo, as the joint owner of the copyright, is not required to join Avent.  *See Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) ("The right to prosecute an accrued cause of action for [copyright] infringement is . . . a right that may be exercised independently of co-owners; a joint owner is not required to join his other co-owners in an action for infringement."); *see also* 17 U.S.C. § 501(b) (noting that a court "may require" a copyright owner to serve notice on a person who is shown "to have or claim an interest in the copyright" and "may require the joinder . . . of any person having or claiming an interest in the copyright").  As to 12 O'Clock Boyz, Inc., the Court finds that it is not a necessary party because that corporation has been dissolved.[30]  Maryland law provides that "[o]nce a corporation's existence has been terminated, the defunct corporation can neither sue, nor be sued."  *Scott v.*

---

[29]  In a cease-and-desist letter written by Deafueh Monbo and "authorized by Taje Monbo," Deafueh Monbo states that "Taje Monbo and Danielle Avent own the copyright in the motion picture entitled '12 O'Clock Boyz.'"  (Letter dated Feb. 18, 2016 from Deafueh Monbo (d/b/a 12 O'Clock Boyz) to Overbrook Entertainment, Will Smith, and James Lassiter, annexed to Am. Compl. as Ex. 42, Docket Entry 99-2, at 9; *see also* Pls.' Opp'n to Defs.' Joint Mot. 7.)

[30]  The Court takes judicial notice that 12 O'Clock Boyz, Inc. was a Maryland company that formed in 2001 and filed articles of dissolution in 2002.  *See* 12 O'CLOCK BOYZ INC.: D06356109, https://egov.maryland.gov/BusinessExpress/EntitySearch/BusinessInformation /D06356109 (last visited Aug. 25, 2022).

*Seek Lane Venture, Inc.*, 91 Md. App. 668, 686 (Md. Ct. Spec. App. 1992) (citing *Atl. Mill &*
*Lumber Realty Co. v. Keefer*, 179 Md. 496, 500 (1941)).

    In addition, although the Joint Moving Defendants argue that failure to join Avent and 12
O'Clock Boyz, Inc. will expose them to "the possibility of duplicative litigations and
inconsistent judgments," (Defs.' Joint Mem. 60; Defs.' Joint Reply 10–11) — a factor to be
considered in determining whether a party is necessary under Rule 19(a)(1)(B) — neither party is
a necessary party under this rule because they have not "claim[ed] an interest relating to the
subject of the action."  Fed. R. Civ. P. 19(a)(1)(B).  Instead, the Joint Moving Defendants seek to
assert an interest on their behalf, which is insufficient to satisfy Rule 19(a)(1)(B)'s requirements.
*See Washington Nat'l Ins. Co.*, 958 F.3d at 135 (concluding that an absent party was not
necessary "under Rule 19(a)(1)(B) because it fail[ed] to satisfy a threshold requirement" of
claiming an interest); *Peregrine Myan. Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) ("[The
defendant's] attempt to assert on behalf of the [absent party] its supposed concern about the
dilution of its interest . . . falls outside the language of the rule.  It is the absent party that must
'claim an interest.'" (first quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030,
1043 (9th Cir. 1983); and then citing Wright, Miller, & Kane, Federal Practice and Procedure §
1604, at 49 (2d ed. 1986))); *Berkley Ins. Co. v. Bouchard*, No. 20-CV-9, 2020 WL 7646542, at
*5 (D. Vt. Dec. 23, 2020) ("Because neither party has claimed an interest, neither is a necessary
party to the instant action as defined by Rule 19(a)." (citing *ConnTech Dev. Co. v. Univ. of*
*Conn. Educ. Props., Inc.*, 102 F.3d 677, 682 (2d Cir. 1996))); *Washington v. City of New York*,
No. 18-CV-12306, 2019 WL 2120524, at *12 (S.D.N.Y. Apr. 30, 2019) (denying motion to
dismiss for nonjoinder where the absent party did not claim an interest in the litigation); *Kunina*
*v. 7 W. 82 LLC*, No. 15-CV-4755, 2015 WL 7075966, at *2–3 (S.D.N.Y. Nov. 12, 2015) ("In

100

order to qualify as a necessary party under Rule 19(a)(1)(B), the absent party . . . must claim an interest relating to the subject of the action. [The absent party] has not done so. Without a self-claimed interest in the action, a party is not necessary under either prong of Rule 19(a)(1)(B)." (footnote omitted)). Nor have the Joint Moving Defendants fulfilled their obligation to explain why they have not attempted to join Avent or 12 O'Clock Boyz, Inc., or explained why dismissal, rather than some other remedy, is appropriate.

Accordingly, the Court denies the Joint Moving Defendants' motion to dismiss the action based on failure to join Avent and 12 O'Clock Boyz, Inc. *See Tae H. Kim*, 776 F. App'x at 20.

### c.   The SPE Defendants' motion to dismiss

The SPE Defendants move to dismiss Plaintiffs' claims on the grounds that (1) the Court lacks personal jurisdiction over Overbrook Entertainment, Inc., Overbrook Entertainment, LLC, and Smith; (2) Plaintiffs have failed to state their copyright and trademark claims; and (3) Plaintiffs' unjust enrichment claim is preempted by federal law and fails to state a claim.[31]

---

[31] The SPE Defendants also argue that Plaintiffs' claims relating to a motion picture that has yet to be released are not ripe for adjudication because their work has not been finalized, and therefore the Court cannot compare it to Plaintiffs' work, and Plaintiffs cannot have been harmed by a movie that is yet to be released. (SPE Defs.' Mem. 15–17.) In response, Plaintiffs argue that the claims are ripe because they are based on the SPE Defendants' "utilization of similar character, theme, setting and mood" in their forthcoming adaptation, and that the script and a filmed scene are enough. (Pls.' Opp'n to SPE Defs.' Mot. 12.) As noted above, the SPE Defendants' film premiered at a film festival in January of 2020, after the motions were filed but before briefing was complete. (SPE Defs.' Reply 5–6.) Because the SPE Defendants' arguments as to why Plaintiffs' claim is not ripe have been superseded by the premiere of the film, the Court does not address the ripeness argument.

i.   **The court lacks personal jurisdiction over Overbrook Entertainment, Inc., Overbrook Entertainment, LLC, and Smith**

The SPE Defendants argue that the court lacks general and specific personal jurisdiction over Overbrook Entertainment, Inc., Overbrook Entertainment, LLC, and Smith.[32]  (SPE Defs.' Mem. 17–25.)  In addition, the SPE Defendants argue that Plaintiffs do not refute the SPE Defendants' jurisdictional facts.  (SPE Defs.' Reply 1.)

Plaintiffs allege that the Court has specific jurisdiction over Overbrook Entertainment, Inc., Overbrook Entertainment, LLC, and Smith and also appear to allege that the Court has general jurisdiction over these Defendants.  (*See* Am. Compl. ¶ 17; Pls.' Opp'n to SPE Defs.' Mot. 17–18.)

"There are two types of personal jurisdiction: specific and general."  *Sonera Holding B.V. v. Çukurova Holding A.Ş.*, 750 F.3d 221, 225 (2d Cir. 2014) (per curiam).  General jurisdiction permits a court to exercise personal jurisdiction over a defendant regardless of whether the underlying claim has a connection to the forum.  *Id.* ("A court with general jurisdiction over a corporation may adjudicate *all* claims against that corporation — even those entirely unrelated to the defendant's contacts with the state.").  Specific jurisdiction requires a connection between the forum exercising jurisdiction over the defendant and the underlying controversy that gave rise to the claim.  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) ("Specific jurisdiction . . . depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation." (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011))).  Under New York law, courts exercise specific jurisdiction pursuant to New

---

[32]  The SPE Defendants do not challenge the Court's jurisdiction over Sony Pictures Entertainment, Inc.

York Civil Practice Law and Rules ("N.Y. C.P.L.R.") § 302 and general jurisdiction pursuant to

N.Y. C.P.L.R. § 301.

### 1.    Specific jurisdiction

The SPE Defendants argue that the Court lacks specific jurisdiction over Overbrook

Entertainment, Inc., Overbrook Entertainment, LLC, and Smith because the Feature Film does

not have ties to New York sufficient to support specific personal jurisdiction.  (SPE Defs.' Mem.

17–25.)

Plaintiffs allege that the Court has specific jurisdiction over the SPE Defendants because

they purposefully availed themselves of the privilege of conducting business in New York by

marketing and promoting the Feature Film on IMDB and through "other means" to New York

consumers, (Am. Compl. ¶ 17), and because they "bought the movie rights" to make the Feature

Film from New York residents, "entered into agreements and contracts" with riders from New

York who appear in the Feature Film, and have produced, advertised, and marketed other films

and music to consumers in New York, (*see* Pls.' Opp'n to SPE Defs.' Mot. 17–18).

Under N.Y. C.P.L.R. § 302(a), the New York long-arm statute, there are four bases for

extending specific personal jurisdiction over a non-domiciliary defendant.  *Bah v. Apple Inc.*, No.

19-CV-3539, 2020 WL 614932, at *4 (S.D.N.Y. Feb. 10, 2020); *see also Best Van Lines, Inc. v.

Walker*, 490 F.3d 239, 244 (2d Cir. 2007) (describing bases for jurisdiction under the New York

long-arm statute).  Section 302(a)(1) permits courts to "exercise personal jurisdiction over [a]

non-domiciliary" where the "cause of action aris[es] from any of the acts enumerated in th[e]

[statute]" and the defendant "transacts any business within the state or contracts anywhere to

supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1); *see also Kurzon LLP v.

Thomas M. Cooley L. Sch.*, No. 12-CV-8352, 2014 WL 2862609, at *5 (S.D.N.Y. June 24, 2014)

103

(defining circumstances under which a court may exercise specific personal jurisdiction over non-domiciliary defendant pursuant to section 302(a)(1)).  In addition, even if a plaintiff can establish jurisdiction under New York law, the court must also determine whether the "exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution."  *Licci IV*, 732 F.3d at 168 (first citing *Best Van Lines, Inc.*, 490 F.3d at 242; and then citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"In order to evaluate whether personal jurisdiction exists pursuant to [N.Y.] C.P.L.R. § 302(a)(1), [the court] must determine: (1) whether [the defendants] transacted any business in New York, and, if so, (2) whether there was an articulable nexus, or substantial relationship, between the [conduct] and the actions that occurred in New York."  *Penachio v. Benedict*, 461 F. App'x 4, 5 (2d Cir. 2012) (citing *Best Van Lines, Inc.*, 490 F.3d at 246); *see also Yih v. Taiwan Semiconductor Mfg. Co.*, 815 F. App'x 571, 574 (2d Cir. 2020) (quoting N.Y. C.P.L.R. § 302(a)(1)); *Licci IV*, 732 F.3d at 168 (stating that section 302(a)(1) has two prongs: (1) the defendant must "have transacted business within the state," either itself or through an agent, and (2) the cause of action "must arise from that business activity" (quoting *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006))).  Under New York state law, a defendant's lack of physical presence in the state is not dispositive of whether he transacts business within the state, "so long as the defendant's activities [within the state] were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quoting *Deustche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006)); *see also Licci ex. rel. Licci v. Lebanese Can. Bank, SAL (Licci II)*, 673 F.3d 50, 61 (2d Cir. 2012) ("A defendant need not physically enter New York State in order to

transact business, 'so long as the defendant's activities here were purposeful.'" (quoting
*Fischbarg*, 9 N.Y.3d at 380)); *C. Mahendra (NY) LLC v. Nat'l Gold & Diamond Ctr., Inc.*, 3
N.Y.S.3d 27, 30 (App. Div. 2015) ("The statute applies where the defendant's New York
activities were purposeful and substantially related to the claim." (citing *D & R Glob. Selections,
S.L. v. Piñeiro*, 934 N.Y.S.2d 19, 20 (App. Div. 2011))).  "Purposeful activities are those with
which a defendant, through volitional acts, avails itself of the privilege of conducting activities
within the forum State, thus invoking the benefits and protections of its laws."  *Eades v.
Kennedy, PC L. Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (quoting *Fischbarg*, 9 N.Y.3d at 380).

In determining whether a defendant is purposefully transacting business in New York, a
court must look at "the quality of the defendant['s] New York contacts."  *Fischbarg*, 9 N.Y.3d at
380; *see Best Van Lines, Inc.*, 490 F.3d at 246 ("Courts look to 'the totality of the defendant's
activities within the forum' to determine whether a defendant has 'transact[ed] business' in such
a way that it constitutes 'purposeful activity' satisfying the first part of the test." (alteration in
original) (citation omitted) (first quoting *Sterling Nat'l Bank & Tr. Co. of N.Y. v. Fidelity Mortg.
Invs.*, 510 F.2d 870, 873 (2d Cir. 1975); and then citing *Longines-Wittnauer Watch Co. v. Barnes
& Reinecke, Inc.*, 15 N.Y.2d 443, 457 (1965))); *see also Licci II*, 673 F.3d at 62 (noting that a
single act or "an ongoing course of conduct or relationship in the state may" suffice to establish
jurisdiction.  "[M]ore limited contacts regarding services to be performed outside New York
would not satisfy [section] 302(a)(1)."  *Yih*, 815 F. App'x at 574 (citing *Fischbarg*, 9 N.Y.3d at
380).

To satisfy the "arising from" prong, a plaintiff must show that there is a "substantial
relationship" or "articulable nexus" between the claim asserted and the actions taken in New
York.  *Best Van Lines, Inc.*, 490 F.3d at 246; *see also Licci ex rel. Licci v. Lebanese Can. Bank,*

*SAL (Licci III)*, 20 N.Y.3d 327, 341 (2012) ("[W]here at least one element [of the cause of action pleaded] arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under [section 302(a)(1)].").

Plaintiffs' allegations are insufficient to support the exercise of specific jurisdiction. Although Plaintiffs allege that the SPE Defendants promoted their film on IMDB, passively making information available to viewers on the internet does not constitute "transacting business" in the forum state. *See, e.g.*, *Yih*, 815 F. App'x at 573 ("[P]assive websites, 'which merely impart information without permitting a business transaction, are generally insufficient to establish personal jurisdiction.'" (quoting *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014))); *Best Van Lines, Inc.*, 490 F.3d at 253 (finding that comments in defamatory article on internationally accessible website were not purposefully directed at New Yorkers and collecting cases); *M. Shanken Commc'ns, Inc. v. Variant Events, LLC*, No. 10-CV-4747, 2010 WL 4159476, at *6 (S.D.N.Y. Oct. 7, 2020) (finding that the defendant's website is "passive" because "it makes information available to viewers but does not permit an exchange of information" and thus is analogous to "an advertisement in a nationally-available magazine or newspaper" (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000))); *Paterno v. Laser Spine Inst.*, 973 N.Y.S.2d 681, 686–87 (App. Div. 2013) (finding no jurisdiction under section 302(a)(1) based on website that "was informational only and, thus, 'passive' in nature" because this does not show that the defendant purposefully directed its activity in a substantial way into the forum state), *aff'd*, 24 N.Y.3d 370 (2014).

In addition, although Plaintiffs assert in their opposition that the SPE Defendants "bought the movie rights" from New York residents, they do not allege any facts that would support a conclusion that the SPE Defendants transacted business in New York in buying the rights.  For

example, they do not allege that the SPE Defendants initiated the negotiations, negotiated, or

executed a contract for the movie rights in New York, and the SPE Defendants' declarations

indicate they did not travel to New York in connection with the film.  (*See* Decl. of Will Smith in

Supp. of SPE Defs.' Mot. ¶ 7, Docket Entry No. 150; Decl. of Overbrook Ent., Inc. in Supp. of

SPE Defs.' Mot. ¶ 5, Docket Entry No. 151); *Lear v. Royal Caribbean Cruises Ltd.*, No. 20-CV-

4660, 2021 WL 1299489, at *6–9 (S.D.N.Y. Apr. 7, 2021) (finding no jurisdiction where

company "hired a New York resident for employment outside of the State," contractual

relationship was brief, "employment contract was negotiated and executed solely via telephone

and email" and "no representative of [the company] traveled to New York," and there was "no

evidence of any payment made to a New York bank" or of a "New York choice of law").

Finally, although Plaintiffs argue that the SPE Defendants have marketed other films and music

in New York, Plaintiffs' claims do not arise from this alleged conduct, either.  *See, e.g.*, *Licci IV*,

732 F.3d at 168 (noting that the cause of action must "arise from" the business transacted).

### 2.   General jurisdiction

The SPE Defendants argue that the Court lacks general jurisdiction over Overbrook

Entertainment, Inc., Overbrook Entertainment, LLC, and Smith because they lack the requisite

contacts with the forum that would support the assertion of general jurisdiction.  (SPE Defs.'

Mem. 17–25; SPE Defs.' Reply 1.)

Based on Plaintiffs' allegations of the SPE Defendants' contacts with New York,

including marketing and promoting the Feature Film to New York consumers, (Am. Compl.

¶ 17), buying the movie rights to make the Feature Film from New York residents, entering into

agreements and contracts with riders from New York, and producing, advertising, and marketing

other films and music to consumers in New York, (*see* Pls.' Opp'n to SPE Defs.' Mot. 17–18),

the Court understands Plaintiffs to also be asserting general jurisdiction over the SPE Defendants

pursuant to N.Y. C.P.L.R. § 301.

      "For an individual, the paradigm forum for the exercise of general jurisdiction is the

individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is

fairly regarded as at home." *SPV Osus, Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018)

(quoting *Goodyear Dunlop*, 564 U.S. at 923).  To establish general jurisdiction over a foreign

corporation, a plaintiff must set forth facts showing that the "corporation's affiliations with the

State are so continuous and systematic as to render it essentially at home in the forum." *Chufen*

*Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 498 (2d Cir. 2020) (quoting *Daimler AG v.*

*Bauman*, 571 U.S. 117, 127 (2014)); *Yih*, 815 F. App'x at 573 ("[A] court sitting in New York

has general personal jurisdiction over a defendant company that has 'engaged in such a

continuous and systematic course of doing business [in New York] that a finding of its presence

in [New York] is warranted.'" (second and third alterations in original) (quoting *Landoil Res.*

*Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 33 (1990)); *Johnson v. UBS AG*, 791

F. App'x 240, 243 (2d Cir. 2019) ("Courts 'may assert general jurisdiction over foreign (sister-

state or foreign-country) corporations to hear any and all claims against them when their

affiliations with the State are so continuous and systematic as to render them essentially at home

in the forum State.'" (quoting *Daimler AG*, 571 U.S. at 127)).  "[E]xcept in a truly exceptional

case, a corporate defendant may be treated as essentially at home only where it is incorporated or

maintains its principal place of business." *Chufen Chen*, 954 F.3d at 498 (quoting *Brown v.*

*Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016)); *Johnson*, 791 F. App'x at 243

("Aside from the truly exceptional case, a corporation is at home and subject to general

jurisdiction only in its place of incorporation or principal place of business." (quoting *SPV Osus Ltd.*, 882 F.3d at 343)).

Overbrook Entertainment, Inc., Overbrook Entertainment, LLC, and Smith are not domiciled or incorporated in New York, New York is not their principal place of business, and there are no other allegations of extensive ties to support the exercise of general jurisdiction. *See Daimler AG*, 571 U.S. at 136–39 (explaining that general jurisdiction may be exercised over a business where it is "at home," generally meaning "where it is incorporated or has its principal place of business," and that "continuous and systematic" contacts with a forum are not by themselves sufficient for general jurisdiction); *Brown*, 814 F.3d at 629 (finding no general jurisdiction over firm with permanent physical presence in state, reasoning that after *Daimler*, "when a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily unlikely to add up to an 'exceptional case'" (citing *Daimler AG*, 571 U.S. at 140 n.20)); *Sonera Holding B.V.*, 750 F.3d at 226 (holding that negotiations, transactions, and an office in New York did not support exercise of general jurisdiction).

Because the Court lacks both specific and general jurisdiction over Overbrook Entertainment, Inc., Overbrook Entertainment, LLC, and Smith, the Court grants the SPE Defendants' motion to dismiss for lack of personal jurisdiction over these Defendants and dismisses the claims against them without prejudice. Even assuming the Court had personal jurisdiction over Overbrook Entertainment, Inc., Overbrook Entertainment, LLC, and Smith, Plaintiffs' claims against these Defendants nevertheless fail for the reasons discussed below with respect to Sony Pictures Entertainment, Inc.

**ii.    The Feature Film does not infringe Plaintiffs' copyrights**

The SPE Defendants argue that Plaintiffs allege only three similarities between their documentaries and the Feature Film with any degree of specificity, and that these similarities do not constitute copyright infringement.  (SPE Defs.' Mem. 3–6.)  In support, the SPE Defendants argue that the similarities — (1) "young riders who want to join a motorcycle club," (2) the "use of skilled motorcycle stunt riders," and (3) "a setting in Baltimore" — are *scènes à faire* in any film about motorcyclists that are neither unique nor original, nor subject to any copyright protection.  (*Id.* at 3.)  The SPE Defendants also argue that (1) "[u]nder copyright law, no one can own the general concept of a film about a kid who aspires to join a Baltimore urban dirt bike club," (SPE Defs.' Reply 1); (2) the combination of unprotectable elements is not entitled to protection because their arrangement is not unique, (*id.* at 4–5); (3) Plaintiffs have not shown any real similarities, and therefore their argument that they needed to show only representative infringement fails, (*id.* at 3–4); and (4) they are not responsible for vicarious infringement because they did not supervise or control the 2013 Documentary, (*id.* at 5).

Plaintiffs argue that they have sufficiently alleged representative acts of infringement and that the SPE Defendants have profited from their infringement.  (Pls.' Opp'n to SPE Defs.' Mot. 8–10.)  In addition, Plaintiffs argue that non-protected elements are protected when viewed as a whole.  (*Id.* at 10–11.)

As discussed above in addressing the Joint Moving Defendants' motion, to the extent the plot of Plaintiffs' works can be understood as one of inspiring young riders to join the 12 O'Clock Boyz, this is a general plot idea that is not protectible beyond the manner in which it is expressed, and, in any event, the Feature Film's concept of a young boy who wants to join a dirt-bike group does not appear in Plaintiffs' works — it only appears in the 2013 Documentary,

which the SPE Defendants licensed from the Nathan Defendants.  *See supra* Section II.b.i.2.A.4.

In addition, the dirt-bike riders in the 2001 and 2003 Documentaries are stock characters and

thus are not protectible elements of Plaintiffs' works, as the concept of skilled riders who

perform daring stunts flows from the theme of a work about dirt-bike riding.  *See supra* Section

II.b.i.2.A.2.  Lastly, the setting of Plaintiffs' works in Baltimore is unprotectible both because it

is a *scène à faire* that necessarily flows from the fact that the works are about the 12 O'Clock

Boyz, to whom the Feature Film gives the fictional name the "Midnight Clique," and because it

is a fact in the public domain that the 12 O'Clock Boyz are from Baltimore and ride there.  *See*

*supra* Section II.b.i.2.A.1; *Walker*, 784 F.2d at 50 (holding that a police story about police

officers from the 41st Precinct that takes place in the South Bronx, where the 41st Precinct is

located, "cannot be copyrightable" because these "are real places known to the public").

Moreover, because neither the 2013 Documentary nor the Feature Film infringes on Plaintiffs'

copyrights, the SPE Defendants are not liable for vicarious or contributory infringement.  *Metro-*

*Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 914 (2005) ("One infringes

contributorily by intentionally inducing or encouraging direct infringement, and infringes

vicariously by profiting from direct infringement while declining to exercise the right to stop or

limit it.").

     Accordingly, the Court grants the SPE Defendants' motion to dismiss Plaintiffs'

copyright infringement claims as to Sony Pictures Entertainment, Inc.

### iii.   Plaintiffs' trademark infringement claims fail

The SPE Defendants argue that none of the four instances of trademark infringement

Plaintiffs allege are a valid basis for a claim.[33]  (SPE Defs.' Mem. 9–11.)  In support, they argue

that (1) stray references to "12 O'Clock Boys" or "Twelve" as a potential title of the film do not

give rise to a trademark claim because Plaintiffs have not plausibly alleged that these references

are likely to cause consumer confusion and they are not explicitly misleading under the *Rogers*

test discussed above, (*id.* at 11–12); (2) such uses of these phrases constitute fair use because the

phrases are used descriptively rather than to identify the SPE Defendants' products, (SPE Defs.'

Reply 6 n.7); (3) casting riders in the "Midnight Clique" from groups other than the 12 O'Clock

Boyz does not constitute trademark dilution because they are not making use of the mark in

commerce, (SPE Defs.' Mem. 14); and (4) Plaintiffs have abandoned their trademark claims by

failing to respond to the SPE Defendants' arguments in their opposition, (SPE Defs.' Reply 6

n.7).

Plaintiffs bring claims of trademark infringement under section 32(1) of the Lanham Act,

15 U.S.C. § 1114(1) based on the SPE Defendants' use and continued use of "reproductions,

copies, and colorable imitations of Plaintiffs' registered 12 O'Clock Boyz [m]arks" in

connection with advertising of the Feature Film, (Am. Compl. ¶ 227); trademark infringement,

false designation of origin, and unfair competition under section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a), based on the SPE Defendants' use of the phrase "12 O'Clock Boys" as the title

of the Feature Film, (*id.* ¶ 229); trademark dilution under section 43(c) of the Lanham Act, 15

---

[33]  The SPE Defendants request that the Court take judicial notice of a list of films with similar titles.  Plaintiffs dispute whether judicial notice is appropriate.  (*See* Pls.' Objs. to Defs.' Request for Jud. Notice, Docket Entry No. 143.)  The Court declines to take judicial notice of the requested items.

U.S.C. § 1125(c), based on the SPE Defendants "casting random riders" as 12 O'Clock Boys, (*id.* ¶ 233); and trademark infringement under Maryland Code Business Regulation § 1-414 *et seq.*, (*id.* ¶ 244); trademark infringement, false advertising, and unfair competition under the Maryland common law, (*id.* ¶¶ 246–248); and contributory and vicarious trademark infringement under federal law and the Maryland common law, (*id.* ¶ 251).  In support of their claims, Plaintiffs allege that the SPE Defendants (1) created or authorized the creation of a Wikipedia page stating that the film would be called 12 O'Clock Boys, (2) created or authorized the creation of an IMDB page that listed "12 O'Clock Boys" as a working title in 2018, (3) authorized advertising of their film on Twitter and other social media platforms using Plaintiffs' mark, and (4) changed the Wikipedia entry in 2019 to refer to the film as "Twelve." (*Id.* ¶¶ 149–151, 159.)  Plaintiffs do not address the SPE Defendants' arguments but argue instead that their 12 O'Clock Boyz mark has acquired distinctiveness and is "well known in the dirt-bike culture."  (Pls.' Opp'n to SPE Defs.' Mot. 15–16.)

As discussed above, in order to prevail on a trademark infringement claim, a plaintiff "must demonstrate that (1) 'it has a valid mark that is entitled to protection' and that (2) the defendant's 'actions are likely to cause confusion with [that] mark'" under the *Polaroid* factors. *Tiffany & Co.*, 971 F.3d at 84 (alteration in original) (quoting *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)); *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 43 (2d Cir. 2020) (same); *Guthrie Healthcare Sys.*, 826 F.3d at 37 (same).  In addition, the First Amendment bars claims based on a title under the Lanham Act and its state-law counterparts "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Twin Peaks Prods.*, 996 F.2d at 1379 (quoting *Rogers*, 875 F.2d at 999).

The four bases Plaintiffs allege for their trademark claims all relate to internet references to "Twelve" and "12 O'Clock Boys" as potential titles for the Feature Film, which was ultimately titled "Charm City Kings."  (*See, e.g.*, SPE Defs.' Reply 5.)  The SPE Defendants' use of "Twelve" as a potential title cannot serve as the basis for Plaintiffs' trademark claims, as Plaintiffs do not allege that they have a valid trademark in the word "Twelve."  Nor can their use of the phrase "12 O'Clock Boys" as a potential title on Wikipedia, IMDB, or in advertising for the film[34] serve as a basis for their trademark claims, as such claims are barred by the First Amendment under *Rogers*.  The SPE Defendants' use of the phrase "12 O'Clock Boys" as a potential title meets the low threshold for artistic relevance to the film's content, as the film is an adaptation of the 2013 Documentary.  In addition, the title is not explicitly misleading as to the source or content of the Feature Film under the *Polaroid* factors.  Although "12 O'Clock Boys" and "12 O'Clock Boyz" are similar, the SPE Defendants' actions are not likely to cause confusion because: (1) Plaintiffs' mark is not particularly strong; (2) the parties' products are both films and thus are in proximate areas of commerce, making the likelihood that Plaintiffs will bridge the gap irrelevant; (3) Plaintiffs do not allege actual consumer confusion; (4) Plaintiffs have not plausibly alleged bad faith, as the SPE Defendants' use of the term is attributable to the fact that the Feature Film is an adaptation of the 2013 Documentary; (5) as a studio feature film, the Feature Film will be a higher quality production than Plaintiffs' documentaries; and (6) the relevant population of consumers of the Feature Film — filmgoers —

---

[34]  Plaintiffs allege that this advertising is contained in Exhibit 59 to the Amended Complaint.  Exhibit 59 consists of Twitter posts by third-parties retweeting and commenting on the announcement that rap artist Meek Mill was going to star in a feature film adaptation of "12 O'Clock Boys, an upcoming adaptation of Lotfy Nathan's 2013 documentary of the same name." (*See generally* Social Media Posts, annexed to Am. Compl. as Ex. 59, Docket Entry No. 99-2, at 81–152.)

are not likely to confuse the source of the Feature Film and Plaintiffs' documentaries, particularly given that both include explicit source designations.  Because there is not a "particularly compelling" likelihood of confusion under the *Polaroid* factors, the use of the phrase "12 O'Clock Boys" as a potential title is not explicitly misleading as to the source or content of the Feature Film.  Accordingly, Plaintiffs' federal and state law claims for trademark infringement, false designation of origin, and unfair competition are barred by the First Amendment.[35]  *See Medina*, 2016 WL 3906714, at *12 (granting motion to dismiss federal and state law trademark claims because "the work is a film, and . . . its title is artistically relevant to its content and not explicitly misleading as to any association with plaintiff's music duo," and "[g]iven the First Amendment values at interest, the Lanham Act and its state law counterparts have been and must be construed not to reach such expression" (first citing *Rogers*, 875 F.2d at 998; and then citing *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 282 (S.D.N.Y. 1992))); *see also Mid S. Bldg. Supply of Md., Inc. v. Guardian Door & Window, Inc.*, 156 Md. App. 445, 460 (2004) ("[T]rademark infringement cases under either the Maryland statute or the Lanham Act are based on the same legal theory and require the same proof."); *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 460, 466 (D. Md. 2002) ("The test for trademark infringement and unfair competition under state law is the same as the test under the Lanham Act.  . . . Moreover, the test for common law trademark infringement and unfair competition under Maryland law is the same as that under the Lanham Act, namely proof of the likelihood of confusion."), *aff'd*, 91 F. App'x 880 (4th Cir. 2004).

---

[35]  Because the Court grants the SPE Defendants' motion as to Plaintiffs' trademark claims on these grounds, the Court declines to consider the SPE Defendants' additional arguments that their use of the phrase "12 O'Clock Boys" as a potential title is fair use and that Plaintiffs have abandoned their trademark claims by failing to respond to the SPE Defendants' arguments.

Finally, as discussed above, because Plaintiffs fail to state claims of direct trademark infringement, their claims of contributory and vicarious infringement also fail.  *See, e.g.*, *Dish Network L.L.C.*, 2019 WL 5781945, at *3.  In addition, because the 12 O'Clock Boyz mark is not sufficiently famous to be the subject of a dilution claim, this claim also fails.  *See Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, No. 14-CV-7170, 2014 WL 5585339, at *7 (S.D.N.Y. Oct. 30, 2014).

Accordingly, the Court grants the SPE Defendants' motion and dismisses Plaintiffs' trademark claims against Sony Pictures Entertainment, Inc. under federal and state law.

### iv.   Plaintiffs fail to state an unjust enrichment claim

The SPE Defendants argue that Plaintiffs' cause of action for unjust enrichment is preempted by federal law,[36] is simply a repetition of their other claims and must fail because those claims are without merit, and fails to state a claim because Plaintiffs do not allege that they had a relationship with the SPE Defendants or undertook activities for the SPE Defendants' benefit.  (SPE Defs.' Mem. 14–15.)

---

[36]  Because Plaintiffs' unjust enrichment claim with respect to the SPE Defendants concerns a claim of trademark infringement, not copyright infringement, the preemption rules of the Copyright Act are inapplicable.  *See, e.g.*, *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 34 (D. Conn. 2009) (finding that Copyright Act did not preempt state law claims to the extent they asserted a violation of the plaintiffs' trademark rights), *aff'd*, 410 F. App'x 362 (2d Cir. 2010); *see also Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 454 (S.D.N.Y. 2014) ("[T]he Copyright Act does not fully preempt state law claims where the claims also seek to protect trademark rights."); *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10-CV-1615, 2012 WL 1107648, at *23 (S.D.N.Y. Mar. 30, 2012) ("Unlike the Copyright Act, however, the Lanham Act does not preempt state law.  [The plaintiff's] unjust enrichment claim is thus not preempted to the extent that it asserts [the defendant's] violation of [the plaintiff's] trademark rights."), *adhered to on reconsideration*, 2012 WL 2929392 (S.D.N.Y. July 18, 2012).

116

Plaintiffs allege that the SPE Defendants unjustly enriched themselves through use of the 12 O'Clock Boyz mark, (Am. Compl. ¶¶ 266–270), but do not respond to the SPE Defendants' arguments.

As discussed above, a choice of law analysis is necessary with respect to Plaintiffs' unjust enrichment claim, and the interest analysis test applies because this claim sounds in tort. However, the parties have not briefed the choice of law issue, and it is unclear from Plaintiffs' allegations where the allegedly tortious conduct underlying this claim — the SPE Defendants' alleged use of Plaintiffs' marks "to promote and advertise" the Feature Film — occurred.  (Am. Compl. ¶ 266.)  However, Plaintiffs fail to state an unjust enrichment claim under both Maryland and New York law.[37]

With respect to Maryland law, Plaintiffs have failed to plausibly allege that the SPE Defendants had an "appreciation or knowledge" of the benefit allegedly conferred on them by their use of the phrase "12 O'Clock Boys" in advertising the Feature Film.  Plaintiffs have also failed to plausibly allege that it would be inequitable to allow the SPE Defendants to "retain this benefit without the payment of its value," as Plaintiffs have failed to state a claim that the SPE Defendants' use of the phrase infringed their mark and that their retention of any benefits due to the use of the phrase "12 O' Clock Boys" is therefore "unjust."  *MAS Assocs., LLC*, 475 Md. at 380 n.18 (quoting *Hill*, 402 Md. at 295); *see also Smoot v. Simmons*, No. 05-CV-3106, 2006 WL 1999203, at *7 (D. Md. July 14, 2006) ("[The] [p]laintiff has failed to allege that [the]

---

[37]  Although the SPE Defendants reside in California, "there is no cause of action in California for unjust enrichment."  *Everett v. Mountains Recreation & Conservation Auth.*, 239 Cal. App. 4th 541, 553 (2015) (quoting *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2006); *see also Graham-Sult v. Clainos*, 738 F.3d 1131, 1156 (9th Cir. 2013) (finding, absent a cause of action in California for unjust enrichment, that "[the] [p]laintiffs' Tenth Cause of Action therefore fails to state a claim, and the district court properly dismissed it without leave to amend").

117

[d]efendants either appreciated or knew about [the plaintiff's] designs, or that [the] [d]efendants accepted and retained any benefits associated with those designs.").  With respect to New York law, as the SPE Defendants argue, Plaintiffs have not alleged a relationship between themselves and the SPE Defendants.  *See, e.g.*, *Ga. Malone & Co.*, 19 N.Y.3d at 517–18 ("[T]he relationship between [the plaintiff] and [the defendant] is too attenuated because they simply had no dealings with each other."); *Mandarin Trading Ltd.*, 16 N.Y.3d at 182 ("[U]nder the facts alleged, there are no indicia of an enrichment that was unjust where the pleadings failed to indicate a relationship between the parties that could have caused reliance or inducement.").

Accordingly, Plaintiffs fail to state an unjust enrichment claim based on the SPE Defendants' allegedly infringing use of their mark.

### d.   Default judgment motions

Plaintiffs move for default judgment against Mission Film, Inc., and Mission Film Productions.

In her answer to the Amended Complaint, Mochin states that she registered the trade name Mission Film Productions but does not conduct business under that name.  (Mochin Answer, Docket Entry No. 132; *see also* Mochin Letter dated Dec. 10, 2019, Docket Entry No. 138.)  In addition, she states that a trade name is not suable under Maryland law.  (Mochin Answer 1.)  Mochin also disclaims involvement in making or distributing the 2013 Documentary and asks that the case be dismissed.  (*Id.* at 1–2.)  Several of the Nathan and Oscilloscope Defendants oppose default judgment on the grounds that Plaintiffs have not shown they are entitled to default judgment as a matter of law, and ask, in the alternative, that the Court decline to grant default judgment until the merits of this multi-defendant case have been resolved.  (*See*

Nathan and Oscilloscope Defs.' Mem. in Opp'n to Pls.' Default J. Mots.; Nathan and

Oscilloscope Defs.' Second Mem. in Opp'n to Pls.' Default J. Mots.)

Pursuant to Rule 55 of the Federal Rules of Civil Procedure, there is "a 'two-step

process' for the entry of judgment against a party who fails to defend: first, the entry of a default,

and second, the entry of a default judgment." *City of New York v. Mickalis Pawn Shop, LLC*,

645 F.3d 114, 128 (2d Cir. 2011) (citing *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

"The entry of a default, while establishing liability, 'is not an admission of damages.'" *Id.* at 128

(quoting *Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009)).  "[T]he admission of factual

allegations does not amount to an admission of liability; the court is still 'required to determine

whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law.'" *Isigi*

*v. Dorvilier*, 795 F. App'x 31, 33–34 (2d Cir. 2019) (second and third alterations in original)

(quoting *Finkel*, 577 F.3d at 84).  "[T]he court may, on plaintiffs' motion, enter a default

judgment if liability is established as a matter of law when the factual allegations of the

complaint are taken as true." *Bricklayers & Allied Craftworkers Loc. 2 v. Moulton Masonry &*

*Const., LLC*, 779 F.3d 182, 187 (2d Cir. 2015) (per curiam) (citing *Mickalis Pawn Shop, LLC*,

645 F.3d at 137).  "A default . . . only establishes a defendant's liability if those allegations are

sufficient to state a cause of action against the defendant." *Taizhou Zhongneng Imp. & Exp. Co.*

*v. Koutsobinas*, 509 F. App'x 54, 56 (2d Cir. 2013); *see also LG Funding, LLC v. Fla. Tilt, Inc.*,

No. 15-CV-631, 2015 WL 4390453, at *2 (E.D.N.Y. July 15, 2015) ("To determine whether the

default judgment should issue, the [c]ourt examines whether 'the factual allegations, accepted as

true, provide a proper basis for liability and relief.'" (quoting *Rolls-Royce PLC v. Rolls-Royce*

*USA, Inc.*, 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010))).  However, the Second Circuit has an

"oft-stated preference for resolving disputes on the merits," *Enron Oil Corp. v. Diakuhara*, 10

F.3d 90, 95 (2d Cir. 1993) (first citing *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983); and then citing *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981)), and therefore "[a] plaintiff is not entitled to default judgment as a matter of right, merely because a party has failed to appear or respond," *LG Funding, LLC*, 2015 WL 4390453, at *2 (citing *Erwin DeMarino Trucking Co. v. Jackson*, 838 F. Supp. 160, 162 (S.D.N.Y. 1993)).

The Court denies Plaintiffs' motion for default judgment because, among other grounds, Plaintiffs have not demonstrated their entitlement to relief on the merits. The alleged involvement of Mission Film Productions and Mission Film, Inc. in producing and distributing the 2013 Documentary is the same as that of the Nathan Defendants. (Am. Compl. ¶¶ 81–84.) Therefore, for the reasons that the Amended Complaint must be dismissed against the Nathan Defendants, the Court denies Plaintiffs' motions for default judgment.[38]

### e. Leave to amend

The Joint Moving Defendants and the SPE Defendants argue that leave to amend should be denied. (Defs.' Joint Reply 1–2; SPE Defs.' Mem. 15.)

Plaintiffs argue that they should be granted leave to amend, relying on their pro se status. (Pls.' Opp'n to Defs.' Joint Mot. 5; Pls.' Opp'n to SPE Defs.' Mot. 6–7.)

While "[a] *pro se* complaint 'should not be dismissed without the [c]ourt's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated,'" *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013)

---

[38] In addition, a defendant must be "a separate legal entity with the capacity to be sued." *Schiavone v. Fortune*, 477 U.S. 21, 23 n.2 (1986). As noted above, Mochin alleges that Mission Film Productions is a trade name. (Mochin Answer.) At the motion to dismiss stage, the Court cannot rely on Mochin's assertion but notes that a trade name is not a legal entity. *See Mattel, Inc. v. Adventure Apparel*, No. 00-CV-4085, 2001 WL 286728, at *5 (S.D.N.Y. Mar. 22, 2001) (explaining that a trade name is not a legal entity).

(quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)), "[l]eave to amend may properly be denied if the amendment would be futil[e]," *id.* at 140 (second alteration in original) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224–25 (2d Cir. 2017) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)); *see also Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) ("[An] [a]mendment is futile if it fails 'to cure prior deficiencies.'" (quoting *Panther Partners Inc.*, 681 F.3d at 119)).  "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss."  *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d. Cir. 2015).  "If the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'"  *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Plaintiffs have already been granted leave to amend once.  In addition, the problems with their claims against the Joint Moving Defendants, the SPE Defendants, and Mission Film, Inc. and Mission Film Productions are substantive.  With respect to the Joint Moving Defendants, Plaintiffs' copyright and trademark claims are either time-barred or barred by laches, and they also fail on the merits, and their right of publicity and unjust enrichment claims are preempted by the Copyright Act.  With respect to the SPE Defendants, Plaintiffs copyright claims fail as a matter of law; they cannot state their trademark claims based on the SPE Defendants' use of the phrases "Twelve" and "12 O'Clock Boys" as potential titles because they do not own a copyright

121

in the phrase "Twelve" and their claims based on the phrases "Twelve" and "12 O'Clock Boys"
are also barred by the First Amendment under *Rogers*; and they cannot state their trademark
dilution claim because the mark is not famous enough to support this claim, or state their unjust
enrichment claim, which is premised on their trademark claims.  Lastly, with respect to Mission
Film, Inc., and Mission Film Productions, because the allegations and claims against them mirror
those against the Nathan Defendants, and the issues with those claims thus also mirror the issues
with the claims against the Nathan Defendants, amendment would not help Plaintiffs establish
the defaulting Defendants' liability for the claims alleged.  Accordingly, the Court declines to
grant Plaintiffs leave to amend a second time as futile.  *Cuoco*, 222 F.3d at 112.

### III.   Conclusion

        For the foregoing reasons, the Court stays the action against Blair pursuant to 11 U.S.C.
§ 362(a).  The Court grants the Joint Moving Defendants' joint motion for summary judgment on
Plaintiffs' copyright claims, right of publicity and unjust enrichment claims, and trademark
claims; denies Plaintiffs' application for declaratory judgments that the Nathan Defendants'
copyrights are invalid; denies the Joint Moving Defendants' request for dismissal under Rule 19;
grants the SPE Defendants' motion to dismiss the claims against Overbrook Entertainment, Inc.,
Overbrook Entertainment, LLC, and Will Smith without prejudice for lack of personal
jurisdiction and to dismiss the copyright, trademark, and unjust enrichment claims against Sony
Pictures Entertainment, Inc., for failure to state a claim; denies Plaintiffs' motions for default
judgments against Mission Film, Inc., and Mission Film Productions and dismisses Plaintiffs'
claims against Mission Film Productions, which is not a suable entity, without prejudice; and
denies Plaintiffs leave to amend as futile.  The Court also denies Plaintiffs' motion to strike the

Oscilloscope Defendants' motion to dismiss, portions of the joint motion to dismiss pertaining to them, and their counterclaims.

Dated: August 26, 2022
        Brooklyn, New York

                    SO ORDERED:

                       s/ MKB

                    _____

                    MARGO K. BRODIE
                    United States District Judge